ASSET PURCHASE AGREEMENT

(LOT 1)

DATED AS OF NOVEMBER [●], 2025

BY AND BETWEEN

BARROW SHAVER RESOURCES COMPANY, LLC

AS SELLER,

AND

TEXOIL INVESTMENTS, LLC,

AS BUYER

**THIS DRAFT IS STRICTLY CONFIDENTIAL AND FOR DISCUSSION PURPOSES ONLY. CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY AN OFFER, CONTRACT, OR ANY OTHER LEGAL OBLIGATION OF ANY TYPE OR NATURE. NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES.**

# TABLE OF CONTENTS

**ARTICLE 1 DEFINITIONS**     **2**
1.1    Definitions. ........................................................................................................ 2
1.2    Other Definitions and Interpretive Matters. .................................................... 13

**ARTICLE 2 PURCHASE AND SALE**     **14**
2.1    Purchase and Sale. ............................................................................................ 14
2.2    Excluded Assets. .............................................................................................. 15
2.3    Assumed Liabilities. ......................................................................................... 17
2.4    Excluded Liabilities. ......................................................................................... 18
2.5    Assigned Contracts and Cure Costs. ............................................................... 18
2.6    Assignment of Assets Subject to Consent Requirements. ............................... 19
2.7    NETX Litigation. .............................................................................................. 20
2.8    Further Assurances. .......................................................................................... 20
2.9    Effective Time. ................................................................................................. 20

**ARTICLE 3 PURCHASE PRICE**     **21**
3.1    Purchase Price. ................................................................................................. 21
3.2    Deposit. ............................................................................................................. 21
3.3    Adjustments to Purchase Price. ....................................................................... 22
3.4    Preliminary Settlement Statement; Closing Amount. ...................................... 23
3.5    Final Settlement Statement; Final Purchase Price ........................................... 24

**ARTICLE 4 CLOSING**     **26**
4.1    Closing Date. .................................................................................................... 26
4.2    Payment on the Closing Date. .......................................................................... 26
4.3    Buyer's Deliveries. .......................................................................................... 26
4.4    Seller's Deliveries. ........................................................................................... 27

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLER**     **27**
5.1    Organization and Good Standing. .................................................................... 28
5.2    Authority; Validity; Consents. ......................................................................... 28
5.3    Permits. ............................................................................................................. 28
5.4    Wells; Plug and Abandon Notice. ................................................................... 28
5.5    Imbalances. ....................................................................................................... 28
5.6    AFEs. ................................................................................................................ 29
5.7    Hedging. ........................................................................................................... 29
5.8    Preferential Purchase Rights. ........................................................................... 29
5.9    Legal Proceedings. ........................................................................................... 29
5.10   Knowledge Qualifier for Non-Operated Oil and Gas Assets. ......................... 29
5.11   Bankruptcy. ...................................................................................................... 29
5.12   No Other Representations or Warranties; Disclaimers. .................................... 29

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER**     **31**
6.1    Organization and Good Standing. .................................................................... 31
6.2    Authority; Validity; Consents. ......................................................................... 31
6.3    No Conflict; Qualification to Be Designated Operator by Railroad Commission of Texas. ......... 31
6.4    Availability of Funds. ...................................................................................... 32
6.5    Litigation. ......................................................................................................... 32

| | | |
|---|---|---|
| 6.6 | Brokers or Finders. | 32 |
| 6.7 | Independent Investigation. | 32 |
| 6.8 | Bankruptcy. | 32 |
| 6.9 | Tag-Along Parties. | 32 |
| 6.10 | Acknowledgement of Disclaimers. | 33 |

**ARTICLE 7 ACTIONS PRIOR TO THE CLOSING DATE** — **34**

| | | |
|---|---|---|
| 7.1 | Operations Prior to the Closing Date. | 34 |
| 7.2 | Reasonable Commercial Efforts. | 35 |
| 7.3 | Successor Operator. | 36 |
| 7.4 | Bankruptcy Court Approval. | 37 |
| 7.5 | Bankruptcy Filings. | 37 |
| 7.6 | Bidding Procedures. | 38 |
| 7.7 | Back-up Bidder. | 38 |
| 7.8 | Updates and Amendments of Exhibits and Schedules. | 38 |

**ARTICLE 8 ADDITIONAL AGREEMENTS** — **38**

| | | |
|---|---|---|
| 8.1 | Taxes. | 38 |
| 8.2 | Allocation of Purchase Price. | 40 |
| 8.3 | Bulk Sales. | 40 |
| 8.4 | Payments Received. | 40 |
| 8.5 | Assigned Contracts: Adequate Assurance and Performance. | 40 |
| 8.6 | Post-Closing Books and Records and Personnel. | 41 |
| 8.7 | Casualty. | 41 |
| 8.8 | No Recourse to Buyer's Debt Financing Sources | 41 |

**ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE** — **42**

| | | |
|---|---|---|
| 9.1 | Accuracy of Representations. | 42 |
| 9.2 | Seller's Performance. | 43 |
| 9.3 | No Order. | 43 |
| 9.4 | Seller's Deliveries. | 43 |
| 9.5 | Sale Order. | 43 |
| 9.6 | Change of Operator Forms | 43 |

**ARTICLE 10 CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE** — **43**

| | | |
|---|---|---|
| 10.1 | Accuracy of Representations. | 43 |
| 10.2 | Sale Order in Effect. | 44 |
| 10.3 | Buyer's Performance. | 44 |
| 10.4 | No Order. | 44 |
| 10.5 | Buyer's Deliveries. | 44 |
| 10.6 | Change of Operator Forms. | 44 |

**ARTICLE 11 TERMINATION** — **44**

| | | |
|---|---|---|
| 11.1 | Termination Events. | 44 |
| 11.2 | Effect of Termination. | 46 |
| 11.3 | Mutual Acknowledgment of Agreements. | 46 |

**ARTICLE 12 SURVIVAL AND LIMITATIONS** — **46**

| | | |
|---|---|---|
| 12.1 | Non-Survival of Seller's Representations and Warranties; Survival of Other Provisions. | 46 |
| 12.2 | Buyer's Exclusive Remedy and Certain Limitations. | 46 |
| 12.3 | Express Negligence/Conspicuous Manner. | 47 |

**ARTICLE 13 GENERAL PROVISIONS** **47**
13.1  Confidentiality. ................................................................................................ 47
13.2  Public Announcements. .................................................................................... 48
13.3  Notices. ............................................................................................................ 48
13.4  Waiver, Waiver of Damages. ........................................................................... 49
13.5  Entire Agreement; Amendment. ...................................................................... 49
13.6  Assignment. ..................................................................................................... 49
13.7  Severability. ..................................................................................................... 50
13.8  Expenses. ......................................................................................................... 50
13.9  Time of Essence. .............................................................................................. 50
13.10 Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver. ....... 50
13.11 Counterparts. .................................................................................................... 51
13.12 Parties in Interest; Third Party Beneficiaries. ................................................. 51
13.13 Non-Recourse. ................................................................................................. 51
13.14 Disclosure Schedules; Materiality. .................................................................. 52
        13.15 WAIVER OF TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER
PROTECTION ACT ...................................................................................................... 52
13.16 Injunctive Relief .............................................................................................. 52


SCHEDULES

Schedule 2.1(b)(iv)     Pipeline Assets
Schedule 2.1(b)(v)      Equipment Interests
Schedule 2.1(b)(xi)     Permits
Schedule 2.1(b)(xii)    Pooling and Unit Agreements
Schedule 2.1(b)(xiii)   Geological/Geophysical/Seismic Data
Schedule 2.2(b)         Certain excluded cash and cash equivalents
Schedule 2.2(g)         Excluded Leases and Excluded Mineral Interests
Schedule 2.2(h)         Excluded Contracts
Schedule 2.2(i)         Excluded Surface Interests
Schedule 2.5(b)         Executory Contracts and Cure Costs
Schedule 2.7            NETX Litigation
Schedule 5.2            Disclosure: Consents
Schedule 7.1            Operations Prior to the Closing Date
Schedule 8.2(a)         Allocated Values
Schedule 8.2(b)         Tax Allocation


EXHIBITS

Exhibit A     Properties (Assigned Leases and Interests and Assigned Wells)
Exhibit B     Assigned Contracts
Exhibit C     Assigned Surface Interests
Exhibit D     Form of Assignment

#110108336v6

## ASSET PURCHASE AGREEMENT (LOT 1)

**THIS ASSET PURCHASE AGREEMENT (LOT 1)** (this "<u>Agreement</u>"), dated as of November [●], 2025, is by and among Barrow Shaver Resources Company, LLC, a Texas limited liability company ("<u>Seller</u>"), and TexOil Investments, LLC, a Texas limited liability company ("<u>Buyer</u>"). Capitalized terms used but not otherwise defined herein have the meanings set forth in <u>Article 1</u>. Seller and Buyer are sometimes referred to collectively herein as the "<u>Parties</u>" and individually as a "<u>Party</u>".

## RECITALS

**WHEREAS**, Seller is engaged in onshore oil and natural gas exploration, development and production in the Hidden Rock Field in and around Cass County, Texas and owns, in varying proportions, certain oil and gas leases and associated assets more particularly described in <u>Section 2.1</u>;

**WHEREAS**, on July 23, 2024 (the "<u>Involuntary Petition Date</u>"), Case No. 24-33353 (the "<u>Bankruptcy Case</u>") was commenced against Seller by the filing of an involuntary petition for relief under chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "<u>Bankruptcy Code</u>"), with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "<u>Bankruptcy Court</u>"). On August 19, 2024 (the "<u>Voluntary Petition Date</u>" or simply the "<u>Petition Date</u>"), Seller consented to an order for relief under chapter 11 of the Bankruptcy Code by filing its voluntary petition for relief. Seller continues to operate its business and manage its property as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Seller desires to sell to Buyer the Assets, and Buyer desires to purchase from Seller the Assets and assume the Assumed Liabilities, upon the terms and conditions set forth in this Agreement;

**WHEREAS**, the Parties intend to effectuate the sale of the Assets contemplated by this Agreement pursuant sections 105, 363 and 365 of the Bankruptcy Code;

**WHEREAS**, Seller's obligation to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

**WHEREAS**, simultaneously with this Agreement, Seller and Buyer have entered into a separate asset purchase agreement (the "<u>Asset Purchase Agreement (Lot 2)</u>"), whereby Seller and Buyer intend to create a structure for transfer of Seller's rights and interests in certain potential rights, interests, claims, causes of action, and defenses to certain Leases and Mineral Interests other than the Assets associated with the Hidden Rock Field (the "<u>Potential Avoidance Actions</u>");

**NOW, THEREFORE**, in consideration of the premises, the mutual promises herein made, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1

## DEFINITIONS

1.1     Definitions.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"Accounting Referee" has the meaning set forth in Section 3.5(d).

"Action" means any private or governmental action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

"Affiliate" has the meaning set forth in 11 U.S.C. § 101(2).

"Agreement" has the meaning set forth in the introductory paragraph.

"Allocated Value" has the meaning set forth in Section 8.2.

"Alternative Outside Date" means thirty (30) calendar days after the Outside Date.

"Alternative Transaction" means:

> (i)   any merger, consolidation, share exchange or other similar transaction to which Seller is a party that has the effect of transferring, directly or indirectly, all or a substantial portion of the Assets, or the direct or indirect ownership thereof, to any party other than Buyer;

> (ii)   any direct or indirect sale or sales of all or a substantial portion of the Assets to any party other than Buyer; or

any other transaction or transactions, including a plan of liquidation or reorganization, that transfers or vests ownership of, economic rights to, or benefits with respect to all or a substantial portion of the Assets to any party other than Buyer.

"Asset Purchase Agreement (Lot 2)" has the meaning set forth in the recitals.

"Assets" has the meaning set forth in Section 2.1(b).

"Asset Taxes" has the meaning set forth in Section 8.1(b).

"Assigned Contracts" has the meaning set forth in Section 2.1(b)(vi).

"Assigned Leases and Interests" has the meaning set forth in Section 2.1(b)(i).

"Assigned Surface Interests" has the meaning set forth in Section 2.1(b)(vii).

"Assignment" means the Assignment and Bill of Sale substantially in the form attached hereto as **Exhibit D**.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" has the meaning set forth in the Bidding Procedures.

"Back-Up Bidder" means the bidder determined by the Seller in its sole discretion to have made the second-best offer for the Assets at the Auction.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Procedures" means the bidding procedures approved pursuant to the Bidding Procedures Order and a copy of which is attached thereto.

"Bidding Procedures Motion" means the Debtor's Emergency Motion for Entry of an Order (I) Approving the Bidding Procedures and Auction, (II) Scheduling Bid Deadlines, an Auction, Objection Deadlines, and a Hearing, (III) Approving the Form and Manner of Notice of the Sale Transaction, the Auction, the Hearing, and Assumption and Assignment Procedures, (IV) Authorizing the Debtor to Enter into a Lead Bidder Agreement, and (V) Granting Related Relief, entered by the Bankruptcy Court on June 27, 2025 as Docket No. 760.

"Bidding Procedures Order" means the Order entered by the Bankruptcy Court granting or approving (in whole or in part) the Bidding Procedures Motion and the Bidding Procedures.

"Business Day" means a day that is not a Saturday, a Sunday or any other day on which national banking institutions in Houston, Texas are not open to the public for conducting business.

"Buyer" has the meaning set forth in the introductory paragraph.

"Buyer Default Termination" has the meaning set forth in Section 3.2(b) and 3.2(c)(ii).

"Buyer Intentional Breach" has the meaning set forth in Section 3.2(d).

"Buyer Parties" means Buyer, its respective Affiliates and the former, current or future equity holders and Representatives of each of the foregoing.

"Buyer's Financing" has the meaning set forth in Section 8.8(a).

"Buyer's Financing Sources" has the meaning set forth in Section 8.8(a).

"Casualty Loss" means any loss, damage, or destruction of the Assets that occurs during the period between the Execution Date of this Agreement and the Closing for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, terrorism, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Assets due to the production of Hydrocarbons through normal depletion (which exclusion shall include the watering-out of any Well, collapsed casing, sand infiltration of any Well, or other reservoir changes relating to Hydrocarbon production).

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq.

"Closing" has the meaning set forth in Section 4.1.

3

"Closing Amount" has the meaning set forth in Section 3.4(b).

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"Closing Payment" has the meaning set forth in Section 3.4(b).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" has the meaning set forth in Section 13.1.

"Consent" means any consent, approval, authorization or permit of, or filing with or notification to, any Governmental Authorities or any other Person which is required to be obtained, made or complied with, or otherwise applicable to, for or in connection with the sale, assignment or transfer of the Assets or the consummation of the transactions contemplated by this Agreement, in all cases after giving effect to sections 365(c)(1) and 365(f)(1) of the Bankruptcy Code.

"Contract" means any legally binding agreement, contract, obligation, promise or undertaking (in each case, whether written or oral) to which Seller is a party or to which any Assets are subject, other than a Lease.

"CRO" means the Chief Restructuring Officer of Seller, who is currently James A. Katchadurian.

"Cure Costs" has the meaning set forth in Section 2.5(a).

"Damages" means any actual loss, cost, cost of settlement, damage, expense, claim, award or judgment incurred or suffered by any Person arising out of or resulting from the matter in question, whether attributable to personal injury or death, property damage, contract breach claims, torts or otherwise, including reasonable fees and expenses of attorneys, consultants, accountants or other agents and experts reasonably incurred with respect to matters in question, the costs of investigation or monitoring of such matters, and the costs of enforcement of the indemnity provided hereunder, if applicable; *provided*, *however*, that "Damages" shall not include any Taxes that may be assessed on payments under Article 12 or any punitive, consequential or exemplary damages.

"Deposit" has the meaning set forth in Section 3.2(a).

"Deposit Account" has the meaning set forth in Section 3.2(a).

"Designation Deadline" has the meaning set forth in the Bidding Procedures Order.

"DTPA" has the meaning set forth in Section 13.15.

"Effective Time" means 12:01 a.m. prevailing Central Time, June 1, 2025.

"Encumbrance" means all liens, whether consensual or statutory (including mechanic's, materialman's, carrier's, repairer's, contractor's and other similar liens arising under applicable Laws), replacement liens, adequate protection liens or other liens granted under sections 361, 363 or 364 of the Bankruptcy Code, other charges, encumbrances, options and transfer restrictions, including without limitation, rights of first refusal or first offer, defect or objection liens, easements, encroachments or servitudes, in each case, that constitutes an "interest" for purposes of Bankruptcy Code § 363(f), including without limitation those charges or interests in property within the meaning of "lien" under Bankruptcy

4

Code § 101(37) or any other limitation, restriction or interest that constitutes an "interest" for the purposes of Bankruptcy Code § 363(f).

"Environmental Laws" means the following: CERCLA; the Superfund Amendment and Reauthorization Act of 1986; the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et seq.*; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Hazardous Materials Transportation Act, 49 U.S.C. § 5101 *et seq.*; the Toxic Substances Control Act, 15 U.S.C. §§ 2601 through 2629; the Oil Pollution Act, 33 U.S.C. § 2701 *et seq.*; the Emergency Planning and Community Right to Know Act, 42 U.S.C. § 11001 *et seq.*; the Safe Drinking Water Act, 42 U.S.C. §§ 300f through 300j; the Endangered Species Act, 16 U.S.C. § 2601, *et seq.*; and the Occupational Safety and Health Act, 29 U.S.C. § 651, *et seq.*, in each case as amended in effect as of the date of this Agreement, and all similar Legal Requirements in effect as of the date of this Agreement of any Governmental Authority having jurisdiction over the property in question addressing (i) pollution or pollution control; (ii) protection of natural resources, the environment, biological resources or human health or public or worker safety or (iii) the disposal or Release or threat of Release of Hazardous Materials, and in each case, all regulations implementing the foregoing Hazardous Materials.

"Environmental Liabilities" means any and all Damages, Remediation obligations, liabilities, environmental response costs, costs to cure, cost to investigate or monitor, restoration costs, costs of Remediation or removal, settlements, penalties, and fines arising out of or related to any violations or non-compliance with any Environmental Laws, including any contribution obligation under CERCLA or any other Environmental Law or matters incurred or imposed pursuant to any claim or cause of action by a Governmental Authority or other Person, attributable to any failure to comply with Environmental Laws, any Release of Hazardous Materials or any other environmental condition with respect to the ownership or operation of Assets.

"Equipment" has the meaning set forth in Section 2.1(b)(v).

"Escrow Agent" has the meaning set forth in Section 2.6(a).

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means those Contracts described on Schedule 2.2(h).

"Excluded Leases" means those Leases described on Schedule 2.2(g).

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Excluded Mineral Interests" means those Mineral Interests described on Schedule 2.2(g).

"Excluded Surface Interests" means those Surface Interests described on Schedule 2.2(i).

"Execution Date" means the date this Agreement is signed by Buyer and Seller.

"Executory Contract" means any executory Contract related to the Assets to which Seller is a party.

"Exploration Agreements" means those certain agreements entered into between Seller and Third Parties beginning in December of 2017 to develop the "Lone Star Prospect", as defined in the Exploration Agreements, in Morris, Cass, Upshur, and Camp Counties, Texas.

"Final Determination Date" has the meaning set forth in Section 3.5(f).

"Final Settlement Statement" has the meaning set forth in Section 3.5(a).

"Final Settlement Disputes" has the meaning set forth in Section 3.5(d).

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental authority or regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Hard Consent Escrow Account" has the meaning set forth in Section 2.6(a).

"Hazardous Substance" means hazardous waste, hazardous material, hazardous substances, toxic substances or any other chemical, pollutant, contaminant, substance or waste regulated under any Environmental Law; any petroleum, petroleum products, natural gas, crude oil or petroleum-derived substance or waste (and any components, fractions or derivatives thereof) that have been Released into the environment; and any asbestos or asbestos-containing material, urea formaldehyde insulation, hydrogen sulfide, polychlorinated biphenyls, mercury, flammable or explosive materials, and radioactive materials, including NORM.

"Hydrocarbons" means oil, gas, casinghead gas, coalbed methane, and other gaseous and liquid hydrocarbons, or any combination of the foregoing, sulfur extracted from hydrocarbons, and all other Lease substances.

"Imbalances" means over-production or under-production or over-deliveries or under-deliveries with respect to Hydrocarbons produced from or allocated to the Properties, regardless of whether such over-production or under-production or over-deliveries or under-deliveries arise at the wellhead, pipeline, gathering system, transportation system, processing plant, or other location, including any imbalances under gas balancing or similar agreements, imbalances under production handling agreements, imbalances under processing agreements, imbalances under the Assigned Leases and Interests, and imbalances under gathering or transportation agreements.

"Knowledge" means (i) with respect to Seller, the actual knowledge (without any duty of inquiry) of the CRO, and (ii) with respect to Buyer, the actual knowledge (without any duty of inquiry) of any officer of the Buyer.

"Lease" means any existing oil and gas lease, oil, gas and mineral lease, sublease, and other Hydrocarbon leasehold interest, and the leasehold estates created thereby, including carried interests, rights of recoupment, options, reversionary interests, convertible interests, and rights to reassignment.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency, guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the ordinary course of business) of any type, whether accrued, absolute or contingent, known or unknown, liquidated or unliquidated, matured or un-matured, or otherwise.

6

"Material Adverse Effect" means any change, event, condition, circumstance or occurrence that individually or in the aggregate (taking into account all other such changes, events, conditions, circumstances or occurrences) has had, or would be reasonably likely to have, a material adverse change in, or material adverse effect on, the Assets taken as a whole, but *excluding*:

(a)      any change, event, condition, circumstance or occurrence to the extent that it results from or arises out of (i) the commencement or pendency of the Bankruptcy Case; (ii) any action taken in connection with the Bankruptcy Case; (iii) the commencement, pendency, settlement or other resolution of the NETX Litigation; (vi) the execution of this Agreement or the Asset Purchase Agreement (Lot 2) or the announcement thereof or consummation of the transactions contemplated hereby or thereby; (v) changes in (or proposals to change) Legal Requirements, generally accepted accounting principles or other accounting regulations or principles; (vi) any Casualty Loss; or (vii) any action contemplated by this Agreement or the Asset Purchase Agreement (Lot 2) or taken by Seller at the request of Buyer;

(b)      any change to the economic, financial or commercial condition of the oil and gas industry, or any development generally applicable to the oil and gas industry, other than such condition or development that does not have a disproportionate adverse impact on Seller;

(c)      any event that is not within the reasonable control of the Parties, including, without limitation, any outbreak or escalation of hostilities or war, any act of terrorism or any act of God, flood, drought, earthquake or other natural disaster;

(d)      the effect of any departure of officers, directors or employees of Seller after the Execution Date,

(e)      any objections filed in the Bankruptcy Court to (i) this Agreement, the Asset Purchase Agreement (Lot 2), the other Transaction Documents or the transactions contemplated hereby and thereby, (ii) the reorganization of Seller pursuant to the Bankruptcy Case and any plan of reorganization or disclosure statement filed or approved thereunder, (iii) the Bidding Procedures or the Bidding Procedures Motion, or (iv) the assumption or rejection of any Material Assigned Contract;

(f)      any Order of the Bankruptcy Court or any actions or omissions of Seller in compliance therewith;

(g)      any Order entered in connection with the NETX Litigation or any actions or omissions of Seller in connection therewith;

(h)      any action taken by Seller at the request of, or with the consent of, Buyer; and

(i)      any matters disclosed on any Exhibit, Schedule or Disclosure Schedule to this Agreement.

"Mineral Interests" means all mineral fee interests, non-leasehold mineral rights, and mineral servitudes in which Seller owns an interest, including royalty interests, overriding royalty interests, net profit interests, production payments, and without limiting the foregoing, other rights of whatever nature, whether legal or equitable, whether vested or contingent.

"Negotiation Period" has the meaning set forth in Section 3.5(c).

"Net Revenue Interest" means, (i) with respect to any Well set forth on **Exhibit A**, Seller's interest (expressed as a percentage or a decimal) in and to the Hydrocarbons produced and saved or sold from or

allocated to such Well on **Exhibit A** from those formations in which such Well is currently producing, or with respect to a Well that is not currently producing, the last depth or formation at which it produced, or (ii) with respect to any Lease set forth on **Exhibit A**, Seller's interest (expressed as a percentage or a decimal) in and to the Hydrocarbons produced and saved or sold from or allocated to such Lease as to the lands and depths described for such Lease on **Exhibit A**, in each case of items (i) and (ii), after deducting to all royalties, overriding royalties, nonparticipating royalties, net profits interests, production payments, carried interests, reversionary interests and other burdens on, measured by or payable out of production therefrom.

"NETX Litigation" has the meaning set forth in Section 2.7.

"NETX Parties" has the meaning set forth in Section 2.7.

"NORM" means naturally occurring radioactive material, radon gas and asbestos.

"Objection Date" has the meaning set forth in Section 3.5(b).

"Objection Notice" has the meaning set forth in Section 3.5(b).

"Operating Agreement" means the Operating Agreement between the Seller and the other parties signatory thereto, originally dated December 1, 2017, and subsequently amended December 1, 2023.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"Outside Date" means May 1, 2026, or such other date as the Parties mutually agree in writing.

"Party" or "Parties" means, individually or collectively, Buyer and Seller.

"Permits" means any governmental (whether federal, state or local) permits, licenses, authorizations, franchises, grants, easements, variances, exceptions, consents, certificates, approvals and related instruments or rights of any Governmental Authority or other Third Party, and any writ, judgment, decree, award, Order, injunction or similar order, writ, ruling, directive or other requirement of any Governmental Authority (in each such case whether preliminary or final) required for the ownership, operation or use of the Properties or Equipment.

"Permitted Encumbrances" means any of the following: (a) any rights, obligations, or duties reserved to or vested in any municipality or other Governmental Authority to: (1) control or regulate any Asset in any manner including all applicable Legal Requirements, (2) purchase, condemn, expropriate, or recapture any Asset, (3) designate a purchaser of any Asset, or (4) use any Asset in any manner, except in the case of (4) to the extent such use operates to reduce the applicable Net Revenue Interest in a Well below that shown in **Exhibit A**, or increase the applicable Working Interest in a Well above that shown in **Exhibit A**, without a corresponding and proportionate  increase in the applicable Net Revenue Interest; (b) the terms and conditions of all options, servitudes, contracts for sale, purchase, exchange, refining or processing of Hydrocarbons, operating agreements, unitization, pooling, and communitization agreements, farmins, farmouts, area of mutual interest agreements, declarations, or Orders, construction agreements, construction and operation agreements, participation agreements, shoot-to-earn agreements, exploration agreements, partnership agreements, processing agreements, plant agreements, pipeline, gathering, exchange, and transportation agreements, disposal agreements, permits, licenses, and any other agreements affecting the Assets, including those set forth as Assigned Contracts on **Exhibit B**, but only to the extent that they do not, either individually or in the aggregate, (1) operate to reduce the applicable Net Revenue Interest in a

Well below that shown in **Exhibit A**, or increase the applicable Working Interest in a Well above that shown in **Exhibit A** without a corresponding and proportionate increase in the applicable Net Revenue Interest in such Well, or (2) except in the case of Assigned Contracts listed on **Exhibit B** adversely affect the ownership and/or operation of the affected Assets (as currently used or owned) in any material respect; (c) any consent applicable to the transactions contemplated hereby; (d) easements, rights-of-way, servitudes, permits, surface leases, and other similar rights on, over, or in respect of any of the Assets, as long as any such encumbrances, individually or in the aggregate, do not interfere in any material respect with Seller's use or operation of the Assets (as currently used or operated) burdened thereby; (e) all royalties, overriding royalties, production payments, net profits interests, reversionary interests, carried interests, and other burdens with respect to a Well if the net cumulative effect of such burdens does not have the effect of reducing the Net Revenue Interest in such Well below that shown in **Exhibit A**, or increase the Working Interest in such Well above that shown in **Exhibit A** without a proportionate increase in the Net Revenue Interest in such Well; (f) defects or irregularities of title (i) as to which the relevant statute(s) of limitations or prescription would bar any challenge to, or claim against, Seller's title, (ii) arising out of lack of corporate authorization or a variation in corporate name, (iii) consisting of the failure to recite marital status or omissions of heirship proceedings in documents, (iv) resulting from lack of survey or failure to record releases of liens, production payments, or mortgages that have expired by their own terms or (v) based solely on lack of information in Seller's files or Records; (g) liens or other Encumbrances for Taxes not yet due and payable or that are being contested in good faith; (h) materialman's, mechanic's, repairman's, employee's, contractor's, operator's, and other similar liens or Encumbrances arising in the ordinary course of business for payments not yet delinquent that are inchoate and have not been perfected pursuant to law or that are contained in joint operating agreements or similar agreements covering the Assets or if delinquent, that are being contested in good faith; (i) Imbalances; (j) plugging and surface restoration obligations; (k) all rights to consent or approval by, required notices to, filings with, or other actions by, Governmental Authorities in connection with the conveyance of the Assigned Leases and Interests, if the same are customarily sought and received after the Closing; (l) calls on Hydrocarbon production under any Assigned Contracts; (m) the terms and conditions of the Assigned Leases and Interests, including any depth limitations or similar limitations that may be set forth therein and any liens or security interests reserved in the Assigned Leases and Interests for royalty, bonus, or rental, or for compliance with the terms of the Assigned Leases and Interests; (n) liens, obligations, defects, irregularities, or other Encumbrances affecting the Assets that would be waived by an ordinary prudent operator or company experienced in the acquisition or divestiture of producing properties; (o) mortgages on the lessor's interest under an Assigned Lease and Interest; (p) Preferential Purchase Rights; (q) any maintenance of uniform interest provisions (i) contained in any agreement applicable to the Assets and Leases to the extent (A) compliance with such provision has been waived in writing by the parties to such agreement, or (B) Buyer is able to confirm (through review of the Records and communications with, and cooperation from, Seller) that such maintenance of uniform interest provision has been previously violated without the transferring party obtaining waivers, or without a non-transferring party under such agreement having filed a lawsuit or having asserted a claim for breach of such agreement, (ii) contained in any Lease to the extent the applicable lessor has waived compliance with such provisions in writing or breach of such provisions will not result in a suspension of material rights under such Lease, the right of the lessor to terminate such Lease or the termination of such Lease or (iii) if the violation of such provision would not give rise to the unwinding of the sale of the affected Asset from the Seller to Buyer; (r) liens or trusts arising in connection with workers' compensation, unemployment insurance, or pension; (s) conventional rights of reassignment obligating the Seller to reassign its interest in any portion of the Assigned Leases and Interests to a Third Party, if such right is only triggered when Buyer expressly indicates its intention to release or abandon such interest prior to the expiration of the primary term or other termination of such interest; (t) decreases in the Net Revenue Interest of Seller (or Buyer as successor in interest to Seller) with respect to any Well below the Net Revenue Interest shown in **Exhibit A** with respect to such Well, (i) in connection with those operations in which Seller or its successors or assigns may from and after the date of this Agreement, elect in accordance with the terms hereof to be a non-consenting co-owner, (ii) resulting from the establishment

9

or amendment from and after the date of this Agreement of drilling and spacing units, pooling orders or pooled units, unitization agreements, communitization agreements, or other units, or (iii) required to allow other working interest owners to make up past underproduction or pipelines to make up past under deliveries; (u) increases in the Working Interest of Seller (or Buyer as successor in interest to Seller) with respect to any Well above that shown in **Exhibit A** for such Well, resulting from contribution requirements with respect to defaulting co-owners under applicable operating agreements; and (v) any Encumbrances that will be released by the Sale Order.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Petition Date" has the meaning set forth in the recitals.

"Potential Avoidance Actions" has the meaning set forth in the recitals.

"Preferential Purchase Right" means any right or agreement that enables any Person to purchase or acquire any Asset or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

"Preliminary Settlement Statement" has the meaning set forth in Section 3.4.

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Properties" has the meaning set forth in Section 2.1(b)(ii).

"Property Costs" means all operating expenses (including costs of insurance, rentals, shut-in payments, other payments called for by the Leases, title examination and curative actions, and overhead costs) and capital expenditures (including bonuses, broker fees, and other Lease acquisition costs, costs of drilling and completing wells, and costs of acquiring equipment) incurred in the ownership and operation of the Assets in the ordinary course of business, but excluding (without limitation) Damages attributable to:

(i) claims, investigations, administrative proceedings, arbitration or litigation directly or indirectly arising out of or resulting from actual or claimed personal injury, illness, or death; property damages; environmental damage or contamination; other torts; private rights of action given under any Legal Requirement; or violation of any Legal Requirement;

(ii) obligations to plug and/or abandon wells, dismantle, decommission or remove facilities;

(iii) obligations to remediate any contamination of groundwater, surface water, soil, sediments, or Equipment;

(iv) title and environmental claims (including claims that Leases have terminated);

(v) claims of improper calculation or payment of Royalties (including overriding royalties and other burdens on production);

10

(vi) gas balancing and other production balancing obligations;

(vii) Casualty Loss;

(viii) Taxes; and

(ix) any claims for indemnification, contribution, or reimbursement from any Third Party with respect to liabilities, losses, costs, and expenses of the type described in preceding clauses (i) through (viii), whether such claims are made pursuant to contract or otherwise.

"Purchase Price" has the meaning set forth in Section 3.1.

"Records" has the meaning set forth in Section 2.1(b)(ix).

"Reimbursing Party" has the meaning set forth in Section 8.1(c).

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing of a Hazardous Substance into the environment (including the abandonment or discharging of barrels, containers and other closed receptacles containing any Hazardous Substance).

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Royalties" means all royalties, overriding royalties, reversionary interests, net profit interests, production payments, carried interests, non-participating royalty interests, and other royalty burdens and other interests payable out of production of Hydrocarbons from or allocated to the Properties or the proceeds thereof.

"Sale" means the sale of the Assets pursuant to section 363 of the Bankruptcy Code.

"Sale Order" means an order of the Bankruptcy Court entered pursuant to sections 363 and 365 of the Bankruptcy Code that (i) approves the sale of the Assets to Buyer at Closing pursuant to section 363 of the Bankruptcy Code as contemplated herein, (ii) approves the assumption and assignment of the Assigned Contracts pursuant to section 365 of the Bankruptcy Code as contemplated herein, (iii) finds that Buyer is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code with respect to, at a minimum, those interests subject to the *Stipulation and Agreed Order by and Among the Debtor and Certain Insiders* that was filed in the Bankruptcy Case as Docket No. 247, and (iv) contains such other provisions as are reasonably acceptable to both Seller and Buyer.

"Seller Parties" means Seller, its Affiliates and the former, current or future equity holders and Representatives of each of the foregoing.

"Seller" has the meaning set forth in the introductory paragraph.

"Special Committee" means the committee comprised of Scott O. Shaver, Linda Barrow, and the CRO appointed pursuant to that certain Joint Written Consent of the Members and the Sole Manager of Barrow Shaver Resources Company LLC, dated effective as of August 19, 2024.

"Straddle Period" has the meaning set forth in Section 8.1(b).

"Successful Bidder" means the bidder for the Assets with the highest or otherwise superior bid for the Assets as determined in accordance with the Bidding Procedures.

"Surface Interests" means all surface fee interests, surface leases, subsurface leases, rights-of-way, water rights, licenses and easements applicable to, or used or held in connection with the ownership, operation, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Hydrocarbons or produced water from, the Properties, together with all surface fee interests in the lands covered by the Assigned Leases and Interests, excluding any surface use agreements and other surface or subsurface rights agreements.

"Suspense Funds" means any and all Royalties and other amounts held in suspense by Seller at the Closing, and any interest accrued in escrow accounts for such suspended funds.

"Tax" or "Taxes" means (i) all taxes, assessments, fees and other charges of any kind whatsoever imposed by any Governmental Authority, including any federal, state, local and/or foreign income tax, surtax, remittance tax, presumptive tax, net worth tax, special contribution tax, production tax, value added tax, withholding tax, gross receipts tax, windfall profits tax, profits tax, ad valorem tax, personal property tax, real property tax, sales tax, goods and services tax, service tax, transfer tax, use tax, excise tax, premium tax, stamp tax, motor vehicle tax, entertainment tax, insurance tax, capital stock tax, franchise tax, occupation tax, payroll tax, employment tax, unemployment tax, disability tax, alternative or add-on minimum tax and estimated tax, and (ii) any interest, fine, penalty or additions to tax imposed by a Governmental Authority in connection with any item described in clause (i).

"Tax Allocation" has the meaning set forth in Section 8.2.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Third Party" means any Person other than Seller, Buyer or any of their respective Affiliates.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement, the Asset Purchase Agreement (Lot 2), and any other agreements, instruments or documents entered into pursuant to this Agreement or the Asset Purchase Agreement (Lot 2).

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Voluntary Petition Date" has the meaning set forth in the recitals.

"Wells" has the meaning set forth in Section 2.1(b)(ii).

"Working Interest" means, with respect to any Well, the interest (expressed as a percentage or a decimal) that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations for that Well from those formations in which such Well is currently producing,

or with respect to a Well that is not currently producing, the last depth or formation at which it produced, in each case, without regard to the effect of any Royalties.

      1.2    <u>Other Definitions and Interpretive Matters.</u>

      (a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

    <u>Calculation of Time Period.</u> When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, if the last day of such period (or if any other date specified in this Agreement for giving any notice or taking any action) is a day other than a Business Day, then the period (or date) in question shall end on (or be deemed to be) the next succeeding Business Day.

    <u>Dollars.</u> Any reference in this Agreement to dollars means United States dollars.

    <u>Exhibits/Schedules/Disclosure Schedules.</u> All Exhibits, Schedules and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Schedule or Disclosure Schedule but not otherwise defined therein shall be defined as set forth in this Agreement.

    <u>Gender and Number.</u> Any reference in this Agreement to gender includes all genders, and words imparting only the singular number include the plural and vice versa.

    <u>Headings.</u> The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "<u>Section</u>" or "<u>Article</u>" are to the corresponding Section or Article of this Agreement unless otherwise specified.

    <u>Herein.</u> Words such as "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

    <u>Including.</u> The word "<u>including</u>" or any variation thereof means "<u>including, without limitation</u>," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

      (b)    <u>No Strict Construction.</u> Buyer and Seller participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer and Seller, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

**ARTICLE 2**

**PURCHASE AND SALE**

2.1     Purchase and Sale.

(a)     Upon the terms and subject to the conditions of this Agreement and the Sale Order, on the Closing Date, Seller shall sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances (other than Permitted Encumbrances), the Assets.

(b)     The "Assets" shall include all right, title, and interest of Seller in, to, or under the following (after excluding any Excluded Assets):

(i)     Seller's right, title, and interest in all Leases and Mineral Interests, including those interests subject to the *Stipulation and Agreed Order by and Among the Debtor and Certain Insiders,* as may be amended, as such are described on **Exhibit A** attached hereto, all of which are located in Camp, Cass, Marion, Morris and Upshur Counties, Texas in that area commonly referred to as the Hidden Rock Field (collectively, the "Assigned Leases and Interests");

(ii)     Seller's right, title, and interest in the oil, gas, water, disposal, observation or injection wells located on the Assigned Leases and Interests, whether producing, non-producing, shut-in, or temporarily abandoned, including, without limitation, those described on **Exhibit A** (collectively, the "Wells", and together with the Assigned Leases and Interests, the "Properties");

(iii)     Seller's right, title, and interest in all Hydrocarbons produced from or attributable to the Properties in storage owned by Seller and above custody transfer point on the Closing Date or produced on and after the Closing Date, and all proceeds attributable thereto;

(iv)     Seller's right, title, and interest, as such may exist, to the gathering and processing systems used or usable in connection with the Properties, including the incomplete pipeline located in the Hidden Rock Field (the "Hidden Rock Pipeline"), all as generally described on **Schedule 2.1(b)(iv)**;

(v)     Seller's right, title, and interest, as such may exist, to the equipment, tools, vehicles, inventory or other physical or corporeal assets used in connection with the exploration of the Properties, or the production, recovery or transportation of Hydrocarbons from the Properties, to the extent such are set forth on **Schedule 2.1(b)(v)** (collectively, the "Equipment");

(vi)     Seller's right, title, and interest, as such may exist, to the Contracts (other than the Excluded Contracts) including, operating agreements, exploration agreements, development agreements, seismic licenses (but only to the extent transferable without material restriction (including a material restriction against assignment without prior consent)), participation agreements, sales contracts, gathering agreements, transportation agreements, processing agreements, balancing agreements, farmout agreements, service agreements, and other contracts, agreements and instruments, including the Contracts described on **Exhibit B** attached hereto, as such Exhibit may be subsequently amended by Buyer pursuant to Section 2.5, insofar as they relate to any other Asset (collectively, the "Assigned Contracts");

(vii)     Seller's right, title, and interest in all Surface Interests (other than Excluded Surface Interests), including those described on **Exhibit C** attached hereto, insofar as they relate to any other Asset (collectively, the "Assigned Surface Interests"),

14

(viii)    except with respect to the Excluded Assets and the Excluded Liabilities, all Seller's right, title, and interest, as such may exist, to claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller to the extent related primarily to the Assets and arising or relating to events occurring from and after the Closing Date or related in any material respect to the Assumed Liabilities.

(ix)    all information, books, databases, files, records and data (whether in written or electronic format) relating directly to any Asset and to any Assumed Liabilities except for (A) records that Seller is prohibited from disclosing or transferring under any Third Party agreement or applicable law, (B) information entitled to legal privilege, including attorney work product and attorney-client communications (except for title opinions, which shall be included in the Records), (C) economic projections and records of offers from or negotiations with, Buyer or Third Parties with respect to any proposed transfer of any of the Assets and economic analyses associated therewith (collectively, subject to such exclusions, the "Records"), which Records shall include all lease records, well records, well files, title records (including abstracts of title, title opinions and memoranda, and title curative documents), correspondence (including email correspondence within the past five years, to the extent related to the Assets, with any third-party field land agent tasked with acquiring Leases on behalf of Seller), production records; and all other data (but only to the extent transferable without material restriction (including a material restriction against assignment without prior consent)), and any other proprietary data which Seller has the right to obtain (either without the payment of money or delivery of other consideration or unduly burdensome effort or, upon Buyer's written election, at Buyer's expense) and relating to the ownership, operation, development, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Hydrocarbons or produced water from, the Assets; *provided*, that if any Records can only be assigned to Buyer with a fee or penalty, Buyer shall bear responsibility for such fee or penalty;

(x)    all trade credits, accounts receivable, note receivables, take or pay amounts receivable, and other receivables attributable to the Assets, with respect to any period of time on and after the Closing Date;

(xi)    to the extent that they may be assigned, all Permits that are primarily used in connection with the ownership or operation of the Assets but only to the extent such are identified on **Schedule 2.1(b)(xi)**;

(xii)    to the extent that they may be assigned, all interests of Seller with respect to pooling and/or unit agreements as such relate, in whole or in part, to the Properties, as generally described on **Schedule 2.1(b)(xii)**; and

(xiii)    to the extent that such exist and are transferable to Buyer without payment of any fee (unless Buyer agrees in writing to bear all such fees), all geological, geophysical, or seismic data relating to the Assets (but excluding Seller's or Seller's Affiliates' interpretation of such geological, geophysical or seismic data and any such data that is subject to licensing requirements and/or other restrictions on transfers) but only to the extent such are identified on **Schedule 2.1(b)(xiii)**.

2.2    Excluded Assets.

Notwithstanding the foregoing, the Assets shall not include, and there is excepted, reserved and excluded from the transaction contemplated hereby, the following (collectively, the "Excluded Assets"):

(a)    the Purchase Price paid to Seller pursuant to this Agreement;

(b)      all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits of Seller as of the Closing Date, in each case, excluding any item described in Schedule 2.2(b);

(c)      all trade credits, accounts receivable, note receivables, take or pay amounts receivable, and other receivables attributable to the Assets with respect to any period of time prior to the Closing Date or attributable to matters constituting Excluded Liabilities;

(d)      all Hydrocarbons produced from or attributable to the Properties prior to the Effective Time and all proceeds attributable to the sale thereof, other than Hydrocarbons produced from or attributable to the Properties in storage owned by Seller above custody transfer point at the Closing Date;

(e)      all minute books, stock ledgers, corporate seals and stock certificates of Seller;

(f)      all (i) corporate, financial, Tax and legal records of Seller that relates to Seller's business generally (excepting the same to the extent relating to the Assumed Liabilities and the Assets) and (ii) books, records and files that relate to any Excluded Assets;

(g)      all Excluded Leases and all Excluded Mineral Interests and any Hydrocarbons produced from or attributable to the Excluded Leases or Excluded Mineral Interests;

(h)      all Excluded Contracts (including, to the extent they do not relate to the Assumed Liabilities, all contracts of insurance and all claims, rights and interests of Seller or any Affiliate of Seller (i) under any policy or agreement of insurance or indemnity agreement, or (ii) to any insurance or condemnation proceeds or awards arising, in each case, from acts, omissions or events, or damage to, or destruction of, an Asset prior to the Closing Date);

(i)      all Excluded Surface Interests;

(j)      all rights to any refunds or credits of Taxes (or other related costs or expenses) that are borne by or the responsibility of Seller or attributable to any Tax asset of Seller;

(k)      any refunds due to Seller by a Third Party for any overpayment of rentals, Royalties, excess royalty interests or production payments attributable to the Assets with respect to any period of time prior to the Closing Date;

(l)      subject only to Section 8.7, all insurance policies and rights to proceeds thereof;

(m)      all prepayments, good faith and other bid deposits submitted by any Third Party under the terms of the Bidding Procedures Order;

(n)      all claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller other than those constituting Assets;

(o)      all rights, claims or causes of action by or in the right of Seller against any current or former director or officer of Seller;

(p)      the Potential Avoidance Actions;

(q)     all claims and causes of action of Seller (i) arising from acts, omissions, or events, or damage to or destruction of property occurring prior to the Closing Date, or (ii) affecting any of the other Excluded Assets;

(r)     any documents or records withheld or not transferred pursuant to the exceptions set forth in Section 2.1(b)(ix), including all documents and instruments of Seller and its Affiliates that are protected by attorney-client privilege;

(s)     all rights of Seller to the reimbursement or return of any portion of an insurance premium paid prior to Closing Date by virtue of the insurance to which such insurance premium relates being cancelled or terminated as of the Closing Date;

(t)     any and all claims for relief of Seller under chapter 5 of the Bankruptcy Code; and

(u)     any rights, claims or causes of action of Seller under this Agreement or any other Transaction Document.

2.3     Assumed Liabilities.

Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), only the following Liabilities (collectively, the "Assumed Liabilities") and no others:

(a)     Assigned Contracts.  All of Seller's Liabilities under the Assigned Contracts, to the extent such Liabilities are attributable to periods from and after the Closing Date.

(b)     Properties.  All of Seller's Liabilities with respect to the Properties (including all plugging and abandonment obligations, and all Property Costs (other than any Excluded Liabilities)), to the extent such Liabilities are attributable to periods from and after the Closing Date.

(c)     Assigned Surface Interests.  All of Seller's Liabilities with respect to the Assigned Surface Interests, to the extent such Liabilities are attributable to periods from and after the Closing Date.

(d)     Environmental Liabilities.  All Environmental Liabilities with respect to the Assets, including obligations to clean-up, restore or remediate the Assets, ground water, surface water, or soil in accordance with applicable Contracts and Legal Requirements, including any obligations to assess, remediate, remove and dispose of NORM, asbestos, mercury, drilling fluids and chemicals, produced waters, and Hydrocarbons, in each case whether arising prior to, on or after the Closing Date.

(e)     Royalties.  All Seller obligations with respect to Royalties, including the payment, non-payment or mis-payment of any Royalties, to the extent attributable to periods on or after the Closing Date, and Hydrocarbons produced and marketed with respect to the Assets on or after the Closing Date.

(f)     Suspense Funds.  Subject to Section 3.3 hereof, all obligations of Seller to third parties with respect to the payout, distribution, or handling of Suspense Funds attributable to production of Hydrocarbons from the Properties.

(g)     Cure Costs.  All obligations of Seller to pay or provide for Cure Costs with respect to the Assigned Leases and Interests and the Assumed Contracts.

(h)     Imbalances.  All obligations of Seller to Third Parties with respect to the over-production and under-delivery Imbalances with respect to the Properties, in each case whether arising prior to, on or after the Closing Date.

(i)     Buyer Taxes.  Asset Taxes assumed by, or transferred to, Buyer pursuant to Section 8.1(b).

(j)     Transfer Taxes.  All Transfer Taxes.

(k)     Assumed Accounts Payables. All Assumed Accounts Payables.

(l)     Post-Closing Liabilities of Assets.  To the extent not already described in Sections 2.3(a) through (k) above, all Liabilities (other than Excluded Liabilities) arising from, related to, or associated with the Assets, to the extent such Liabilities are attributable to periods from and after the Closing Date.

2.4     Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to pay, perform or otherwise discharge any Liability of Seller other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"). For avoidance of doubt, and without limitation of the foregoing, Excluded Liabilities shall include, without limitation, each of the following Liabilities of Seller, other than the Assumed Liabilities:

(a)     any indebtedness for borrowed money of Seller;

(b)     any guarantees of Third Party obligations by Seller or reimbursement obligations to guarantors of Seller's obligations or under letters of credit;

(c)     all accrued expenses and accounts payables, other than the Assumed Accounts Payables;

(d)     any Asset Taxes, to the extent that they are the responsibility of Seller pursuant to Section 8.1(b);

(e)     all Actions and Proceedings against Seller that exist as of the Closing;

(f)     all Liabilities of Seller to any owner or former owner of capital stock or warrants, or holder of indebtedness for borrowed money;

(g)     all obligations of Seller with respect to drafts or checks issued by Seller that are outstanding at the Closing; and

(h)     any claims to the extent related to the Excluded Assets.

2.5     Assigned Contracts and Cure Costs.

(a)     At the Closing (or, with respect to any Assigned Contract or Assigned Lease and Interest that is not capable of being assigned to Buyer at Closing pursuant to the terms of Section 2.6, then at the time of the assignment of such Assigned Contract or Assigned Lease and Interest to Buyer, if ever), Buyer shall pay, pursuant to section 365 of the Bankruptcy Code and the Sale Order, any and all cure and reinstatement costs or expenses that are required to be paid under sections 365(b)(1)(A) and (B) of the

Bankruptcy Code in connection with the assumption and assignment of the Assigned Contracts and Assigned Leases and Interests (the "Cure Costs").  For the avoidance of doubt, the payment of any Cure Costs called for by this Agreement shall be paid by Buyer in cash at Closing (except for any Cure Costs as to which such payment may be deferred as provided herein) and shall be in addition to the Purchase Price; *provided* that Buyer shall not be required to pay any Cure Costs for, and shall not assume any Liabilities with respect to, any Contract that is not an Assigned Contract.

(b)     Schedule 2.5(b) sets forth each Executory Contract and Seller's good faith estimate as of the date of this Agreement of the amount of the Cure Costs payable with respect to each such Executory Contract; *provided* that if no Cure Cost is estimated by Seller to be payable with respect to any particular Executory Contract, the amount of such Cure Cost designated for such Contract shall be "$0.00".

(c)     Ten Business Days after the date of Execution Date of this Agreement, Buyer shall deliver to Seller updated versions of (i) Schedule 2.5(b), to be determined in Buyer's sole discretion, setting forth the Executory Contracts to be assumed by and assigned to Buyer at the Closing (and upon such designation, such Executory Contract shall constitute an Assigned Contract), (ii) Schedule 2.2(h), to be determined in Buyer's sole discretion, setting forth the Executory Contracts that Buyer rejects and declines to assume (and upon such designation, such contract or lease shall constitute an Excluded Contract and, if applicable, shall cease to constitute an Assigned Contract), and (iii) Exhibit B to reflect any changes to the list of Assigned Contracts per the updated schedules in subsections (i) and (ii) above in this paragraph (c).

(d)     No later than five days prior to the hearing regarding the Sale Order or as otherwise provided in the Bidding Procedures Order, Seller shall deliver a written notice in a form reasonably acceptable to Buyer of the proposed rejection or assumption and assignments of the Executory Contracts and the proposed Cure Costs for each Executory Contract that is an Assigned Contract to be paid to all non-debtor parties of such Executory Contracts that are Assigned Contracts, which notice shall notify each non-debtor party of (i) the proposed Cure Cost for such Assigned Contract and (ii) an objection deadline for such non-debtor party to object to the proposed Cure Cost. Seller shall give written notice to the Buyer, and seek Buyer's prior written approval, prior to the submission by Seller of any motion to assume or reject any contract or lease related to the Assets together with a copy of the proposed order.

(e)     If the Cure Costs determined by the Bankruptcy Court for any Assigned Contract exceed the amount estimated in Schedule 2.5(b) by more than $0, Buyer may, within three Business Days after entry of an order establishing such Cure Costs, elect to (i) exclude such Contract from the Assigned Contracts, and such Contract shall thereafter be an Excluded Contract (and Buyer shall deliver simultaneously to Seller an updated version of Schedule 2.2(h) and Exhibit B to such effect) or (ii) to pay such Cure Costs, and such Contract shall remain an Assigned Contract.

2.6     Assignment of Assets Subject to Consent Requirements.

(a)     Within ten Business Days after the Sale Order is entered, Seller shall send letters seeking any consent to assignment (including Hard Consents) or approval rights applicable to the transactions contemplated hereby.   Subject to Section 2.6(b), this Agreement shall not constitute an agreement to assign or transfer and shall not effect the assignment or transfer of any Asset subject to a Hard Consent that has not been obtained. Seller and Buyer shall use their commercially reasonable efforts to obtain all Hard Consents; *provided*, *however*, neither Seller nor Buyer will be obligated to pay any consideration or initiate any Proceedings to obtain a Hard Consent.  If Seller fails to obtain a consent to the assignment of any Asset prior to Closing and the failure to obtain such consent would cause (i) the assignment of the Asset affected thereby to Buyer to be void, (ii) the termination of the Asset under the express terms thereof, or (iii) the breaching party to pay a specified sum as a penalty or in damages (each, a "Hard Consent"), then, in each such case, the Asset subject to such Hard Consent shall be excluded from

the Assets to be acquired by Buyer at Closing hereunder and, as Buyer's exclusive remedy, the Allocated Value of the Asset so excluded shall be deposited into an escrow account (the "Hard Consent Escrow Account") with a nationally recognized financial institution acting as escrow agent (the "Escrow Agent"), with cash in the amount of the Allocated Value assigned to the subject Asset to be released to the Parties by the Escrow Agent from the Escrow Account pursuant to either joint written instruction from the Parties as set forth below or in accordance with an order of the Bankruptcy Court. If a Hard Consent (with respect to any applicable Asset excluded pursuant to this Section 2.6(a)) that was not obtained prior to Closing is obtained within one hundred twenty (120) days following Closing (or such later date as the Parties may mutually agree), then the Parties shall issue a joint written instruction instructing the Escrow Agent to release the Allocated Value from the Hard Consent Escrow Account to Seller, and Seller shall assign such Asset to Buyer. If a Hard Consent is not obtained within one hundred twenty (120) days following Closing (or such later date as the Parties may mutually agree), then the Parties shall issue a joint written instruction instructing the Escrow Agent to release the Allocated Value from the Hard Consent Escrow Account to Buyer, and title to the Asset subject to the Hard Consent shall be retained by Seller as an Excluded Contract, provided however, that if at any time thereafter Seller obtains a Hard Consent with respect to such Excluded Asset, it shall have the right at such time to require Buyer to purchase such Excluded Asset at the Allocated Value of such Excluded Asset. With respect to any consents to the assignment of any Asset other than Hard Consents that are not obtained prior to Closing, such Asset shall nevertheless be sold and conveyed to Buyer at the Closing. Notwithstanding the foregoing, and subject to the payment of Cure Costs pursuant to Section 2.5 above, nothing in this Section 2.6 shall (x) require Seller to make any expenditure or incur any obligation on its own or on behalf of Buyer, or (y) prohibit Seller from ceasing operations or winding up its affairs following the Closing. For purposes of this Agreement, only those consents set forth on Disclosure Schedule 5.10 shall be Hard Consents.

(b)     The provisions of Section 2.6(a) shall only apply with respect to those Assets (i) that are subject to any consent to assignment (including Hard Consents) or approval rights applicable to the transactions contemplated hereby and (ii) which cannot be acquired by Buyer free and clear of such consent to assignment or approval right pursuant to the Bidding Procedures Order, the Sale Order or the Bankruptcy Code.

2.7     NETX Litigation.

(a)     Seller has informed Buyer that Seller is a party to those cases identified on Schedule 2.7 (collectively, the "NETX Litigation"), which cases were initiated by NETX Acquisitions, LLC ("NETX"), ETX Minerals, LLC ("ETX Minerals"), and ETX Oil & Gas, LLC ("ETX Oil & Gas" and together with NETX and ETX Minerals, the "NETX Parties") on the dates indicated on Schedule 2.7.

(b)     Buyer understands that it is purchasing the Assets subject to the NETX Litigation and, notwithstanding anything to the contrary, that Seller makes no representations regarding the potential outcome of the NETX Litigation.

2.8     Further Assurances.

The Parties agree to (a) furnish upon request to each other such further information, (b) execute, acknowledge and deliver to each other such other documents, and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents; *provided*, that Seller's covenants and obligations after Closing shall be limited to the extent Seller has employees and resources available for such purposes and *provided*, *further* that nothing in this Section 2.8 or otherwise in this Agreement shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

2.9     Effective Time.

Notwithstanding that the Closing may occur on another date and at another time, the purchase and sale of the Assets and the assumption of the Assumed Liabilities shall be deemed effective as of the Effective Time.

# ARTICLE 3

## PURCHASE PRICE

3.1     Purchase Price.

The purchase price for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to, and under the Assets, subject to the adjustments as outlined in Sections 3.3-3.5, shall be $20,000,000 and shall consist of the following (collectively, the "Purchase Price"):

(a)     cash in an amount equal to the Closing Payment, which shall be delivered by Buyer as set forth in Section 4.2; and

(b)     the assumption of the Assumed Liabilities.

3.2     Deposit. Concurrently with the Execution Date of this Agreement, Buyer shall pay over to Seller an amount of $2,000,000, which amount is equal to ten percent (10%) of the Purchase Price (such amount, together with any interest accrued thereon prior to the Closing Date, the "Deposit"). The Deposit shall be deposited by Seller at Closing into a separate, interest-bearing bank account (the "Deposit Account") with a federally insured banking institution, with the Deposit to be withdrawn and disbursed by Seller from such account in accordance with the remainder of this Section 3.2.

(b)     Following the execution of this Agreement, subject to Section 3.2(d) below, Seller shall be entitled to withdraw funds from the Deposit Account from time to time as necessary for purposes of payment of administrative expenses (including without limitation filing fees and legal fees) associated with the Bankruptcy Case.

(c)     Any amount remaining in the Deposit Account may be withdrawn by Seller from the Deposit Account upon the earliest of the following:

(i)     at Closing;

(ii)     the date this Agreement is terminated by Seller pursuant to Section 11.1(c)(i) or Section 11.1(c)(iii) being a "Buyer Default Termination").

If the Closing occurs, the Deposit shall be credited against the Purchase Price. Within five Business Days following a Buyer Default Termination, Seller may withdraw all funds remaining in the Deposit Account, which may thereafter be retained by Seller for its own account.

(d)     The Deposit shall be returned to Buyer by Seller from the Deposit Account upon the earliest to occur of the following:

(i)     the date this Agreement is terminated by either Buyer or Seller pursuant to Section 11.1(a) hereof; or

(ii)    the date this Agreement is terminated by Buyer pursuant to <u>Section 11.1(b)</u>.

Within five Business Days following the occurrence of the earliest event described in subsections (i) and (ii) above of this subsection (d), Seller shall return the Deposit, or to the extent the amount in the Deposit Account is less than the amount of the Deposit, return the amount remaining in the Deposit Account (the "<u>Remaining Deposit Account Funds</u>") to Buyer by wire transfer of immediately available funds to the account designated in writing by Buyer.  In addition, Seller agrees to not oppose a claim by Buyer that the amount of the Deposit, *less* the Remaining Deposit Account Funds returned to Buyer, shall constitute an administrative expense of Seller under section 503(b) and 507(a)(2) of the Bankruptcy Code, payable by Seller to Buyer as part of the closing of an Alternative Transaction.

(e)    The Parties further acknowledge and agree that Seller's entitlement to the Deposit under <u>Section 3.2(b)</u> shall constitute liquidated damages (and not a penalty) and, if the Deposit is delivered to Seller in accordance with <u>Section 3.2(c)</u>, then, except in the event of (x) fraud by Buyer or (y) a knowing and intentional breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement (any such breach described in subsection (y) being a "<u>Buyer Intentional Breach</u>"), such Deposit shall be the sole and exclusive remedy available to Seller and any other Person against Buyer in connection with this Agreement, the other Transaction Documents, and the transactions contemplated hereby or thereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise).  Notwithstanding the limitations set forth in the foregoing sentence, in the event of (x) fraud by Buyer or (y) a Buyer Intentional Breach, Seller may pursue both a grant of specific performance in accordance with <u>Section 13.16</u> and Damages, including retention of all or any portion of the Deposit pursuant to this <u>Section 3.2</u>.

3.3    <u>Adjustments to Purchase Price</u>

All adjustments to the Purchase Price under this <u>Section 3.3</u> shall be without duplication of other adjustments under this Agreement, if any:

(a)    <u>Upward Adjustments</u>. The Purchase Price shall be adjusted upward by the following:

(i)    the amount of all Property Costs, Royalties, and other costs and expenses attributable to the Assets or the operation or ownership thereof during the period from and after the Effective Time that are paid by or on behalf of, but have not been reimbursed to, Seller, and paid to a Third Party, including (A) rentals, shut-in payments, and other lease payments, (B) prepaid costs and expenses (including delay rentals, shut-in payments, and surface use agreement fees, to the extent such payments are attributable to the period from and after the Effective Time), and (C) costs of acquiring necessary Surface Interests, provided that no upward adjustment made pursuant to this Section 3.3(a)(i) shall affect Buyer's liability with respect to Assumed Liabilities;

(ii)    to the extent that Seller has not been reimbursed prior to Closing, the aggregate amount of all accounts receivable with respect to costs and expenses paid by Seller on behalf of any Third Party co-owner of any property or asset a portion of which constitutes an Acquired Property, with Buyer to be solely responsible for the collection of such accounts receivable from and after Closing;

(iii)    the amount of all Taxes prorated to Buyer under <u>Section 8.1</u> that are paid or to be paid or otherwise economically borne by Seller, (net of any deductions, credits, reimbursements, and refunds attributable thereto that are realized by Seller) in accordance with <u>Section 8.1(c)</u>;

(iv)     the amount of all income, revenues, and proceeds attributable to the Assets during the period prior to the Effective Time that are received by or otherwise owing to Buyer and not remitted or paid to Seller, net of any applicable marketing fees and adjustments, Royalties, and Production Taxes in connection therewith that are deducted by purchasers of production or that otherwise are or will be paid or borne by Buyer (including amounts owing to Seller in connection with overpayment of any Royalties, but excluding amounts held in suspense for the benefit of a Third Party);

(v)     an amount equal to the volume of all Hydrocarbons attributable to the Assets that, at the Effective Time, constitute linefill or that are in storage tanks above the load level connection or within processing plants, multiplied by the applicable price paid or, if not yet sold, the applicable price for which the applicable production from the Assets was sold most recently prior to the Effective Time; and

(vi)     any other upward purchase price adjustment provided for elsewhere in this Agreement or otherwise agreed upon by Seller and Buyer.

(b)     <u>Downward Adjustments</u>. The Purchase Price shall be adjusted downward by the following:

(i)     the amount of all Expenses attributable to the Assets or the ownership or operation thereof during the period prior to the Effective Time that are incurred by or on behalf of Seller and paid by, but not reimbursed to, Buyer;

(ii)     the amount of all Property and Production Taxes prorated to Seller under <u>Section 8.1</u> that are paid or to be paid or otherwise economically borne by Buyer (to the extent Buyer has not been reimbursed therefor and net of any deductions, credits, reimbursements, and refunds attributable thereto that are realized by Buyer);

(iii)     other than any Excluded Assets, the amount of all income, revenues, and proceeds attributable to the Assets during the period from and after the Effective Time that are received by Seller and not remitted or paid to Buyer, net of any applicable marketing fees and adjustments, Royalties, and Production Taxes in connection therewith that are deducted by purchasers of production or that otherwise are or will be paid or borne by Seller (excluding amounts held in suspense for the benefit of a Third Party, and excluding any rebates of insurance premiums received as a result of termination of Seller's insurance policies). For the avoidance of doubt no fees paid or owed to Chaffe and Associates, Inc., CR3 Partners and/or Jones Walker, LLP will be deducted from the income, revenue, and proceeds attributed to the Assets;

(iv)     all liabilities of Seller to Third Parties with respect to Suspense Funds that have not been paid or discharged as of the Closing Date; and

(v)     any other purchase price adjustment provided for elsewhere in this Agreement or otherwise agreed upon by Seller and Buyer.

3.4     <u>Preliminary Settlement Statement; Closing Amount.</u>

(a)     <u>Preliminary Settlement Statement.</u>  Not later than 5:00 p.m. Houston, Texas time on the day that is five Business Days prior to Closing, Seller shall prepare and submit to Buyer a draft settlement statement (the "<u>Preliminary Settlement Statement</u>") setting forth (i) the Purchase Price, (ii) estimates of any adjustments under <u>Section 3.3(a)</u> and <u>Section 3.3(b)</u>, and (iii) the resulting Closing Amount and Closing Payment, together with a reasonably detailed explanation and supporting detail of the

calculation thereof to enable review thereof by Buyer. Within two Business Days of receipt from Seller of the initial draft of the Preliminary Settlement Statement, Buyer will deliver to Seller a written report containing all changes with the explanation therefor that Buyer proposes to be made to the Preliminary Settlement Statement, together with a reasonably detailed explanation and supporting detail of the calculation thereof to enable review thereof by Seller. The Preliminary Settlement Statement, as agreed upon by Seller and Buyer, will be used to adjust the Purchase Price at Closing; provided, however, if Seller and Buyer do not agree upon an adjustment set forth in the Preliminary Settlement Statement, then Seller's proposed Preliminary Settlement Statement shall control for purposes of all disputed payments to be made at Closing.

(b)     Closing Amount.  The Purchase Price, as increased or decreased by the net amount of the estimated upward and downward adjustments under Section 3.3, as set forth in the Preliminary Settlement Statement, is referred to herein as the "Closing Amount". At the Closing, an amount equal to (i) the Closing Amount, minus (ii) the Deposit, shall be paid by Buyer to Seller by wire transfer of immediately available funds in United States dollars to the account or accounts designated in writing by Seller to Buyer (the "Closing Payment").

3.5     Final Settlement Statement; Final Purchase Price

(a)     Final Settlement Statement. Not later than 5:00 p.m., Houston, Texas time on the date that is 60 days following the Closing Date, Seller, with the reasonable assistance and cooperation of Buyer, shall prepare and deliver to Buyer a final settlement statement (the "Final Settlement Statement"). The Final Settlement Statement will take into account all final adjustments to the Purchase Price provided in this Agreement, including each adjustment under Section 3.3 not finally determined or that was estimated or incorrectly determined at the Closing pursuant to the Preliminary Settlement Statement, and will set forth a reconciliation of the Closing Amount to the Purchase Price.

(b)     Objection Notice. As soon as practicable after receipt of Seller's proposed Final Settlement Statement, but in any case not later than 5:00 p.m., Houston, Texas time on the date that is ten Business Days after receipt of Seller's proposed Final Settlement Statement (the "Objection Date"), Buyer may deliver to Seller a written notice (an "Objection Notice") indicating those particular items or amounts in Seller's proposed Final Settlement Statement as to which Buyer objects, together with a reasonably detailed explanation and supporting detail of the calculation thereof to enable review thereof by Seller. Any particular amounts or items contained or omitted in Seller's proposed Final Settlement Statement that are not specifically objected to by Buyer in a proper and timely delivered Objection Notice shall be deemed accepted by Buyer and shall be final, binding, and conclusive on both Parties and not subject to dispute. If Buyer does not deliver a proper Objection Notice by the Objection Date, then Seller's proposed Final Settlement Statement and calculation of the Purchase Price, as adjusted, shall be deemed final, binding, and conclusive on all Parties and not subject to dispute.

(c)     Negotiation Period. If an Objection Notice is properly and timely delivered by Buyer, then Buyer and Seller shall negotiate in good faith during the five Business Day period after such delivery (the "Negotiation Period") to reach an agreement on the disputed items or amounts to determine the Final Purchase Price. If Seller and Buyer agree as to the Final Purchase Price or any particular amount or item thereof that is specifically objected to in the Objection Notice, then Buyer and Seller shall execute a written acknowledgement of such agreement, and the Final Purchase Price or any amounts or items thereof that are the subject of such agreement, as applicable, shall be deemed final, binding, and conclusive on all Parties and not subject to dispute.

(d)     Submission to Accounting Referee. If Buyer and Seller are unable to agree on the Final Purchase Price and all such items or amounts by the expiration of the Negotiation Period, then any

remaining dispute, controversy, or matters of difference relating to the Final Settlement Statement or the determination of the Purchase Price (collectively, "Final Settlement Disputes") shall be resolved by a nationally recognized independent accounting firm mutually agreeable to the Parties (the "Accounting Referee"). To the extent necessary, Seller and Buyer shall act in good faith to agree promptly on the Accounting Referee and to execute such engagement letters and other documents as shall be reasonably necessary to engage the Accounting Referee within ten Business Days after the expiration of the Negotiation Period. The fees and expenses of the Accounting Referee shall be paid fifty percent (50%) by Seller and fifty percent (50%) by Buyer. Seller, on the one hand, and Buyer, on the other hand, shall bear its own legal fees and other costs of presenting its case.

(e)     Decisions of Accounting Referee. The Accounting Referee shall make its determination and provide to the Parties written findings within 20 Business Days after it has received the materials explaining the dispute from each Party. In making a determination, the Accounting Referee shall be bound by the terms of this Agreement and, without any additional or supplemental submittals by any Party (except as may be specifically requested by the Accounting Referee), may consider such other accounting and financial standards matters as in its opinion are necessary or appropriate to make a proper determination. The decision of the Accounting Referee shall be final, conclusive, binding, and nonappealable and shall be enforceable against any of the Parties in any court of competent jurisdiction, provided that the Accounting Referee (i) shall be limited to determining the specific Final Settlement Disputes submitted to it, and (ii) shall set forth a calculation of the Purchase Price, as adjusted, and any item or component thereof that was not finally determined during or before the Negotiation Period and a line-item comparison (showing increases and decreases) to the calculations contained in the Final Settlement Statement and the Objection Notice, together with explanations of each variance. **THE ACCOUNTING REFEREE SHALL ACT AS AN EXPERT FOR THE LIMITED PURPOSE OF DETERMINING THE SPECIFIC FINAL SETTLEMENT STATEMENT MATTERS PRESENTED TO IT, SHALL NOT HAVE THE POWERS OF AN ARBITRATOR, SHALL BE LIMITED TO THE PROCEDURES SET FORTH IN THIS SECTION, MAY NOT HEAR OR DECIDE ANY MATTERS EXCEPT THE SPECIFIC FINAL SETTLEMENT STATEMENT MATTERS PRESENTED TO IT, AND MAY NOT AWARD DAMAGES, INTEREST, COSTS, ATTORNEY'S FEES, EXPENSES, OR PENALTIES TO ANY PARTY.**

(f)     Final Determination Date. The final Purchase Price, as agreed upon by the Parties or finally determined by the Accounting Referee, as applicable, shall be deemed final, binding, and conclusive on both Parties and not subject to dispute. The date on which the final Purchase Price shall be deemed to have been determined shall be the earliest of: (i) the Objection Date, if Buyer has not delivered an Objection Notice by the Objection Date; (ii) the date during the Negotiation Period that Buyer and Seller have resolved all disputed amounts with respect to the Purchase Price, if all disputed amounts with respect to the Purchase Price are resolved during the Negotiation Period; and (iii) the date on which the Accounting Referee delivers its report as to the final determination of the Purchase Price, if submitted to the Accounting Referee (such earliest date, the "Final Determination Date").

(g)     Cooperation. Seller and Buyer shall cooperate in good faith and assist as reasonably requested by the Parties and the Accounting Referee in the preparation of the Final Settlement Statement and the calculation of the Purchase Price.

(h)     Payment of Purchase Price if Disputed. If the Purchase Price as finally determined under this Section 3.5 is more than the Closing Amount, then Buyer shall pay to Seller, within five (5) Business Days after the Final Determination Date, the amount of such difference by wire transfer of immediately available funds to the accounts designated by Seller. If the Purchase Price as finally determined under this Section 3.5 is less than the Closing Amount, then (subject to the final sentence of this Section 3.5(h)) Seller shall pay to Buyer, within five (5) Business Days after the Final Determination Date, the

amount of such difference by wire transfer of immediately available funds to an account or accounts designated by Buyer. For clarity, thereafter there shall be no further adjustments to the Purchase Price between the Parties under this Agreement. Notwithstanding anything herein to the contrary, nothing in this <u>Section 3.5</u> shall prohibit or prevent Seller from ceasing operations or winding up its affairs following Closing.

**ARTICLE 4**

**<u>CLOSING</u>**

4.1    <u>Closing Date.</u>

Upon the terms and subject to the conditions hereof, the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "<u>Closing</u>") shall take place remotely by teleconference or at the offices of Jones Walker, Suite 2900, 811 Main Street, Houston, Texas 77002, no later than three Business Days following the entry of the Sale Order and the date on which the conditions set forth in <u>Article 9</u> and <u>Article 10</u> have been satisfied or, if permissible, waived, except for those conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or, if permissible, waiver of such conditions. The date at which the Closing actually occurs is hereinafter referred to as the "<u>Closing Date.</u>"

4.2    <u>Payment on the Closing Date.</u>

Subject to satisfaction or, if permissible, waiver of the conditions set forth in <u>Article 9</u> and <u>Article 10</u>, at the Closing (by the party entitled to grant such waiver as the intended beneficiary of such conditions), Buyer shall pay, or cause to be paid, the Closing Payment, *minus* the amount of the Deposit, *minus* any amount deposited into the Hard Consent Escrow Account, by wire transfer of immediately available funds to an account specified in writing by the Seller prior to the Closing Date.

4.3    <u>Buyer's Deliveries.</u>

At the Closing, Buyer shall deliver or cause to be delivered to Seller (or such other Persons where applicable and so designated):

(a)    the Closing Payment to the Seller in accordance with <u>Section 4.2</u>;

(b)    the Cure Costs in accordance with <u>Section 2.5(a)</u>;

(c)    the Assignment and each other Transaction Document to which Buyer is a party, duly executed (and acknowledged, where applicable) by Buyer, including the Assignment, letters-in-lieu of transfer orders to be prepared by Buyer, any applicable change of owner notices required under applicable operating agreements, and any other applicable forms and declarations required by federal and state agencies relative to Buyer's assumption of operations and plugging and abandonment Liabilities with respect to all of the Assets;

(d)    a certificate duly executed by an authorized officer of Buyer, dated as of the Closing, certifying on behalf of Buyer that the covenants in <u>Section 10.1</u> and <u>Section 10.3</u> have been duly performed by Buyer and complied with in all material respects;

(e)    a certificate duly executed by an authorized officer of Buyer, dated as of the Closing, (i) attaching and certifying on behalf of Buyer complete and correct copies of the resolutions of

26

the board of directors or other equivalent governing body of Buyer authorizing the execution, delivery, and performance by Buyer of this Agreement and the transactions contemplated hereby, which resolutions or consent shall be dated prior to the date of this Agreement, and (ii) certifying on behalf of Buyer the incumbency of each officer of Buyer executing this Agreement or any document delivered in connection with the Closing;

    (f) evidence (including evidence of satisfaction of all applicable bonding or insurance requirements) as Seller may reasonably request demonstrating that Buyer is qualified with the applicable Governmental Authorities and pursuant to any applicable operating agreement to be a successor to Seller as the owner of the Assets; and

    (g) such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

  4.4 <u>Seller's Deliveries.</u>

  At the Closing, Seller shall deliver to Buyer:

    (a) the Assignment and each other Transaction Document to which Seller is a party, duly executed by the Seller;

    (b) a copy of the Sale Order;

    (c) a certificate duly executed by the CRO, dated as of the Closing, certifying on behalf of Seller that the covenants in <u>Section 9.1</u> and <u>Section 9.2</u> have been duly performed by Seller and complied with in all material respects;

    (d) (i) a certificate duly executed by the CRO, dated as of the Closing, (A) attaching and certifying on behalf of Seller complete and correct copies of the resolutions or unanimous consent of the Special Committee authorizing the execution, delivery, and performance by Seller of this Agreement and the transactions contemplated hereby, which resolutions or consent shall be dated prior to the date of this Agreement, and (B) certifying on behalf of Seller the incumbency of the CRO executing this Agreement or any document delivered in connection with the Closing; or (ii) as an alternative to the certificate described in <u>Section 4.4(d)(i)</u>, the Sale Order shall include a finding from the Bankruptcy Court that the CRO is authorized to execute this Agreement and any document delivered in connection with the Closing and to cause Seller to deliver and perform all obligations of Seller under this Agreement; and

    (e) such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Assets.

**ARTICLE 5**

**REPRESENTATIONS AND WARRANTIES OF SELLER**

  Except as disclosed in the Disclosure Schedules attached hereto, Seller represents and warrants the following to Buyer:

5.1     Organization and Good Standing.

To the best of Seller's Knowledge, (a) Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and (b) Seller has the requisite partnership power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

5.2     Authority; Validity; Consents.

Seller has, subject to requisite Bankruptcy Court approval, the requisite partnership or corporate power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to requisite Bankruptcy Court approval, the execution, delivery and performance of this Agreement and such other Transaction Documents by Seller and the consummation by Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite partnership action. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents which Seller is party thereto constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by general principles of equity. Subject to requisite Bankruptcy Court approval, to Seller's Knowledge, except (a) for entry of the Sale Order, (b) for notices, filings and consents required in connection with the Bankruptcy Case and (c) for the notices, filings and consents set forth on Disclosure Schedule 5.2, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, have a Material Adverse Effect.

5.3     Permits.

To Seller's Knowledge, all Permits necessary for the Seller to own or operate the Oil and Gas Assets have been obtained and are in effect and no violations exist in respect of such Permits, except for such non-compliance, failure to obtain or maintain, and such facts, conditions or circumstances constituting violations, the existence of which would not, individually or in the aggregate, constitute a Material Adverse Effect.

5.4     Wells; Plug and Abandon Notice.

To Seller's Knowledge, except as set forth on Disclosure Schedule 5.4, there are no Wells as to which Seller has received an Order from any Governmental Authority requiring that such Wells be plugged and abandoned.

5.5     Imbalances.

To Seller's Knowledge, except as set forth on Disclosure Schedule 5.5, there are no Imbalances relating to the Oil and Gas Assets as of the date stated therein.

5.6     AFEs.

To Seller's Knowledge, Disclosure Schedule 5.6 sets forth a list, true and correct as of the date set forth therein, of any material authority for expenditure (individually an "AFE" and collectively, the "AFEs") for capital expenditures with respect to the Oil and Gas Assets that have been proposed by any Person having authority to do so (including internal AFEs of Seller not delivered to third parties), as well as any other commitment to make expenditures in respect of the ownership or operation of the Oil and Gas Assets, in each case, which require, individually, an expenditure in excess of $100,000.  The amounts shown on Disclosure Schedule 5.6 with respect to any operations or projects are estimates only and Seller makes no representation or warranty concerning the actual costs of the operations or activities to which such AFEs relate.

5.7     Hedging.

To Seller's Knowledge, there are no futures, options, swaps or other derivatives with respect to the sale of Hydrocarbons from the Oil and Gas Assets that are or will be binding on the Oil and Gas Assets at any time after the Closing Date.

5.8     Preferential Purchase Rights.

To Seller's Knowledge, Disclosure Schedule 5.8 lists all Preferential Purchase Rights applicable to the transactions contemplated by this Agreement.

5.9     Legal Proceedings.

To Seller's Knowledge, except for the Bankruptcy Case and any adversary proceedings relating to the Bankruptcy Case, the NETX Litigation and as set forth on Disclosure Schedule 5.11, there is no Proceeding or Order pending, outstanding or threatened in writing against Seller that seeks to restrain or prohibit or otherwise challenge the consummation, legality or validity of the transactions contemplated hereby or that would have, individually or in the aggregate, a Material Adverse Effect.

5.10    Knowledge Qualifier for Non-Operated Oil and Gas Assets.

To the extent that Seller has made any representations or warranties in this Article 5 in connection with matters relating to Oil and Gas Assets as to which Seller is not the operator, each and every such representation and warranty shall be deemed to be qualified by the phrase "To Seller's Knowledge".

5.11    Bankruptcy.

From the Voluntary Petition Date through the date that this Agreement is executed, Seller has been at all times in its Bankruptcy Case a debtor in possession pursuant to section 1107 of the Bankruptcy Code, and no trustee or examiner has been appointed in the Bankruptcy Case.

5.12    No Other Representations or Warranties; Disclaimers.

(a)     NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER

(INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY AFFILIATE OR REPRESENTATIVE OF SELLER OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, ANY PETROLEUM ENGINEER OR ENGINEERING FIRM, SELLER'S COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLER). WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, SELLER EXPRESSLY DISCLAIMS AND NEGATES ANY REPRESENTATION OR WARRANTY, EXPRESS, IMPLIED, AT COMMON LAW, BY STATUTE, OR OTHERWISE, RELATING TO (A) THE TITLE TO ANY OF THE ASSETS, (B) THE CONDITION OF THE ASSETS (INCLUDING ANY IMPLIED OR EXPRESS WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR CONFORMITY TO MODELS OR SAMPLES OF MATERIALS), IT BEING DISTINCTLY UNDERSTOOD THAT THE ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS," (C) ANY INFRINGEMENT BY SELLER OF ANY PATENT OR PROPRIETARY RIGHT OF ANY THIRD PARTY, (D) ANY INFORMATION, DATA, OR OTHER MATERIALS (WHETHER WRITTEN OR ORAL) FURNISHED TO BUYER BY OR ON BEHALF OF SELLER (INCLUDING WITHOUT LIMITATION, IN RESPECT OF ANY SEISMIC DATA, THE EXISTENCE OR EXTENT OF HYDROCARBONS OR THE MINERAL RESERVES, THE RECOVERABILITY OF SUCH RESERVES, ANY PRODUCT PRICING ASSUMPTIONS, AND THE ABILITY TO SELL HYDROCARBON PRODUCTION AFTER THE CLOSING), AND (E) THE ENVIRONMENTAL CONDITION AND OTHER CONDITION OF THE ASSETS AND ANY POTENTIAL LIABILITY ARISING FROM OR RELATED TO THE ASSETS.

(b)     **NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS AGREEMENT OR ANY OTHER TRANSACTION DOCUMENT, EXCEPT AS SET FORTH IN <u>ARTICLE 5</u>, SELLER EXPRESSLY DISCLAIMS, AND BUYER WAIVES, ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, WITH RESPECT TO ANY ENVIRONMENTAL LIABILITIES, RELEASE OF HAZARDOUS MATERIALS OR ANY OTHER ENVIRONMENTAL CONDITION, INCLUDING THE PRESENCE OR ABSENCE OF ASBESTOS OR NORM IN OR ON THE ASSETS IN QUANTITIES TYPICAL FOR OILFIELD OPERATIONS IN THE AREAS WHERE THE ASSETS ARE LOCATED. AS OF CLOSING, BUYER SHALL HAVE SATISFIED ITSELF AS TO THE PHYSICAL AND ENVIRONMENTAL CONDITION OF THE ASSETS, BOTH SURFACE AND SUBSURFACE, INCLUDING CONDITIONS SPECIFICALLY RELATING TO THE PRESENCE, RELEASE, OR DISPOSAL OF HAZARDOUS SUBSTANCES, SOLID WASTES, ASBESTOS, OTHER MAN-MADE FIBERS, AND NORM. BUYER IS RELYING SOLELY UPON THE TERMS OF THIS AGREEMENT AND ITS OWN INSPECTION OF THE ASSETS.**

(c)     Seller does not make any representation or warranty to Buyer as to transferability or assignability of operatorship of the Assets or the ability of Buyer or any other Person to be designated or qualified as the operator of the Assets.

(d)     **SELLER AGREES THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE 5</u> AND THE REST OF THIS AGREEMENT ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LEGAL REQUIREMENTS**.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

6.1     Organization and Good Standing.

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2     Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Buyer is not or will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict; Qualification to Be Designated Operator by Railroad Commission of Texas.

(a)      The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the partnership agreement, bylaws or other governing documents of Buyer, as applicable, (c) any Order or (d) any Legal Requirement. Prior to Closing, Buyer shall provide documentation to Seller that it, or its designee, is a duly approved operator with the Railroad Commission of Texas (approved Form P-5) that can operate the Assets as required.

(b)      Buyer is qualified to own and assume operatorship of the Assets in all jurisdictions where the Assets are located, and the Sale Order will not cause Buyer to be disqualified as such an owner or operator or to exceed any acreage limitations imposed by Law.

31

6.4     <u>Availability of Funds.</u>

At Closing, Buyer will have sufficient cash in immediately available funds (without giving effect to any unfunded financing, regardless of whether any such financing is committed) to pay the Purchase Price, the Cure Costs and all costs, fees and expenses to be paid by Buyer that are necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, and assume the Assumed Liabilities.

6.5     <u>Litigation.</u>

There are no Proceedings pending or, to the Knowledge of Buyer, threatened, that would affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.6     <u>Brokers or Finders.</u>

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

6.7     <u>Independent Investigation.</u>

Buyer is (or its advisors are) experienced and knowledgeable in the oil and gas business and are aware of the risks of such business. Buyer acknowledges and affirms that it is solely responsible for making its independent investigation, verification, analysis, evaluation and valuation of the Assets and making all such reviews and inspections of the Assets as it deems necessary or appropriate to consummate the transactions contemplated hereby.  Except for the representations and warranties expressly made by Seller in <u>Article 5</u> of this Agreement, the Assignment or the certificate to be delivered to Buyer pursuant to <u>Section 4.4(c)</u> of this Agreement, Buyer acknowledges that there are no representations or warranties, express or implied, as to the financial condition, Liabilities, operations, business, condition, volume, recoverability, value or prospects of the Assets and that, in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own independent investigation, verification, analysis, and evaluation. Buyer understands and acknowledges that neither the United States Securities and Exchange Commission nor any federal, state, or foreign agency has passed upon the Assets or made any finding or determination as to the fairness of an investment in the Assets or the accuracy or adequacy of the disclosures made to Buyer, and, except as set forth in <u>Article 11</u>, Buyer is not entitled to cancel, terminate or revoke this Agreement.

6.8     <u>Bankruptcy.</u>

There are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to Buyer's Knowledge, threatened in writing against Buyer or any Affiliate of Buyer.  Buyer is not (and will not be upon, or by virtue of, the consummation of the transactions contemplated hereby) insolvent.

6.9     <u>Tag-Along Parties.</u>

Buyer acknowledges that it has been informed of the obligation imposed on Seller under the terms of the Exploration Agreements that Seller use its best efforts to cause a buyer of the Subject Interests (as defined in the Exploration Agreements) to offer to acquire that portion of the Subject Interests owned by Tag-Along Parties (as defined in the Exploration Agreements) at the same time and on the identical terms

and conditions, proportionately adjusted to account for differences in the ownership percentages held by the parties to the Exploration Agreement, in the Subject Interests. Buyer further acknowledges that it is satisfied that, through Seller's notification to Buyer of this obligation, Seller has discharged this best efforts obligation.

6.10    <u>Acknowledgement of Disclaimers</u>.

(a)    Buyer acknowledges that (i) the Assets have been used for exploration, development, production, gathering, and transportation of oil and gas and other Hydrocarbons and there may be petroleum, produced water, wastes, scale, NORM, Hazardous Materials, or other substances or materials located in, on or under the Assets or associated with the Assets; (b) Equipment and sites included in the Assets may contain asbestos, NORM or other Hazardous Materials; (c) NORM may affix or attach itself to the inside of wells, pipelines, materials, and equipment as scale, or in other forms; (d) the wells, materials, and equipment located on the Assets or included in the Assets may contain NORM and other wastes or Hazardous Materials; (e) NORM containing material or other wastes or Hazardous Materials may have come in contact with various environmental media, including water, soils, or sediment; and (f) special procedures may be required for the assessment, remediation, removal, transportation, or disposal of environmental media, wastes, asbestos, NORM, and other Hazardous Materials from the Assets.

(b)    **BUYER ACKNOWLEDGES AND AGREES THAT, WITHOUT LIMITATION OF THE OTHER TERMS OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, CLAIMS OR PROCEEDINGS AGAINST SELLER OR TO WHICH SELLER IS OR MAY BECOME A PARTY BEFORE, ON, OR AFTER THE CLOSING MAY HAVE AN EFFECT ON THE CALCULATION OF, AND LIABILITY WITH RESPECT TO, TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF BUYER ARISING UNDER THIS AGREEMENT AFTER THE CLOSING DATE RELATING TO THE ASSETS AND THE ASSUMED LIABILITIES AND THE NET REVENUE INTEREST OR WORKING INTEREST WITH RESPECT TO THE ASSETS. WITHOUT LIMITATION OF THE OTHER TERMS OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, NOTWITHSTANDING THAT SELLER HAS RETAINED ANY LIABILITY OR RESPONSIBILITY UNDER THIS AGREEMENT FOR THE PAYMENT OF ANY DAMAGES, LOSSES OR CLAIMS WITH RESPECT TO ANY OF THE FOREGOING, THE EXCLUDED LIABILITIES AND OTHER LIABILITIES OF SELLER HEREUNDER SHALL NOT INCLUDE, AND BUYER HEREBY EXPRESSLY RELEASES SELLER GROUP, ANY LIABILITY OR RESPONSIBILITY ARISING OUT OF OR RELATING TO ANY EFFECT THAT THE OUTCOME OR SETTLEMENT OF ANY SUCH CLAIMS OR PROCEEDINGS MAY HAVE ON THE CALCULATION OF TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF BUYER ARISING AFTER THE CLOSING DATE. WITHOUT LIMITATION OF SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES OR BUYER'S RIGHTS UNDER OTHER PROVISIONS OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS FOR THE AVOIDANCE OF DOUBT, BUYER ACKNOWLEDGES AND AGREES THAT BUYER CANNOT RELY ON OR FORM ANY CONCLUSIONS FROM SELLER'S METHODOLOGIES FOR (A) THE CALCULATION AND REPORTING OF PRODUCTION AND ROYALTIES ATTRIBUTABLE TO PRODUCTION PRIOR TO THE CLOSING DATE, OR (B) THE DETERMINATION AND REPORTING OF ANY ASSET TAXES THAT WERE UTILIZED FOR ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING PRIOR TO THE CLOSING DATE FOR PURPOSES OF CALCULATING AND REPORTING ASSET TAXES ATTRIBUTABLE TO ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING AFTER THE CLOSING DATE, IT BEING UNDERSTOOD THAT BUYER MUST MAKE ITS OWN DETERMINATION AS TO THE PROPER METHODOLOGIES THAT CAN OR SHOULD BE USED FOR ANY SUCH LATER TAX RETURN**.

(c)     **BUYER ACKNOWLEDGES THAT IT SHALL ASSUME ALL RISK OF LOSS WITH RESPECT TO: (i) CHANGES IN COMMODITY OR PRODUCT PRICES AND ANY OTHER MARKET FACTORS OR CONDITIONS FROM AND AFTER THE CLOSING DATE; (ii) WITHOUT LIMITATION OF THE OTHER TERMS OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, PRODUCTION DECLINES OR ANY ADVERSE CHANGE IN THE PRODUCTION CHARACTERISTICS OR DOWNHOLE CONDITION OF ANY WELL, INCLUDING ANY WELL WATERING OUT, OR EXPERIENCING A COLLAPSE IN THE CASING OR SAND INFILTRATION, FROM AND AFTER THE CLOSING DATE AND (iii) DEPRECIATION OF ANY ASSETS THAT CONSTITUTE PERSONAL PROPERTY THROUGH ORDINARY WEAR AND TEAR.**

(d)     Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Assets (including Buyer's own estimate and appraisal of the extent and value of Seller's Hydrocarbon reserves attributable to the Assets, and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Assets. Buyer acknowledges that in entering into this Agreement, it has relied only on the aforementioned investigation and the express representations and warranties of Seller contained in this Agreement and the Transaction Documents. Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Proceeding of any kind against Seller or its Affiliates, alleging facts contrary to the foregoing acknowledgment and affirmation.

(e)     **BUYER AGREES THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5 AND THE REST OF THIS AGREEMENT ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LEGAL REQUIREMENTS.**

## ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

7.1     Operations Prior to the Closing Date.

Seller covenants and agrees that, except (v) as expressly contemplated by this Agreement, (w) as disclosed in Schedule 7.1, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed) or (y) as otherwise required by Legal Requirements (including as required under the Bankruptcy Code), after the date of this Agreement and prior to the Closing Date:

(a)     Seller shall, subject to the approval, if required, of the Bankruptcy Court:

(i)     pay or cause to be paid all Property Costs with respect to the Assets;

(ii)     maintain its books, accounts and records consistent with past practices;

(iii)     use commercially reasonable efforts, taking into account Seller's status as a debtor in possession, to maintain its relationships with its key service providers;

(iv)     provide Buyer a copy of the Daily Field Reports each day for current activities;

(v)      provide Buyer a copy of the Weekly Production Reports each week;

(vi)     provide Buyer a copy of the Monthly Lease Operating Statements each month;

(vii)    provide Buyer with monthly profit and loss statements prepared in accordance with generally accepted accounting principles; and

(viii)   continue to operate the business in the ordinary course, taking into account Seller's status as a debtor in possession. Seller shall use commercially reasonable efforts to notify Buyer of any situation (such as damage, shutdown or malfunction) involving the Assets to which a reasonably prudent operator would devote attention. Promptly after notification of such a situation, Buyer shall notify Seller of the measures that Buyer believes a reasonably prudent operator would take to protect the affected Asset, and Buyer and Seller shall negotiate in good faith to develop a plan to protect the affected Asset, but with Buyer to have the ultimate authority to take corrective action. Any costs incurred by Buyer with respect to such negotiated remedial efforts shall be deducted from the final Purchase Price.

(b)      Seller shall not:

(i)      exercise any election to abandon any Asset (except any abandonment of Leases to the extent any such Leases terminate in accordance with their terms);

(ii)     propose or agree to participate in any single operation with respect to the Wells or Assigned Leases and Interests without first using commercially reasonable efforts to notify Buyer, except for emergency operations, operations scheduled pursuant to the AFEs, operations required by any Governmental Authority, or any such operations that are in the ordinary course;

(iii)    terminate, cancel, or materially amend or modify any Assigned Contract or Assigned Lease and Interest, except as such may be ordered by the Bankruptcy Court;

(iv)     sell, lease, encumber, or otherwise dispose of all or any portion of any Assets, except sales of Hydrocarbons in the ordinary course of business; or

(v)      enter into any agreement or commitment to take any action prohibited by this Section 7.1(b).

Notwithstanding the foregoing provisions of this Section 7.1, in the event of an emergency or as ordered by the Bankruptcy Court, Seller may take such action as reasonably necessary and shall notify Buyer of such action promptly thereafter.  The acts or omissions of third Persons who are not controlled Affiliates of Seller shall not constitute a violation of the provisions of this Section 7.1, nor shall any action required by a vote of working interest owners constitute such a violation so long as the Seller has voted its interests in a manner consistent with the provisions of this Section 7.1.

7.2    Reasonable Commercial Efforts.

(a)      Each of Seller and Buyer shall use reasonable commercial efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate as soon as practicable, the transactions contemplated by this Agreement,  including using reasonable commercial efforts to: (i) cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) obtain, at the earliest practicable date, all necessary Governmental Authorizations and to make all necessary registrations, declarations and filings

(including registrations, declarations and filings with Governmental Authorities, if any) and to take all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) execute or deliver any additional instruments necessary to consummate the transactions contemplated hereby and to carry out the purposes of this Agreement.

(b)     Each of Seller and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, neither Party shall participate, or agree to participate in any meeting with any Governmental Authority with respect to any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Party in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate in such meeting, in each case to the extent practicable. Subject to any restrictions under applicable laws, rules or regulations, each of Buyer and Seller shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it, its Affiliates and its respective Representatives and any Governmental Authority or members of its staff with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to a Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

(c)     Subject to the terms and conditions of this Agreement, Buyer shall take any and all steps necessary to avoid or eliminate any impediments under any applicable antitrust, competition or trade regulation laws, rules or regulations that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible, including, without limitation, proposing, negotiating, committing to and effecting, by consent decree or otherwise, the sale, divestiture or disposition of such assets or businesses of Buyer or any of its controlled Affiliates as may be required in order to avoid the entry, or to effect the dissolution, of any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of preventing, delaying or restricting the consummation of the transactions contemplated in this Agreement.

(d)     At the Closing, to the extent required under the Operating Agreement or Exploration Agreements, Seller shall deliver letters-in-lieu of transfer or division orders to Buyer.  To the extent that Seller receives after the Closing payments from purchasers of Hydrocarbons on or after the Closing Date, Seller shall remit such payments to Buyer within five Business Days after receiving such payments; *provided*, that Buyer shall pay all expenses attributable to the production of such Hydrocarbons. To the extent that Buyer receives payments from purchasers of Hydrocarbons for sales that precede the Closing Date, Buyer shall remit to Seller such payments within five Business Days after receiving such payments; *provided*, that Seller shall pay of all expenses attributable to such revenue with respect to pre-Closing time periods.

7.3     <u>Successor Operator</u>.

(a)     Buyer acknowledges that it desires to succeed Seller as operator of those Assets or portions thereof that Seller may operate. Buyer further acknowledges and agrees that Seller cannot and does not covenant or warrant that Buyer or any Affiliate of Buyer shall become successor operator of such Assets

or portions thereof. Seller and Buyer agree however that, as to the Assets that Seller operates, prior to Closing they shall use their commercially reasonable efforts (at no out-of-pocket cost to Seller) to have Buyer designated, to the extent legally possible and permitted under any applicable joint operating agreements, as successor operator of such Acquired Assets effective as of the Closing, and Buyer hereby consents and agrees to accept such designation and the responsibilities and Liabilities as the operator of such Acquired Assets.

(b)      To the extent required by any applicable Laws, Buyer, or its applicable designee, shall, as of the Closing Date, make all reasonable efforts to (a) hold all permits, lease bonds, and any other surety or similar requirements as may be required by, and in accordance with, all applicable Laws governing the ownership and operation of the Assets and (b) have filed any and all required reports necessary for such ownership and operation with all Governmental Authorities having jurisdiction over such ownership and operation.

7.4      Bankruptcy Court Approval.

(a)      Buyer understands that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval, and to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and best offer for the Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court. Seller understands that Buyer must provide adequate assurance of future performance under the to-be-assigned Leases and Executory Contracts.

(b)      If any party other than Buyer or Seller appeals or seeks a stay of the Sale Order, Seller shall promptly notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)      From and after the Execution Date of this Agreement and prior to the Closing or the termination of this Agreement in accordance with Section 11.1, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

7.5      Bankruptcy Filings.

Subject to Section 7.4, Seller shall pursue diligently the entry of the Sale Order; *provided that,* and notwithstanding anything herein to the contrary, Seller, in all instances, shall act in accordance with its fiduciary obligations and obligations owed under the Bankruptcy Code. Buyer agrees that it shall promptly take such actions as are reasonably requested by Seller to assist Seller in obtaining entry of the Sale Order (after Buyer has had an opportunity to review and comment on the form and substance of the Sale Order) and a finding by the Bankruptcy Court that Buyer has presented adequate assurance of its future performance of the Assigned Contracts and Assigned Leases and Interests, documentation evidencing its performance of its obligations under this Agreement and evidence that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code. In the event that the entry of the Sale Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation). Notwithstanding the foregoing, any resulting changes to this Agreement or any related document or resulting material changes to the Sale Order shall be subject to the approval of Buyer in its reasonable discretion. Seller shall (i) provide Buyer with drafts of any and all other pleadings and proposed orders to be filed or submitted in connection with this Agreement and the transactions

contemplated hereby, and such pleadings and proposed orders shall be in form and substance reasonably acceptable to Buyer and (ii) make reasonable efforts to consult and cooperate with Buyer regarding any discovery taken in connection with seeking entry of the Sale Order (including any depositions).

      7.6    Bidding Procedures.

Buyer agrees and acknowledges that Seller, including through its Representatives, is and may continue to take such actions as are mandated by the Bidding Procedures and the Bidding Procedures Order, including for the avoidance of doubt, the termination of this Agreement at any time prior to Closing if mandated by such Bidding Procedures or Bidding Procedures Order.

      7.7    Back-up Bidder.

If an Auction is conducted and Seller does not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-up Bidder, Buyer will be the Back-up Bidder. If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as may be amended with Buyer's written consent prior to or at the Auction) open and irrevocable until the closing of the sale of the Assets to the Successful Bidder. If the Successful Bid with the Successful Bidder is terminated prior to closing, Buyer will be deemed to be the Successful Bidder and will proceed promptly to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be amended with Buyer's written consent prior to or at the Auction).

      7.8    Updates and Amendments of Exhibits and Schedules.

Until the fifth Business Day before Closing, Seller shall have the right to amend, modify and/or supplement **Exhibit A**, **Exhibit B** (subject to Section 2.5) and **Exhibit C**, Schedule 2.2(g), Schedule 2.2(h), Schedule 2.2(i), and Schedule 2.5(b), in each case, as applicable, in order to reflect (i) any additional Contracts or Leases agreed to be assumed by and subsequently assigned to Buyer, (ii) the deletion of any Contracts or Leases from any such Exhibit or Schedule, or (iii) the addition of Exhibits or Schedules that are responsive to the representations and warranties contained herein but for which an Exhibit or Schedule is not contemplated as of the Execution Date of this Agreement. For all purposes of this Agreement, including for purposes of termination pursuant to Article 11 and for determining whether the conditions set forth in Article 11 have been fulfilled, the Exhibits and Schedules to Seller's representations and warranties contained in this Agreement shall be deemed to include only that information contained therein on the date that this Agreement is executed and shall be deemed to exclude all information contained in any addition, supplement or amendment thereto.

## ARTICLE 8

## ADDITIONAL AGREEMENTS

      8.1    Taxes.

      (a)    Any transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement (collectively, the "Transfer Taxes") shall be borne by and paid by Buyer when do. Seller and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Assets from any Transfer Taxes, including under section 1146(a) of the Bankruptcy Code. Buyer will, at its own expense, timely file all necessary Tax Returns and other documentation with respect to all Transfer

Taxes, and, if required by applicable law, rule or regulation, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

(b)    Seller shall retain responsibility for, and shall bear and pay, all ad valorem, property, excise, severance, production or similar Taxes based upon operation or ownership of the Assets or the production of Hydrocarbons or the receipt of proceeds therefrom (but excluding, for the avoidance of doubt, income, franchise and similar Taxes and Transfer Taxes) (collectively, the "Asset Taxes") for (i) any period ending prior to the Effective Time and (ii) the portion of any Straddle Period ending prior to the Effective Time.  For purposes of allocation between the Parties of Asset Taxes assessed with respect to the Assets that are payable with respect to any tax periods beginning before and ending after the Effective Time ("Straddle Periods"), the portion of any such Taxes that are attributable to the portion of the Straddle Period that ends prior to the Effective Time shall (A) in the case of such Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis such as severance or production Taxes, be allocated based on revenues from sales occurring before the Effective Time (which shall be Seller's responsibility) and on or after the Effective Time (which shall be Buyer's responsibility); and (B) in the case of other Asset Taxes, be allocated pro rata per day between the period prior to the Effective Time (which shall be Seller's responsibility) and the period on and after the Effective Time (which shall be Buyer's responsibility). For purposes of clause (A) and (B) of the preceding sentence, any exemption, deduction, credit or other item that is calculated on an annual basis shall be allocated pro rata per day between the period ending prior to the Effective Time and the period beginning on and after the Effective Time. At the Closing, Asset Taxes for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Asset Tax assessment for such Straddle Period, if available, or if otherwise, based on the Asset Taxes paid during the preceding Tax period. With respect to any not yet delinquent Asset Taxes relating to a Tax year ending after the Closing Date, Buyer assumes responsibility for the payment of all such Asset Taxes to the applicable Governmental Authority. With respect to any Asset Taxes relating to a Straddle Period or pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing.

(c)    Seller or Buyer, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other (the "Paying Party") all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Section 8.1. Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective Liability therefor (together with the supporting calculation of such Taxes and Liability), although failure to do so will not relieve the Reimbursing Party from its Liability hereunder except to the extent the Reimbursing Party is prejudiced thereby. Any amounts which may become payable from Seller to Buyer pursuant to this Section 8.1 shall constitute a super priority administrative expense of Seller under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

(d)    From and after Closing Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Assets are located; *provided*, *however*, that neither Buyer nor Seller shall be required to disclose the contents of its income Tax Returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(d) shall be borne by the Party requesting it.

8.2     Allocation of Purchase Price.

The Purchase Price shall be allocated among the Assets as set forth in Schedule 8.2(a) hereto, and the portion of the Purchase Price allocated to each Asset is referred to herein as the "Allocated Value" of such Asset. Seller and Buyer agree to be bound by the Allocated Values set forth in Schedule 8.2(a) and Schedule 8.2(b) for purposes of this Agreement. Schedule 8.2(b) sets forth the allocation of the Purchase Price and any liabilities assumed by Buyer under this Agreement that are treated as consideration for Tax purposes among the Assets in accordance with section 1060 pf the Code, and the regulations thereunder (the "Tax Allocation"). Seller and Buyer agree that the Tax Allocation shall be prepared in a manner consistent with the Allocated Values, as set forth on Schedule 8.2(a). Seller and Buyer each agree to report, and to cause their respective Affiliates to report, the federal, state and local income and other Tax consequences of the transactions contemplated herein, and in particular to report the information required by section 1060(b) of the Code, and to jointly prepare Form 8594 (Asset Acquisition Statement under section 1060 of the Code) as promptly as possible following the Closing Date and in a manner consistent with the Tax Allocation as revised to take into account subsequent adjustments to the Purchase Price, including any adjustments pursuant to the Agreement to determine the Purchase Price, and shall not take any position inconsistent therewith upon examination of any Tax return, in any refund claim, in any litigation, investigation, or otherwise, unless required to do so by a determination as defined in section 1313(a) of the Code (or corresponding provision of state Tax Law), or with the Party's prior consent.

8.3     Bulk Sales.

Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar Legal Requirements that may otherwise be applicable with respect to the sale and transfer of any or all of the Assets to Buyer.

8.4     Payments Received.

Each of Seller and Buyer agree that, after the Closing and until the Final Determination Date, each will hold and will promptly transfer and deliver to the other within five Business Days after receipt, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing and until the Final Determination Date which properly belongs to the other in accordance with the terms of this Agreement and will account to the other for all such receipts. For the avoidance of doubt, to the extent that Seller receives after the Closing payments from purchasers of Hydrocarbons related to the Assets which is attributable to production on or after the Effective Time, Seller shall remit such payments to Buyer within five Business Days after receiving such payments. To the extent that Buyer receives payments from purchasers of Hydrocarbons for sales of production attributable to production prior to the Effective Time, Buyer shall remit to Seller such payments within five Business Days after receiving such payments. Notwithstanding anything herein to the contrary, nothing in this Section 8.4 or elsewhere in this Agreement shall prohibit or prevent Seller from ceasing operations or winding up their affairs following Closing.

8.5     Assigned Contracts: Adequate Assurance and Performance.

(a)     With respect to each Assigned Contract, Buyer shall provide adequate assurance as required under the Bankruptcy Code of the future performance by Buyer of each such Assigned Contract. Buyer and Seller agree that they will promptly take all actions reasonably required to obtain a Bankruptcy Court Order that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court

40

and making Buyer's and Seller's employees and Representatives available to testify before the Bankruptcy Court.

(b)     Buyer shall pay, perform or satisfy the Assumed Liabilities from time to time and as such Assumed Liabilities become due and payable or are required to be performed or satisfied in accordance with their respective terms.

8.6     <u>Post-Closing Books and Records and Personnel.</u>

For five years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim), (a) Buyer shall not dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer shall allow Seller (including, for clarity, any trust established for Seller or any other successors of Seller) and any of its directors, officers, employees, counsel, representatives, accountants and auditors reasonable access during normal business hours, at Seller's (or such Person's) sole expense and upon reasonable advance notice, to all employees and files of Buyer and their respective controlled Affiliates and any Records included in the Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Seller, the functions of any such trusts or successors, or other reasonable business purposes, and Seller (including any such trust or successors) and such directors, officers, employees, counsel, representatives, accountants and auditors shall have the right to make copies of any such files, books, records and other materials. Until the closing of the Bankruptcy Case or the liquidation and winding up of Seller's estates, Seller shall preserve and keep the Records and, at Buyer's sole expense, shall make such Records, records, and Seller's personnel available to Buyer as may be reasonably required by Buyer in connection with, among other things, any insurance claims by, Proceedings, Actions or Tax audits against, or governmental investigations of, Buyer or any of its Affiliates or in order to enable Buyer to comply with its obligations under this Agreement and each other Transaction Document. In the event any Party desires to destroy any such Records during or after the time during which they must be maintained pursuant to this <u>Section 8.6</u>, such Party shall first give 90 days prior written notice to the other Party and any such other Party shall have the right at its option and expense, upon prior written notice given within such 90 day period to the Party desiring to destroy such Records or records, to take possession of the applicable Records within 180 days after the date of such notice, or such shorter period as the liquidation and winding up of Seller's estates shall permit.

8.7     <u>Casualty.</u>

If, after the Execution Date of this Agreement and prior to the Closing, a material part of the Assets suffers a Casualty Loss or if a material part of the Assets is taken in condemnation or under the right of eminent domain or if proceedings for such purposes are initiated, Buyer shall, subject to the satisfaction (or waiver of the conditions to Closing in <u>Article 9</u>, and Seller shall, subject to the satisfaction (or waiver) of the conditions to Closing set forth in <u>Article 10</u>, nevertheless be required to proceed with Closing, *provided that*, in the event of a Casualty Loss, at Closing, Seller shall pay to Buyer all amounts paid to Seller by insurers or other Third Parties as insurance proceeds or compensation for such Casualty Loss and shall assign, transfer and set over to Buyer or subrogate Buyer to all of Seller's right, title and interest (if any) in insurance claims, unpaid awards and other rights against Third Parties related to such Casualty Loss; *further provided that,* Seller shall reserve and retain all rights, title, interests and claims against Third Parties who are not Affiliates of Seller for the recovery of Seller's costs and expenses incurred prior to the Closing in pursuing or asserting any such insurance claims or other rights against such Third Parties with respect to any such Casualty Loss, and further provided that nothing contained herein shall confer on Buyer any rights with respect to insurance or any other claims (i) that relate to any Casualty Losses with respect to the Assets that were incurred prior to the Execution Date of this Agreement, or (ii) that relate to any of the Seller's assets other than the Assets.

8.8     No Recourse to Buyer's Debt Financing Sources.

(a)     Subject to the rights of the parties to any commitment letter evidencing the Buyer's financing incurred or intended to be incurred by Buyer in regards to financing, in whole or in part, the Deposit, the balance of the Purchase Price at Closing, and the other transactions contemplated by this Agreement (collectively, the "***Buyer's Financing***"), under the terms thereof, none of the parties hereto, or any of their respective Affiliates, shall have any rights or claims against any persons, including any investors, lenders or arrangers, that have committed to provide the Buyer's Financing (such persons collectively, the "***Buyer's Financing Sources***") in connection with the terms of this Agreement or the Buyer's Financing, whether at law or equity, in contract, in tort or otherwise.

(b)     Notwithstanding anything in this Agreement to the contrary, each of the parties hereto agrees (i) that it will not bring, support or permit any claim, action, proceeding or counterclaim involving any Buyer's Financing Sources arising out of, or relating to this Agreement, the transactions contemplated hereby, the Buyer's Financing or the performance of services thereunder or related thereto, against such Buyer's Financing Sources in any forum other than any federal court of the United States sitting in Houston, Texas and any appellate court thereof or, if that court does not have subject matter jurisdiction, in any state court located in Houston, Texas; (ii) that service of process, summons, notice or document by registered mail addressed to them at their respective addresses will be effective service of process against them for any such legal proceeding brought in any such court; (iii) to hereby waive, to the fullest extent permitted by law, any objection which any of them may now or hereafter have to the laying of venue of, and the defense of an inconvenient forum to the maintenance of, any such legal proceeding in any such court; and (iv) that any such legal proceeding will be governed and construed in accordance with the laws of the State of Texas. The provisions of this <u>Section 8.8</u> shall be enforceable by any Buyer's Financing Sources, their Affiliates and their respective successors and assigns.

EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING AGAINST ANY BUYER'S FINANCING SOURCES DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND FOR ANY COUNTERCLAIM THEREIN.

## ARTICLE 9

## CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

9.1     Accuracy of Representations.

The representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties shall be true and correct in all material respects on and as of such earlier date), except whether the failure to be true and correct could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. If Buyer determines that there has been a breach or inaccuracy of any of Seller's representations and warranties, it shall provide Seller with notice of such breach or inaccuracy as promptly as reasonably practicable so that Seller may attempt to cure such breach or inaccuracy on or before the Closing Date.

9.2     Seller's Performance.

The covenants and agreements that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, including those set forth in Section 7.1.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.

9.4     Seller's Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.4 shall have been so delivered or Seller shall be ready, willing and able to make such deliveries (or cause such deliveries to be made).

9.5     Sale Order.

The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not be subject to a stay pending appeal.  The Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising liens, claims, and encumbrance (other than Permitted Encumbrances and Assumed Liabilities) of, against or created by Seller or its bankruptcy estate, shall be fully released from and with respect to the Assets, which shall be transferred to Buyer free and clear of all such liens, claims (subject to Section 2.7), and encumbrance (other than Permitted Encumbrances and Assumed Liabilities).

9.6     Change of Operator Forms.

Each of Buyer and Seller, pursuant to Section 10.6, shall duly execute all federal, state, and other forms necessary to effectuate the change in operator with respect to the Assets to be operated by Buyer or its designee after Closing.

**ARTICLE 10**

**CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE**

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

10.1     Accuracy of Representations.

The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties shall be true and correct in all material respects on and as of such earlier date), except whether the failure to be true and correct could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

43

10.2    <u>Sale Order in Effect.</u>

The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall be in full force and effect and shall not be subject to a stay pending appeal.

10.3    <u>Buyer's Performance.</u>

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects.

10.4    <u>No Order.</u>

No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and which has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.

10.5    <u>Buyer's Deliveries.</u>

Each of the deliveries required to be made to Seller pursuant to <u>Section 4.3</u> shall have been so delivered or Buyer shall be ready, willing and able to make such deliveries (or cause such deliveries to be made).

10.6    <u>Change of Operator Forms.</u>

Each of Seller and Buyer, pursuant to <u>Section 9.6</u>, shall duly execute all federal, state, and other forms necessary to effectuate the change in operator with respect to the Assets to be operated by Buyer or its designee after Closing.

## ARTICLE 11

## <u>TERMINATION</u>

11.1    <u>Termination Events.</u>

Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)    by either Seller or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order prohibiting the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of Seller or Buyer or either of their Affiliates;

(ii)    by mutual written consent of Seller and Buyer;

(iii)    if the Bankruptcy Court enters an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, the Bankruptcy Case; and

(iv)    if the Seller exercises its rights under Section IV(D)(xiii) of the Bidding Procedures to pursue an Alternative Transaction because such action is deemed necessary by the Seller to discharge properly its fiduciary duties or to otherwise comply with the governing law.

(b)      by Buyer:

(i)      in the event of any breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein and such breach (A) would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied, and (B) has not been cured by Seller within 15 Business Days after Buyer has given written notice thereof to Seller (which notice shall specify the nature of such breach and be given as promptly as practicable); *provided*, *however*, that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 11.1(b)(i) if Buyer is in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or similar expressions);

(ii)      if Seller enters into and consummates an Alternative Transaction;

(iii)      if the Closing shall not have occurred by the Outside Date, or such later date as agreed to in writing by Seller and Buyer; *provided*, *however*, that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 11.1(b)(iii) if Buyer is in breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or similar expressions); *provided*, *further*, that in the event Buyer is determined to be the Back-Up Bidder with respect to the Assets, Buyer shall have no right to terminate this Agreement until the earlier of: (x) the closing of the Successful Bid with the Successful Bidder; or (y) if the Successful Bid with the Successful Bidder is terminated prior to closing and Buyer is then deemed to be the Successful Bidder, the Outside Date provided herein.

(c)      by Seller:

(i)      upon any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein and such breach (A) would result in the failure of a condition set forth in Section 10.1, Section 10.3 or Section 10.5 to be satisfied (including, without limitation, if Buyer is unable to deliver the Closing Payment to Seller in accordance with Section 4.3(a) because of Buyer's failure to obtain Buyer's Financing), and (B) has not been cured within 15 Business Days after the giving of written notice thereof by Seller to Buyer (which notice shall specify the nature of such breach and be given as promptly as practicable); *provided*, *however*, that Seller shall not be permitted to terminate this Agreement pursuant to this Section 11.1(c)(i) if Seller is in breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(ii)      if Seller enters into and consummates an Alternative Transaction; and

(iii)      if the Closing shall not have occurred by the Outside Date, or such later date as agreed to in writing by Seller and Buyer; *provided*, *however*, that Seller shall not be permitted to terminate this Agreement pursuant to this Section 11.1(c)(iii) if Seller is itself in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions).

45

11.2     Effect of Termination.

Subject to Section 3.2, in the event of termination of this Agreement by Buyer or Seller pursuant to this Article 11, this Agreement shall become null and void and have no effect, and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party (other than as expressly provided herein); *provided*, that the provisions of Sections 13.8 (Expenses), and 13.10 (Governing Law, Consent to Jurisdiction and Venue; Jury Trial Waiver), and 13.16 (Injunctive Relief), and this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 11 shall expressly survive the termination of this Agreement).

11.3     Mutual Acknowledgment of Agreements.

Each Party acknowledges that the agreements contained in this Article 11 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

## ARTICLE 12

## SURVIVAL AND LIMITATIONS

12.1     Non-Survival of Seller's Representations and Warranties; Survival of Other Provisions.

(a)     All (i) representations and warranties of Seller set forth in this Agreement and the other Transaction Documents shall terminate and expire at Closing (except as expressly set forth in this Section 12.1); (ii) the covenants, obligations and agreements of Seller set forth in this Agreement and the other Transaction Documents which are expressly stated to be performed on or prior to Closing shall terminate and expire at Closing; and (iii) the covenants, obligations and agreements of Seller set forth in this Agreement and the other Transaction Documents to be performed after Closing shall survive the Closing and terminate and expire the date such covenant, obligation and/or agreement is fully performed; provided, however, that Seller shall not be deemed to be in breach of any covenant, obligation and/or agreement unless Seller fails to cure such breach within 60 days of Purchaser's written notification to Seller of such breach.

(b)     The representations, warranties, obligations and covenants of Buyer set forth in this Agreement and the other Transaction Documents, including the covenants and obligations set forth in Section 2.3, shall survive the Closing indefinitely. Subject to Article 11 and Section 13.10, the liability of Buyer under this Agreement shall be without limit.

12.2     Buyer's Exclusive Remedy and Certain Limitations.

(a)     If this Agreement is terminated pursuant to Article 11 for any reason, notwithstanding anything to the contrary contained in this Agreement, Buyer's sole and exclusive remedy against Seller with respect to (i) the negotiation, performance and consummation of, or the failure to consummate, the transactions contemplated hereunder, (ii) any breach of the representations, warranties, covenants and agreements of Seller contained herein, (iii) the affirmations of such representations, warranties, covenants and agreements contained in this Agreement or any other Transaction Document delivered hereunder by or on behalf of Seller, and/or (iv) the breach or failure of Seller to perform any warranties, covenants or agreements of Seller required to be performed hereunder and under any Transaction Document, shall be limited to the return of the Deposit, if returnable to Buyer pursuant to Section 3.2(c).

46

(b)     From and after the Closing, notwithstanding anything to the contrary contained in this Agreement, Buyer shall have no remedy against Seller, and Buyer shall be deemed to have waived, released, remised and forever discharged Seller from any and all Damages, suits, legal or administrative proceedings, claims, demands, losses, costs, obligations, liabilities, interest, charges or causes of action whatsoever, in law or in equity, known or unknown, which Buyer might now or subsequently may have, based on, relating to or arising out of (i) all avoidance, fraudulent transfer, preference or similar claims, causes of action, rights or proceedings, including all claims under Chapter 5 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act enacted by any state, or any other similar state or Federal law, (ii) the negotiation, performance and consummation of this Agreement or the other Transaction Documents or the transactions contemplated hereunder or thereunder, (iii) any breach of the representations, warranties, covenants and agreements of Seller contained in this Agreement or the other Transaction Documents, (iv) the affirmations of such representations, warranties, covenants and agreements contained in this Agreement or any other Transaction Document delivered hereunder by or on behalf of Seller, (v) the breach or failure of Seller to perform any warranties, covenants or agreements of Seller required to be performed hereunder and under any Transaction Document and/or (vi) Seller's ownership, use or operation of the Assets, or the condition, quality, status or nature of the Assets, **INCLUDING RIGHTS TO CONTRIBUTION UNDER CERCLA OR ANY OTHER ENVIRONMENTAL LAW, BREACHES OF STATUTORY AND IMPLIED WARRANTIES, NUISANCE OR OTHER TORT ACTIONS, RIGHTS TO PUNITIVE DAMAGES, COMMON LAW RIGHTS OF CONTRIBUTION, ANY RIGHTS UNDER INSURANCE POLICIES ISSUED OR UNDERWRITTEN BY SELLER, EVEN IF CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE, OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY RELEASED PERSON, INVITEES OR THIRD PARTIES, BUT, IN ALL CASES, EXCLUDING ANY ACTUAL FRAUD CLAIMS THAT BUYER MAY HAVE.**

12.3    Express Negligence/Conspicuous Manner.

**WITH RESPECT TO THIS AGREEMENT, ALL PARTIES AGREE THAT THE PROVISIONS SET OUT IN THIS ARTICLE 12 AND ELSEWHERE IN THIS AGREEMENT COMPLY WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS PROVISIONS REQUIRING BUYER TO BE RESPONSIBLE FOR THE NEGLIGENCE (WHETHER, SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF SELLER. BUYER REPRESENTS TO SELLER (A) THAT BUYER HAS CONSULTED AN ATTORNEY CONCERNING THIS AGREEMENT OR, IF IT HAS NOT CONSULTED AN ATTORNEY, THAT BUYER WAS PROVIDED THE OPPORTUNITY AND HAD THE ABILITY TO SO CONSULT, BUT MADE AN INFORMED DECISION NOT TO DO SO AND (B) THAT BUYER FULLY UNDERSTANDS ITS OBLIGATIONS UNDER THIS AGREEMENT.**

## ARTICLE 13

## GENERAL PROVISIONS

13.1    Confidentiality.

The Parties agree that the confidentiality agreement entered into by them and their Affiliates, dated [●] (the "Confidentiality Agreement"), shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; *provided*, *however*, that (a) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute

a breach of such Confidentiality Agreement, and (b) disclosures permitted under this Agreement shall not constitute a breach of such Confidentiality Agreement.

13.2    Public Announcements.

Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Seller or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or with respect to disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto, Buyer and Seller shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

13.3    Notices.

All notices (including any notice of termination pursuant to Section 11.1 of this Agreement), consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by email (with read receipt requested, with the receiving Party being obligated to respond affirmatively to any read receipt requests delivered by the other Party), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and representatives (if applicable) set forth below (or to such other addresses and representatives as a Party may designate by notice to the other Parties):

      (i)     If to Seller, then to:

> Barrow Shaver Resources Company LLC
> Attn:  James Katchadurian
> 977 Pruitt Place
> Tyler, TX 75703
> Email:  james.katchadurian@cr3partners.com

with a copy (which shall not constitute notice) to:

> Jones Walker LLP
> 201 St. Charles Avenue, Suite 5100
> New Orleans, LA 70170
> Attn: Curtis R. Hearn, Meredith Maxwell
> E-mail: chearn@joneswalker.com;
>         mmaxwell@joneswalker.com

-and-

> Jones Walker LLP
> 811 Main Street, Suite 2900
> Houston, TX 77002
> Attn: Joseph E. Bain, Sean T. Wilson
> E-mail: jbain@joneswalker.com;
>         swilson@joneswalker.com

48

    (ii)    If to Buyer:

TEXOIL INVESTMENTS, LLC

_____

_____

Attn:  Brett Lattin

Email: _____

with a copy (which shall not constitute notice) to:

Jones, Allen & Fuquay, LLP
7557 Rambler Road, Suite 500
Dallas, Texas 75231
Attn: Laura L. Worsham
Email: lworsham@jonesallen.com

13.4    <u>Waiver, Waiver of Damages.</u>

Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER FOR SPECIAL, INDIRECT, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS AGREEMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER SAME MAY BE CAUSED) AND THE PARTIES HEREBY WAIVE ALL CLAIMS FOR ANY SUCH DAMAGES.

13.5    <u>Entire Agreement; Amendment.</u>

This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer and Seller with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and Seller with respect to their subject matter. This Agreement may not be amended except by a written agreement executed by all of the Parties.

13.6    <u>Assignment.</u>

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); *provided*, *however*, that Buyer shall be permitted, upon prior notice to Seller prior to the Closing Date, to assign all or part of its rights and/or obligations hereunder to one or more of its Affiliates, and each such assignee shall be deemed

to be a Buyer for all purposes under the Transaction Documents to the extent of the rights and obligations so assigned to such assignee. No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to the Seller or Buyer shall also apply to any such assignee unless the context otherwise requires.

13.7     Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

13.8     Expenses.

Whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby; *provided*, *however*, that, subject to Section 8.1(a), Transfer Taxes shall be borne by Buyer.

13.9     Time of Essence.

Time shall be of the essence with respect to all time periods and notice periods set forth in this Agreement.

13.10     Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)     SUBJECT TO SECTION 8.8, EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAWS OR ANY OTHER LAW THAT WOULD MAKE THE LAWS OF ANY OTHER JURISDICTION OTHER THAN THE STATE OF TEXAS APPLICABLE HERETO.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a Texas federal court sitting in Houston, Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with Section 13.3) or any other manner permitted by Legal Requirement.

(c)       EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENT CONTEMPLATED HERETO AND THERETO OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

13.11     Counterparts.

This Agreement and any amendment hereto may be executed in one or more counterparts and by different Parties in separate counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or other electronic means (including portable document format sent via email) shall be as effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

13.12     Parties in Interest; Third Party Beneficiaries.

This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind; provided notwithstanding anything in this Agreement to the contrary, the parties expressly confirm their agreement that any liquidation trust established and approved by the Bankruptcy Court as a successor in interest to Seller shall be an express intended third-party beneficiary of this Agreement. Any such liquidation trust shall be entitled to reply upon, shall be an express intended third-party beneficiary of, and shall be entitled to enforce the provisions of, this Agreement as if such liquidation trustee were an original party hereto. The Parties further agree that Seller shall be entitled to assign to any such liquidation trust without any Buyer's consent any right or claim that Seller may have pursuant to or arising under this Agreement.

13.13     Non-Recourse.

Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against the Parties hereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties hereto, no other party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any party under this Agreement, the other Transaction Documents, or any other agreement contemplated hereto and thereto or of or for any Proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud,

strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party hereto or another Person or otherwise.

13.14   Disclosure Schedules; Materiality.

The inclusion of any matter in any Disclosure Schedule shall be deemed to be an inclusion in all other Disclosure Schedules to the extent that such disclosure is sufficient to identify the matter to which such disclosure is responsive and reasonably apparent on its face, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Disclosure Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

13.15   WAIVER OF TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT.

BUYER EXPRESSLY ACKNOWLEDGES AND RECOGNIZES THAT THE PRICE FOR WHICH SELLER HAS AGREED TO SELL THE ASSETS AND PERFORM ITS OBLIGATIONS UNDER THE TERMS OF THIS AGREEMENT HAS BEEN PREDICATED UPON THE INAPPLICABILITY OF THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER PROTECTION ACT, TEX. BUS. & COM. CODE § 17.41 *ET SEQ.* (THE "DTPA"), OR ANY SIMILAR STATUTE, AND THE WAIVER OF THE DTPA, AND ANY SIMILAR STATUTE, BY BUYER, SET FORTH IN THIS SECTION 13.15. BUYER'S RIGHTS AND REMEDIES WITH RESPECT TO THIS TRANSACTION AND WITH RESPECT TO ALL ACTS OR PRACTICES OF SELLER, PAST, PRESENT, OR FUTURE, IN CONNECTION WITH THIS TRANSACTION SHALL BE GOVERNED BY LEGAL PRINCIPLES OTHER THAN THE DTPA, OR ANY SIMILAR STATUTE OF ANY JURISDICTION THAT MAY BE APPLICABLE TO THE TRANSACTIONS CONTEMPLATED HEREBY. BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES THE APPLICABILITY OF THE DTPA, OR ANY SIMILAR STATUTE, TO THIS TRANSACTION AND ANY AND ALL RIGHTS, DUTIES, OR REMEDIES THAT MIGHT BE IMPOSED BY THE DTPA, OR ANY SIMILAR STATUTE.

13.16   Injunctive Relief.

(a)   Except as provided in Section 3.2(d), the Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement or the other Transaction Documents (as applicable) were not performed in accordance with their specific terms or were otherwise breached, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement or the other Transaction Documents (as applicable), and, accordingly, any Party shall be entitled to injunctive relief to prevent any such breach, and to specifically enforce specifically the terms and provisions of this Agreement or the other Transaction Documents (as applicable), including without limitation specific performance of such covenants, promises or agreements or an order enjoining a Party from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement or the other Transaction Documents (as applicable).  The rights set forth in this Section 13.16 shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement or the other Transaction Documents (as applicable).

(b)   The Parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement or the other Transaction Documents (as applicable) by Buyer or Seller, as applicable, and to specifically enforce the terms and provisions of this Agreement or the other Transaction Documents (as applicable) to prevent

breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of Buyer or Seller, as applicable, under this Agreement or the other Transaction Documents (as applicable) all in accordance with the terms of this <u>Section 13.16</u>.

(c)     Notwithstanding the foregoing, nothing in this <u>Section 13.16</u> shall prevent Seller from ceasing operations or winding up its affairs following the Closing.

*[Signature page follows.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

**SELLER:**

BARROW SHAVER RESOURCES COMPANY, LLC

By: _____

Name: _____

Title: _____

**BUYER:**

TEXOIL INVESTMENTS, LLC

By: _____

Name: _____

Title: _____

#110108336v6