ASSET PURCHASE AGREEMENT ¶

(LOT 2)

DATED AS OF NOVEMBER [●], 2025

BY AND BETWEEN

BARROW SHAVER RESOURCES COMPANY, LLC

AS SELLER,

AND

[●]TEXOIL INVESTMENTS, LLC ,

AS BUYER

**THIS DRAFT IS STRICTLY CONFIDENTIAL AND FOR DISCUSSION PURPOSES ONLY. CIRCULATION OF THIS DRAFT SHALL NOT GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY AN OFFER, CONTRACT, OR ANY OTHER LEGAL OBLIGATION OF ANY TYPE OR NATURE. NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUATED AND DELIVERED BY ALL PARTIES.**

**TABLE OF CONTENTS**

**ARTICLE 1 DEFINITIONS**     **2**

1.1    Definitions. ................................................................................2
1.2    Other Definitions and Interpretive Matters. ................................7

**ARTICLE 2 PURCHASE AND SALE**     **8**

2.1    Purchase and Sale. ........................................................................8
2.2    Assets. ..........................................................................................89
2.3    Excluded Assets. ..........................................................................910
2.4    Assumed Liabilities. ....................................................................1011
2.5    Excluded Liabilities. ....................................................................1011
2.6    Further Assurances. ......................................................................11

**ARTICLE 3 PURCHASE PRICE**     **11**

3.1    Purchase Price. .............................................................................11
3.2    Deposit. ........................................................................................1112

**ARTICLE 4 CLOSING**     **1214**

4.1    Closing Date. ................................................................................1214
4.2    Payment on the Closing Date. ......................................................1314
4.3    Buyer's Deliveries. ......................................................................1314
4.4    Seller's Deliveries. ......................................................................1315

**ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF SELLER**     **1415**

5.1    Organization and Good Standing. ................................................1415
5.2    Authority; Validity; Consents. ....................................................1415
5.3    Title to Potential Avoidance Actions. ..........................................1416
5.4    Bankruptcy. ..................................................................................1516
5.5    No Other Representations or Warranties; Disclaimers. ................1516

**ARTICLE 6 REPRESENTATIONS AND WARRANTIES OF BUYER**     **1617**

6.1    Organization and Good Standing. ................................................1617
6.2    Authority; Validity; Consents. ....................................................1617
6.3    No Conflict. ..................................................................................17
6.4    Availability of Funds. ..................................................................17
6.5    Litigation. .....................................................................................1718
6.6    Brokers or Finders. ......................................................................1718
6.7    Independent Investigation. ...........................................................1718
6.8    Bankruptcy. ..................................................................................18
6.9    Acknowledgement of Disclaimers. ..............................................18¶

**ARTICLE 7 ACTIONS PRIOR TO THE CLOSING DATE**     **1819**

7.1    Operations Prior to the Closing Date...........................................................1819
7.2    Reasonable ~~Best~~Commerical Efforts...................................................1820
7.3    Bankruptcy Court Approval........................................................................1920
7.4    Bankruptcy Filings.....................................................................................1921
7.5    Bidding Procedures....................................................................................2021
7.6    Back-up Bidder..........................................................................................2021

**ARTICLE 8 ADDITIONAL AGREEMENTS**     2022

8.1    Taxes...........................................................................................................2022
8.2    Allocation of Purchase Price.....................................................................2123
8.3    Bulk Sales...................................................................................................2223
8.4    ~~Payments Received~~Reserved..............................................................2223
8.5    Post-Closing Books and Records and Personnel.......................................2223
8.6    Prosecution of Potential Avoidance Actions............................................24¶
8.7     No Recourse to Buyer's Debt Financing
Sources………………………………………………….24¶

**ARTICLE 9 CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE**     2226

9.1    Accuracy of Representations......................................................................2326
9.2    Seller's Performance..................................................................................2326
9.3    No Order.....................................................................................................2326
9.4    Seller's Deliveries.....................................................................................2326
9.5    Confirmation Order....................................................................................2326
9.6    Consummation of Purchase of Stipulated Oil and Gas Interests................26¶

**ARTICLE 10**     27¶

**CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE**     2327

10.1    Accuracy of Representations....................................................................2327
10.2    Confirmation Order in Effect...................................................................2427
10.3    Buyer's Performance................................................................................2427
10.4    No Order...................................................................................................2427
10.5    Buyer's Deliveries...................................................................................2427

**ARTICLE 11 TERMINATION**     2427

11.1    Termination Events...................................................................................2427
11.2    Effect of Termination...............................................................................2629
11.3    Mutual Acknowledgment of Agreements.................................................2629

**ARTICLE 12 SURVIVAL AND LIMITATIONS**     2629

12.1    Non-Survival of Seller's Representations and Warranties; Survival of Other Provisions..........2629
12.2    Buyer's Exclusive Remedy and Certain Limitations................................2629
12.3    Express Negligence/Conspicuous Manner...............................................2730

**ARTICLE 13 GENERAL PROVISIONS**     2731

ii

13.1    Confidentiality. ........................................................................................... 2731
13.2    Public Announcements. ............................................................................... 2831
13.3    Notices. ....................................................................................................... 2831
13.4    Waiver, Waiver of Damages. ...................................................................... 2932
13.5    Entire Agreement; Amendment. ................................................................. 2932
13.6    Assignment. ................................................................................................ 2933
13.7    Severability. ............................................................................................... 2933
13.8    Expenses. .................................................................................................... 3033
13.9    Time of Essence. ......................................................................................... 3033
13.10   Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver. ... 3033
13.11   Counterparts. ............................................................................................... 3134
13.12   Parties in Interest; No Third Party Beneficiaries. ...................................... 3134
13.13   Non-Recourse. ............................................................................................ 3134
13.14   Disclosure Schedules; Materiality. ............................................................. 3135
13.15   Waiver of Texas Deceptive Trade Practices – Consumer Protection Act WAIVER OF TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER PROTECTION ACT. ................................... 3135
13.16   Injunctive Relief. ....................................................................................... 3235

iii

SCHEDULES

Schedule ~~5.2~~3.3(b)   ~~Disclosures~~ Third Party Claimed Interest Schedule
Schedule ~~8.2~~8.2(a)       Allocated Values
Schedule ~~8.2~~8.2(b)       Tax Allocation

EXHIBITS

Exhibit A        Leases and Mineral Interests
Exhibit B        Form of Assignment

¶
¶
#103982600v11¶

## ASSET PURCHASE AGREEMENT (LOT 2)

**THIS ASSET PURCHASE AGREEMENT (LOT 2)** (this "Agreement"), dated as of November [●], 2025, is by and among Barrow Shaver Resources Company LLC, a Texas limited liability company ("Seller" or "BSR"), and [●], a [●]TexOil Investments, LLC , a Texas limited liability company ("Buyer"). Capitalized terms used but not otherwise defined herein have the meanings set forth in Article 1. Seller and Buyer are sometimes referred to collectively herein as the "Parties" and individually as a "Party".

## RECITALS

**WHEREAS**, Seller is engaged in onshore oil and natural gas exploration, development and production and owns, in varying proportions, certain oil and gas leases and associated assets in East Texas and desires to sell its interest in the causes of action associated with the Leases and Mineral Interests in the Hidden Rock Field.;

**WHEREAS**, on July 23, 2024 (the "Involuntary Petition Date"), the bankruptcy case, Case No. 24-33353 (the "Bankruptcy Case"), was commenced against Seller by the filing of an involuntary petition for relief under chapter 7 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), with the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court"). On August 19, 2024 (the "Voluntary Petition Date" or simply the "Petition Date"), Seller consented to an order for relief under chapter 11 of the Bankruptcy Code by filing its voluntary petition for relief. Seller continues to operate its business and manage its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Seller has informed Buyer of its separate intention to sell itssimultaneously with this Agreement, Seller and Buyer have entered into a separate asset purchase agreement (the "Asset Purchase Agreement (Lot 1)"), whereby Seller has agreed  to sell, and Buyer has agreed to purchase , Seller's rights and interests to certain Leases and Mineral Interests, as well as certain stipulated rights and interest to certain Leases and Mineral Interests, associated with the Hidden Rock Field (collectively, the "Stipulated Oil and Gas Interests") pursuant to a separate Asset Purchase Agreement;

**WHEREAS**, Seller holds potential rights, interests, claims, causes of action, and defenses to certain remaining Leases and Mineral Interests other than the Stipulated Oil and Gas Interests associated with the Hidden Rock Field as identified on **Exhibit A** (the "Properties");

**WHEREAS**, Seller has potential rights, interests, claims, causes of action, and defenses under state and federal law, including chapter 5 avoidance actions under the Bankruptcy Code, that relate to Seller's claims that it is the proper owner of the working interests in the Properties (such claims and causes of action are defined in Section 2.2(b) as the "Potential WIO Avoidance Actions") to which other parties have asserted or claimed an ownership interest;

**WHEREAS**, Seller has potential rights, interests, claims, causes of action, and defenses under state and federal law, including chapter 5 avoidance actions under the Bankruptcy Code, that relate to Seller's claims that it is the proper owner of the overriding royalty interests in the Properties (such claims and causes of action are defined in Section 2.2(a) as the "Potential ORRI Avoidance Actions" and together with the Potential WIO Avoidance Actions,, are defined as the "Potential Avoidance Actions") to which other parties have asserted or claimed an ownership interest;

1

WHEREAS, Buyer has an interest in acquiring the rights and interests of Seller with respect to the Potential Avoidance Actions ~~have significant value~~ and is willing to undertake the time, expenses, and risks involved in prosecuting the Potential Avoidance Actions;

WHEREAS, Seller intends to sell its rights and ~~interest~~ interests with respect to the Potential Avoidance Actions to Buyer, and Buyer desires to purchase Seller's interests in the Potential Avoidance Actions, upon the terms and conditions set forth in this Agreement;

WHEREAS, the Parties intend to ~~effect the sale~~ create a structure for transfer of Seller's rights and interests with respect to the Potential Avoidance Actions contemplated by this Agreement pursuant to sections 105, 363, and 365 of the Bankruptcy ~~Code and through a chapter 11 plan pursuant to sections 1123 and 1129 of the Bankruptcy~~ Code;

WHEREAS, Seller's obligation to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Confirmation Order by the Bankruptcy Court;

NOW, THEREFORE, in consideration of the premises, the mutual promises herein made, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

ARTICLE 1

**DEFINITIONS**

1.1     <u>Definitions</u>.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"<u>Action</u>" means any private or governmental action, suit or arbitration, or any inquiry, proceeding or investigation, by or before any Governmental Authority.

"<u>Affiliate</u>" has the meaning set forth in 11 U.S.C. § 101(2).

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph.

"<u>Allocated Value</u>" has the meaning set forth in Section ~~8.2.~~ 8.2.

"<u>Alternative Outside Date</u>" shall mean 30 days after the Outside Date.¶

"<u>Alternative Transaction</u>" means:

 (i)   any merger, consolidation, share exchange or other similar transaction to which Seller is a party that has the effect of transferring, directly or indirectly, all or a substantial portion of the Assets, or the direct or indirect ownership thereof, to any party other than Buyer;

 (ii)  any direct or indirect sale or sales of all or a substantial portion of the Assets to any party other than Buyer; or

2

(iii) any other transaction or transactions, including a plan of liquidation or reorganization, that transfers or vests ownership of, economic rights to, or benefits with respect to all or a substantial portion of the Assets to any party other than Buyer.

"Asset Purchase Agreement (Lot 1)" has the meaning set forth in the recitals.¶

"Assets" has the meaning set forth in Section ~~2.1(a)~~2.2.

"Asset Taxes" has the meaning set forth in Section 8.1(b).

"Assignment" means the Assignment and Bill of Sale substantially in the form attached hereto as **Exhibit B**.

"Assumed Liabilities" has the meaning set forth in Section 2.4.

"Auction" has the meaning set forth in the Bidding Procedures.

"Avoidance Litigation Account" has the meaning set forth in Section 3.3(a).¶

"Back-Up Bidder" means the bidder determined by the Seller in its sole discretion to have made the second-best offer for the Assets at the Auction.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Bidding Procedures" means the bidding procedures approved pursuant to the Bidding Procedures Order and a copy of which is attached thereto.

"Bidding Procedures Motion" means the Debtor's Emergency Motion for Entry of an Order (I) Approving the Bidding Procedures and Auction, (II) Scheduling Bid Deadlines, an Auction, Objection Deadlines, and a Hearing, (III) Approving the Form and Manner of Notice of the Sale Transaction, the Auction, the Hearing, and Assumption and Assignment Procedures, (IV) Authorizing the Debtor to Enter into a Lead Bidder Agreement, and (V) Granting Related Relief, ~~filed on or about~~ entered by the Bankruptcy Court on June ~~9~~27, 2025 as Docket No. 760.

"Bidding Procedures Order" means the Order entered by the Bankruptcy Court granting or approving (in whole or in part) the Bidding Procedures Motion and the Bidding Procedures.

"Business Day" means a day that is not a Saturday, a Sunday or any other day on which the Bankruptcy Court is not open to the public for conducting business.

"Buyer" has the meaning set forth in the introductory paragraph.

"Buyer Default Termination" has the meaning set forth in Section 3.2(b)(iii).

"Buyer Intentional Breach" has the meaning set forth in Section 3.2(d).

"Buyer Parties" means Buyer, its respective Affiliates and the former, current or future equity holders and Representatives of each of the foregoing.

3

"Buyer's Financing" has the meaning set forth in Section 8.7(a).¶

"Buyer's Financing Sources" has the meaning set forth in Section 8.7(a).¶

"Cash Consideration" has the meaning set forth in Section 3.1(a).

"Chapter 11 Plan" means a chapter 11 plan proposed by the Debtor that, among other things, effectuates the sale of the Assets from the Seller to the Buyer as contemplated by this Agreement.Claimed Interest Value" has the meaning set forth in Section 3.3(a).

"Cleared Interest" has the meaning set forth in Section 3.3(b).¶

"Cleared Interest Payment" has the meaning set forth in Section 3.3(b).¶

"Clear Title" means, with respect to each Third Party Claimed Interest described in the Third Party Claimed Interest Schedule, marketable title in Buyer or its designee that is free of any competing claim of ownership of legal, beneficial, equitable, or record title, or other rights by any Third Party Clouded Interest Claimant, including marketable title that is obtained free of such third-party claims through (a) a settlement in accordance with a settlement agreement approved by each of Seller and Buyer, (b) a final, non-appealable judgment issued by a court of competent jurisdiction, or (c) adjudication of a court of competent jurisdiction.¶

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidentiality Agreement" has the meaning set forth in Section 13.1.

"Confirmation Hearing" shall mean the hearing scheduled by the Bankruptcy Court (as the same may be continued from time to time) to consider entry of the Confirmation Order.

"Confirmation Order" means an Order entered by the Bankruptcy Court that confirms the Chapter 11 Plan pursuant to section 1129 of the Bankruptcy Code.

"CRO" means the Chief Restructuring Officer of Seller, who is currently James A. Katchadurian.

"Damages" means any actual loss, cost, cost of settlement, damage, expense, claim, award or judgment incurred or suffered by any Person arising out of or resulting from the matter in question, whether attributable to personal injury or death, property damage, contract breach claims, torts or otherwise, including reasonable fees and expenses of attorneys, consultants, accountants or other agents and experts reasonably incurred with respect to matters in question, the costs of investigation or monitoring of such matters, and the costs of enforcement of the indemnity provided hereunder, if applicable; *provided*, *however*, that "Damages" shall not include any Taxes that may be assessed on payments under Article 12 or any punitive, consequential or exemplary damages.

"Deposit" has the meaning set forth in Section 3.2(a).

"Deposit Account" has the meaning set forth in Section 3.2(a).

4

"DTPA" has the meaning set forth in Section 13.15.

"Effective Time" shall means 12:01 a.m. prevailing Central Time [•]on the Closing Date.

"Encumbrance" means all liens, whether consensual or statutory (including mechanic's, materialman's, carrier's, repairer's, contractor's and other similar liens arising under applicable Laws), replacement liens, adequate protection liens or other liens granted under sections 361, 363, or 364 of the Bankruptcy Code, other charges, encumbrances, options, and transfer restrictions, including without limitation, rights of first refusal or first offer, defect, or objection liens, easements, encroachments or servitudes, in each case, that constitutes an "interest" for purposes of Bankruptcy Code § 363(f), including without limitation those charges or interests in property within the meaning of "lien" under Bankruptcy Code § 101(37) or any other limitation, restriction, or interest that constitutes an "interest" for the purposes of Bankruptcy Code § 363(f).

"Escrow Agent" has the meaning set forth in Section 3.3(b).¶

"Excluded Assets" has the meaning set forth in Section 2.3.

"Executory Contract" means any Eexecutory Contract, as that term is defined in 11 U.S.C. § 365, related to the Assets, including the Excluded Assets, to which Seller is a party.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental authority or regulatory or administrative authority or any court, tribunal or judicial body having jurisdiction.

"Governmental Authorization" means any approval, consent, license, permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Insider" has the meaning set for in 11 U.S.C. § 101(31)(A).

"JIB Invoices" means all invoices or requests for payment or reimbursement issued by Seller, as Operator under the Operating Agreement, pursuant to Section D.2. of Article V thereof, to the parties to the Operating Agreement requiring their payment, in accordance with respective percentage shares, of expenses incurred in the development and operation of the Contract Area (as such term is defined in the Operating Agreement).

"Knowledge" means (i) with respect to Seller, the actual knowledge (without any duty of inquiry) of the CRO, and (ii) with respect to Buyer, the actual knowledge (without any duty of inquiry) of any officer of the Buyer.

-"Lease" means any existing oil and gas lease, oil, gas and mineral lease, sublease, and other Hydrocarbon leasehold interest, and the leasehold estates created thereby, including carried interests, rights of recoupment, options, reversionary interests, convertible interests, and rights to reassignment.

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Liability" means any direct or indirect, primary or secondary, liability, indebtedness, obligation, penalty, cost or expense (including costs of investigation, collection and defense), claim, deficiency,

guaranty or endorsement of or by any Person (other than endorsements of notes, bills, checks, and drafts presented for collection or deposit in the ordinary course of business) of any type, whether accrued, absolute or contingent, known or unknown, liquidated or unliquidated, matured or un-matured, or otherwise.

"Mineral Interests" means all mineral fee interests, non-leasehold mineral rights, and mineral servitudes in which Seller owns an interest, including royalty interests, overriding royalty interests, net profits interests, production payments, and without limiting the foregoing, other rights of whatever nature, whether legal or equitable, whether vested or contingent.

"Order" means any award, writ, injunction, judgment, order or decree entered, issued, made, or rendered by any Governmental Authority.

"ORRI" means an overriding royalty interest, whether properly or improperly conveyed. The classification of an interest as an "ORRI" or overriding royalty interest in this Agreement does not give any legal effect to the nature of the interest.

"Outside Date" shall mean May 1, 2026, or such other date as the Parties mutually agree in writing.¶

"Party" or "Parties" means, individually or collectively, Buyer and Seller.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, estate, trust, association, organization or other entity or Governmental Authority.

"Petition Date" has the meaning set forth in the recitals.

"Potential Avoidance Actions" includes the Potential ORRI Avoidance Actions and the Potential WIO Avoidance Actions.

"Potential ORRI Avoidance Actions" has the meaning set for in Section 2.2(a).

"Potential WIO Avoidance Actions" has the meaning set forth in Section 2.2(b).

"Preferential Purchase Right" means any right or agreement that enables any Person to purchase or acquire any Asset or any interest therein or portion thereof as a result of or in connection with the execution or delivery of this Agreement or the consummation of the transactions contemplated hereby.

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Proceeds" means any form of property, including, but not limited to, legal or equitable interests, cash, interest, penalties, legal fees, fees, damages, settlements, reimbursements, costs, expenses, sanctions, penalties, monetary award, securities, membership interests, partnership interests, liens, security interests, contingent interests, rights or other property paid, distributed by, or on behalf of any party in satisfaction, settlement, or resolution of a cause of action.

"Properties" has the meaning set forth in the Recitals.

"Purchase Price" has the meaning set forth in Section 3.1.

6

"Records" has the meaning set forth in Section 2.2(a)(iii) and Section 2.2(ba)(iii).

"Reimbursing Party" has the meaning set forth in Section 8.1(c).

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Seller" has the meaning set forth in the introductory paragraph.

"Special Committee" means the committee comprised of Scott O. Shaver, Linda Barrow, and the CRO appointed pursuant to that certain Joint Written Consent of the Members and the Sole Manager of Barrow Shaver Resources Company LLC, dated effective as of August 19, 2024.

"Stipulated Oil and Gas Interests" has the meaning set forth in the Recitals.

"Straddle Period" has the meaning set forth in Section 8.1(b).

"Successful Bidder" means the bidder for the Assets with the highest or otherwise superior bid for the Assets as determined in accordance with the Bidding Procedures.

"Tax" or "Taxes" means (i) all taxes, assessments, fees and other charges of any kind whatsoever imposed by any Governmental Authority, including any federal, state, local and/or foreign income tax, surtax, remittance tax, presumptive tax, net worth tax, special contribution tax, production tax, value added tax, withholding tax, gross receipts tax, windfall profits tax, profits tax, ad valorem tax, personal property tax, real property tax, sales tax, goods and services tax, service tax, transfer tax, use tax, excise tax, premium tax, stamp tax, motor vehicle tax, entertainment tax, insurance tax, capital stock tax, franchise tax, occupation tax, payroll tax, employment tax, unemployment tax, disability tax, alternative or add-on minimum tax and estimated tax, and (ii) any interest, fine, penalty or additions to tax imposed by a Governmental Authority in connection with any item described in clause (i).

"Tax Allocation" has the meaning set forth in Section 8.28.2.

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Third Party" means any Person other than Seller, Buyer, or any of their respective Affiliates.

"Third Party Claimed Interest Escrow Account" has the meaning set forth in Section 3.3(b).¶

"Third Party Claimed Interests" has the meaning set forth in Section 3.3(a).¶

"Third Party Claimed Interest Schedule" has the meaning set forth in Section 3.3(a).¶

"Transaction Documents" means this Agreement, the Asset Purchase Agreement (Lot 1), and any other agreements, instruments or documents entered into pursuant to this Agreement or the Asset Purchase Agreement (Lot 1).

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

7

"Voluntary Petition Date" has the meaning set forth in the recitals.

"Wells" means those wells included in the Leases and Mineral Interests as identified on **Exhibit A**.

"Working Interest" means, with respect to any Well, the interest (expressed as a percentage or a decimal) that is burdened with the obligation to bear and pay costs and expenses of maintenance, development and operations for that Well from those formations in which such Well is currently producing, or with respect to a Well that is not currently producing, the last depth or formation at which it produced, in each case, without regard to the effect of any Royalties.

 1.2  Other Definitions and Interpretive Matters.

   (a)  Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period. When calculating the period of time before which, within which, or following which any act is to be done or step taken pursuant to this Agreement, if the last day of such period (or if any other date specified in this Agreement for giving any notice or taking any action) is a day other than a Business Day, then the period (or date) in question shall end on (or be deemed to be) the next succeeding Business Day.

Dollars. Any reference in this Agreement to dollars means United States dollars.

Exhibits/Schedules/Disclosure Schedules. All Exhibits, Schedules, and Disclosure Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit, Schedule, or Disclosure Schedule but not otherwise defined therein shall be defined as set forth in this Agreement. All references in this Agreement to any "Exhibit", "Schedule", or "Disclosure Schedule" are to the corresponding Exhibit, Schedule, or Disclosure Schedule of this Agreement, unless otherwise specified.

Gender and Number. Any reference in this Agreement to gender includes all genders, and words imparting only the singular number include the plural and vice versa.

Headings. The provision of a table of contents, the division of this Agreement into Articles, Sections, and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement, unless otherwise specified.

Herein. Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

Including. The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

   (b)  No Strict Construction. Buyer and Seller participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by Buyer and Seller, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

Without limitation as to the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

## ARTICLE 2

## PURCHASE AND SALE

2.1    Purchase and Sale.

(a)    Upon the terms and subject to the conditions of this Agreement and the Confirmation Order, on the Closing Date, Seller shall sell, transfer, assign, convey, and deliver, or cause to be sold, transferred, assigned, conveyed, and delivered, to Buyer, and Buyer shall purchase from Seller, free and clear of all Encumbrances, the Assets.

2.2    Assets.

–The "Assets" shall be limited to all right, title, and interest of Seller in, to, or under the following (after excluding any Excluded Assets):

(a)    the following Assets (collectively, the "Potential ORRI Avoidance Actions"):

(i)    all potential claims, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims, and defenses of Seller in the ORRIs with respect to the Properties, including those claims attributable to the avoidance of Insider ORRI assignments;

(ii)    all potential Proceeds of the Potential ORRI Avoidance Actions; and

(iii)    all legal rights of Seller to access or use, information, books, databases, files, records and data (whether in written or electronic format) relating directly to the Potential ORRI Avoidance Actions only to the extent necessary to prosecute or defend the Potential ORRI Avoidance Actions, except for (A) records that Seller is prohibited from disclosing or transferring under any Third Party agreement or applicable law, (B) information entitled to legal privilege, including attorney work product and attorney-client communications (except for title opinions, which shall be included in such records), (C) economic projections and records of offers from or negotiations with, Buyer or Third Parties with respect to any proposed transfer of any of the Assets and economic analyses associated therewith (collectively, subject to such exclusions, the "ORRI Records"). The ORRI Records shall include, to the extent available and necessary to prosecute or defend the Potential ORRI Avoidance Actions, lease records, well records, well files, production records; and any other Records specifically requested by the Buyer to the extent the Parties mutually agree (but only to the extent transferable without material restriction (including a material restriction against assignment without prior consent)), and any other proprietary data which Seller has in its possession relating to the ownership, operation, development, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Hydrocarbons or produced water from, the Assets; *provided*, that if access to any ORRI Records can only be provided to Buyer with a fee or penalty, Buyer shall bear responsibility for such fee or penalty.

(b)    the following Assets (collectively, the "Potential WIO Avoidance Actions"):

(i)    all potential claims, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims, and defenses of Seller to the Working Interests,

9

including those unrecorded Working Interests, with respect to the interest in the Properties currently claimed to be owned by third parties other than ~~the~~ Seller.

          (ii)        all potential Proceeds of the Potential WIO Avoidance Actions; and

          (iii)        all legal rights of Seller to access or use information, books, databases, files, records and data (whether in written or electronic format) relating directly to the Potential WIO Avoidance Actions only to the extent necessary to prosecute or defend the Potential WIO Avoidance Actions, except for (A) records that Seller is prohibited from disclosing or transferring under any Third Party agreement or applicable law, (B) information entitled to legal privilege, including attorney work product and attorney-client communications (except for title opinions, which shall be included in such records), (C) economic projections and records of offers from or negotiations with, Buyer or Third Parties with respect to any proposed transfer of any of the Assets and economic analyses associated therewith (collectively, subject to such exclusions, the "<u>WIO Records</u>" and, together with the ORRI Records, the "<u>Records</u>"). The WIO Records shall include, to the extent available and necessary to prosecute or defend the Potential WIO Avoidance Actions, lease records, well records, well files, production records; and any other WIO Records specifically requested by the Buyer to the extent the Parties mutually agree (but only to the extent transferable without material restriction (including a material restriction against assignment without prior consent)), and any other proprietary data which Seller has in its possession relating to the ownership, operation, development, maintenance or repair of, or the production, gathering, treatment, processing, storing, sale or disposal of Hydrocarbons or produced water from, the Assets; *provided*, that if access to any WIO Records can only be provided to Buyer with a fee or penalty, Buyer shall bear responsibility for such fee or penalty.

          (c)        All rights of Seller to any recoveries or reimbursements with respect to all amounts invoiced pursuant to JIB Invoices ~~issued on the Properties~~ that were issued on or before the Closing ~~Rights of~~by Seller, to the extent not paid ~~by such~~ to Seller by the Closing ~~d~~Date.

2.3     <u>Excluded Assets.</u>

Notwithstanding the foregoing, all assets of Seller other than the Assets shall be excepted, reserved and excluded from the transaction contemplated hereby (collectively, the "<u>Excluded Assets</u>"), including for the avoidance of doubt the following:

          (a)        the Purchase Price paid to Seller pursuant to this Agreement;

          (b)        all minute books, stock ledgers, corporate seals and stock certificates of Seller;

          (c)        all Executory Contracts related to the Assets not otherwise assumed pursuant to the procedures set forth in the Bidding Procedures and the Bidding Procedures Order;

          (d)        all (i) corporate, financial, Tax and legal records of Seller that relates to Seller's business generally (excepting the same to the extent solely relating to the Assets) and (ii) books, records and files that relate to any Excluded Assets;

          (e)        any refunds due to Seller by a Third Party for any overpayment of rentals, Royalties, excess royalty interests or production payments attributable to the Assets with respect to any period of time prior to the Closing Date;

          (f)        all insurance policies and rights to proceeds thereof;

(g)     all prepayments, good faith and other bid deposits submitted by any Third Party under the terms of the Bidding Procedures Order;

(h)     all claims, refunds, abatements, variances, allocations, causes of action, claims for relief, choses in action, rights of recovery, audit rights, rights of set-off, rights of indemnity, contribution or recoupment, counter-claims, cross-claims and defenses of Seller other than those constituting Assets;

(i)     any ~~such~~ ORRI determined by the Bankruptcy Court to be a valid and enforceable ORRI with respect to the Properties that is not subject to avoidance or otherwise unenforceable;

(j)     any Working Interest determined by the Bankruptcy Court to be a valid and enforceable Working Interest with respect to the Properties that is not subject to avoidance or otherwise unenforceable;¶

(k)     ~~(j)~~all other claims and causes of action of Seller, including those that may relate to any of the other Excluded Assets;

(l)     ~~(k)~~any documents or records withheld or not transferred pursuant to the exceptions set forth in Section 2.1(b)(iii), including all documents and instruments of Seller and its Affiliates that are protected by attorney-client privilege; and

(m)     ~~(l)~~any rights, claims, or causes of action of Seller under this Agreement or any other Transaction Document.

2.4     Assumed Liabilities.

Upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer shall assume and agree to discharge, when due (in accordance with their respective terms and subject to the respective conditions thereof), all Liabilities arising for, related to or associated with the Potential Avoidance Actions, including, without limitation, all liabilities with respect to counterclaims or counter-actions maintained or asserted by the opponent parties thereto, and fees and expenses, including attorneys' fees and litigation costs, relating to the pursuit and prosecution of the Potential Avoidance Actions, to the extent such Liabilities are attributable to periods from and after the Closing Date (collectively, the "Assumed Liabilities").

2.5     Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to pay, perform or otherwise discharge any Liability of Seller other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities").

2.6     Further Assurances.

The Parties agree to (a) furnish upon request to each other such further information, (b) execute, acknowledge and deliver to each other such other documents, and (c) do such other acts and things, all as the other Party may reasonably request for the purpose of carrying out the intent of this Agreement and the Transaction Documents; *provided*, that Seller's covenants and obligations after Closing shall be limited to the extent Seller has employees and resources available for such purposes and *provided*, *further* that nothing in this Section 2.6 or otherwise in this Agreement shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

# ARTICLE 3

## PURCHASE PRICE

3.1     Purchase Price.

The purchase price for the purchase, sale, assignment and conveyance of Seller's right, title and interest in, to and under the Assets shall consist of the following (collectively, the "Purchase Price"):

(a)     cash in an amount equal to [$●]25,659,270 (the "Cash Consideration"), which shall be delivered by Buyer as set forth in Section 4.23.3; and

(b)     the assumption of the Assumed Liabilities.

3.2     Deposit.¶

(a)     Concurrently with the execution of this Agreement, Buyer shall pay over to Seller an amount of $[●]2,565,927, which amount is equal to ten percent (10%) of the Purchase Price (such amount, together with any interest accrued thereon prior to the Closing Date, the "Deposit"). such amount toThe Deposit shall be deposited by Seller at Closing into a separate, interest-bearing bank account (the "Deposit Account") with a federally insured banking institution, with the Deposit to be withdrawn and disbursed by Seller from such account in accordance with the remainder of this Section 3.2.

(b)     Following the execution of this Agreement, subject to Section 3.2(d) below, Seller shall be entitled to withdraw funds from the Deposit Account from time to time as necessary for purposes of payment of administrative expenses (including without limitation filing fees and legal fees) associated with the Bankruptcy Case.

(c)     The Deposit Any amount remaining in the Deposit Account may be withdrawn by Seller from the Deposit Account upon the earliest of the following:

(i)     the Closing;

(ii)     the date this Agreement is terminated by (x) Seller pursuant to Section 11.1(a)(i), Section 11.1(a)(iii) or Section 11.1(c)(i) hereof, or (y) Buyer pursuant to Section 11.1(a)(i) or Section 11.1(a)(iii) hereof; or ¶

(iii)     the date this Agreement is terminated by Seller pursuant to Section 11.1(ac)(iii) or Section 11.1(c) if all conditions to the Closing set forth in Article 10 have been satisfied or, to the extent permitted by applicable Legal Requirements and this Agreement, waived by Seller in writing (other than those conditions that by their nature cannot be satisfied until the Closing) and Buyer breaches its obligation to effect the Closing pursuant to Article 4 (any such termination described in subsections (ii) and (iii) hereof being a "Buyer Default Termination").

If the Closing occurs, the Deposit shall be credited against the Purchase Price. Within five Business Days following a Buyer Default Termination, Seller may withdraw the Deposit fromall funds remaining in the Deposit Account, andwhich may thereafter be retained by Seller for its own account.

¶

(d)   (c)The Deposit shall be returned to Buyer by ~~the Escrow Agent~~Seller from the Deposit Account upon the earliest to occur of the following:

(i)   the date this Agreement is terminated by either Buyer or Seller pursuant to Section 11.1(a)~~(ii)~~ hereof; or

(ii)   the date this Agreement is terminated by Buyer pursuant to ~~(A)~~ Section 11.1(b)~~(i) hereof, or (B) Section 11.1(b)(ii) or~~ Section 11.1(b)(iii) hereof~~, unless in the case of this subsection (B), all conditions to the Closing set forth in Article 10 have been satisfied or, to the extent permitted by applicable Legal Requirements and this Agreement, waived by Seller in writing (other than those conditions that by their nature cannot be satisfied until the Closing) and Buyer breaches its obligation to effect the Closing pursuant to Article 4 (in which case, such termination shall also be deemed a Buyer Default Termination, and the Deposit shall be payable to Seller)~~.

Within five Business Days following the occurrence of the earliest event described in subsections (i) and (ii) above of this subsection (~~B~~d), Seller shall return the Deposit, or to the extent the amount in the Deposit Account is less than the amount of the Deposit, return the amount remaining in the Deposit Account (the "Remaining Deposit Account Funds") to Buyer by wire transfer of immediately available funds to the account designated in writing by Buyer ~~in the joint instruction letter~~.   In addition, Seller agrees to not oppose a claim by Buyer that the amount of the Deposit, *less* the Remaining Deposit Account Funds returned to Buyer, shall constitute an administrative expense of Seller under section 503(b) and 507(a)(2) of the Bankruptcy Code, payable by Seller to Buyer as part of the closing of an Alternative Transaction.

(e)   (d)   The Parties further acknowledge and agree that Seller's entitlement to the Deposit under Section 3.2(~~a~~b) shall constitute liquidated damages (and not a penalty) and, if the Deposit is delivered to Seller in accordance with Section 3.2(~~b~~c)(ii), then, except in the event of (x) fraud by Buyer or (y) a knowing and intentional breach by Buyer of any of its representations, warranties, covenants or agreements contained in this Agreement (any such breach described in subsection (y) being a "Buyer Intentional Breach"), such Deposit shall be the sole and exclusive remedy available to Seller and any other Person against Buyer in connection with this Agreement, the other Transaction Documents, and the transactions contemplated hereby or thereby (including as a result of the failure to consummate the Closing or for a breach or failure to perform hereunder or otherwise)~~, and Buyer shall not be further liable under this Agreement, the other Transaction Documents, or the transactions contemplated hereby or thereby, except~~. Notwithstanding the limitations set forth in the foregoing sentence, in the event of (x) fraud by Buyer or ~~a Buyer Intentional Breach.(y)~~ For the avoidance of doubt, except in the event of fraud by Buyer or a Buyer Intentional Breach, ~~(i) under no circumstances shall Seller or any of its Affiliates be entitled to Damages other than the delivery of the Deposit and (ii) while~~ Seller may pursue both a grant of specific performance in accordance with Section 13.16 and ~~retaining the Deposit pursuant to this Section 3.2, under no circumstances shall Seller or any of its Affiliates be permitted or entitled to the benefits of a judicial order of specific performance and~~ Damages, including retention of all or any portion of the Deposit~~.~~ pursuant to this Section 3.2.

3.3   Delivery of Cash Consideration.  The Cash Consideration, *less* the amount of the Deposit, shall be payable by Buyer to Seller at the Closing as follows:¶

(a)   Buyer shall deposit an amount equal to $5,000,000 into a separate, interest-bearing bank account (the "Avoidance Litigation Account") with a federally insured banking institution. The funds in the Avoidance Litigation Account shall serve to finance all costs and expenses incurred by Seller (or its successor in interest) in connection with (i) administrative expenses associated with the Bankruptcy Case, (ii) the transfer of Seller's right, title and interest in the Potential Avoidance Actions to a liquidation trust established and approved by the Bankruptcy Court as a successor in interest to Seller, and (iii) all legal

13

action necessary to prosecute the Potential Avoidance Actions in accordance with Section 8.6, including without limitation, all legal fees, filing fees, administrative fees and other fees and expenses incurred by Seller in connection with clearing title with respect to the ORRIs and Working Interests in the Properties currently claimed to be owned by third parties other than Seller (collectively, the "Third Party Claimed Interests"), as each as more particularly identified on Schedule 3.3(a) of this Agreement (the "Third Party Claimed Interest Schedule"). The Third Party Claimed Interest Schedule sets forth the value mutually agreed by the Parties for each Third Party Claimed Interest (such value, the "Claimed Interest Value"). Seller (and any successor in interest to Seller) shall be granted access to withdraw funds from the Avoidance Litigation Account in connection with Seller's prosecution of the Potential Avoidance Actions in accordance with Section 8.6.  If any funds remain in the Avoidance Litigation Account following the final resolution of all Potential Avoidance Actions, such remaining amount shall be retained by Seller. Buyer may have access to the Avoidance Litigation Account for purposes of viewing the activity of the funds in such account, but Buyer shall not be entitled to withdraw any funds from the Avoidance Litigation Account for any reason without the prior written consent of Seller.¶

(b)     Buyer shall deposit the remainder of the Cash Consideration in the amount of $18,093,343 into an escrow account (the "Third Party Claimed Interest Escrow Account") with a nationally recognized financial institution acting as escrow agent (the "Escrow Agent"). At such time as Clear Title has been established with respect to any of the Third Party Claimed Interests (any Third Party Clouded Interest with Clear Title being referred to as the "Cleared Interest"), Seller shall provide written notice to Buyer of the Cleared Interest, and within three Business Days following the date of such notice, the Parties shall issue a joint written instruction instructing the Escrow Agent to release the Claimed Interest Value for a Cleared Interest from the Third Party Claimed Interest Escrow Account to Seller.  If Buyer fails to issue such joint written instruction, Seller shall be entitled to seek a enforcement action with the Bankruptcy Court. Each payment released to Seller from the Third Party Claimed Interest Escrow Account in connection with a Cleared Interest shall be a "Cleared Interest Payment". The procedure set forth above in this Section 3.3(b) shall apply each time and from time to time that Clear Title has been established with respect to any of the Third Party Claimed Interests, until Clear Title has been established with respect to all Third Party Clouded Interests. Upon request by Buyer, Seller shall execute all documents reasonably requested by Buyer to confirm Clear Title in Buyer and, to the extent necessary, to transfer such Cleared Interest to Buyer. ¶

## ARTICLE 4

## CLOSING

4.1     Closing Date.

Upon the terms and subject to the conditions hereof, the closing of the sale of the Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at 10:00 a.m., Central Standard Time,remotely by teleconference or at the offices of Jones Walker, Suite 2900, 811 Main Street, Houston, Texas 77002, no later than three Business Days following the date on which the conditions set forth in Article 9 and Article 10 have been satisfied or, if permissible, waived, except for those conditions which by their nature are to be satisfied at the at the same time the Cclosing, but subjectpursuant to the satisfaction or, if permissible, waiver of such conditionsAsset Purchase Agreement (Lot 1) occurs. The date and time aton which the Closing actually occurs is hereinafter referred to as the "Closing Date." and the Closing shall be effective as of the Effective Time.

14

4.2     Payment on the Closing Date.

Subject to satisfaction or, if permissible, waiver of the conditions set forth in Article 9 and Article 10, at the Closing (by the party entitled to grant such waiver as the intended beneficiary of such conditions), Buyer shall pay, or cause to be paid, the Cash Consideration, *minus* the amount of the Deposit, by wire transfer of immediately available funds to ~~an~~the account~~s~~ as specified in ~~writing by the Seller prior to the Closing Date~~Sections 3.3(a) and 3.3(b).

4.3     Buyer's Deliveries.

At the Closing, Buyer shall deliver or cause to be delivered to Seller (or such other Persons where applicable and so designated):

(a)     the Cash Consideration to the Seller in accordance with Section 4.2;

(b)     the Assignment and each other Transaction Document to which Buyer is a party, duly executed (and acknowledged, where applicable) by Buyer;

(c)     a certificate duly executed by an authorized officer of Buyer, dated as of the Closing, certifying on behalf of Buyer that the covenants in Sections 10.1 and 10.3 have been duly performed by Buyer and complied with in all material respects;

(d)     a certificate duly executed by an authorized officer of Buyer, dated as of the Closing, (i) attaching and certifying on behalf of Buyer complete and correct copies of the resolutions of the board of directors or other equivalent governing body of Buyer authorizing the execution, delivery, and performance by Buyer of this Agreement and the transactions contemplated hereby, which resolutions or consent shall be dated prior to the date of this Agreement, and (ii) certifying on behalf of Buyer the incumbency of each officer of Buyer executing this Agreement or any document delivered in connection with the Closing; and

(e)     such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Buyer.

4.4     Seller's Deliveries.

At the Closing, Seller shall deliver to Buyer:

(a)     the Assignment and each other Transaction Document to which Seller is a party, duly executed by the Seller;

(b)     a copy of the Confirmation Order;

(c)     a certificate duly executed by the CRO, dated as of the Closing, certifying on behalf of Seller that the covenants in Section 9.1 and Section 9.2 have been duly performed by Seller and complied with in all material respects;

(d)      (i) a certificate duly executed by the CRO, dated as of the Closing, (A) attaching and certifying on behalf of Seller complete and correct copies of the resolutions or unanimous consent of the Special Committee authorizing the execution, delivery, and performance by Seller of this Agreement and the transactions contemplated hereby, which resolutions or consent shall be dated prior to the date of

15

this Agreement, and (B) certifying on behalf of Seller the incumbency of the CRO executing this Agreement or any document delivered in connection with the Closing; or (ii) as an alternative to the certificate described in <u>Section 4.4(d)(i)</u>, the Confirmation Order shall include a finding from the Bankruptcy Court that the CRO is authorized to execute this Agreement and any document delivered in connection with the Closing and to cause Seller to deliver and perform all obligations of Seller under this Agreement; and

      (e)      such other instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all the right, title and interest of Seller in, to or under any or all the Assets.

**ARTICLE 5**

**REPRESENTATIONS AND WARRANTIES OF SELLER**

Except as disclosed in the Disclosure Schedules attached hereto, Seller represents and warrants the following to Buyer:

5.1      <u>Organization and Good Standing.</u>

To the best of Seller's Knowledge, (a) Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, and (b) Seller has the requisite partnership power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

5.2      <u>Authority; Validity; Consents.</u>

Seller has, subject to requisite Bankruptcy Court approval, the requisite partnership or corporate power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to requisite Bankruptcy Court approval, the execution, delivery and performance of this Agreement and such other Transaction Documents by Seller and the consummation by Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite partnership action. This Agreement has been duly and validly executed and delivered by Seller and each other Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing. Subject to requisite Bankruptcy Court approval, this Agreement and the other Transaction Documents which Seller is party thereto constitute the legal, valid and binding obligations of Seller, enforceable against Seller in accordance with their respective terms, except as such enforceability is limited by general principles of equity. Subject to requisite Bankruptcy Court approval, to Seller's Knowledge, except (a) for entry of the Confirmation Order, (b) for notices, filings and consents required in connection with the Bankruptcy Case, and (c) for the notices, filings and consents set forth on <u>Disclosure Schedule 5.2</u>, Seller is not required to give any notice to, make any filing with or obtain any consent from any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby, except as would not, individually or in the aggregate, have a Material Adverse Effect.

5.3      <u>Title to Potential Avoidance Actions.</u>

Seller represents and warrants that (a) Seller is the sole owner of all rights and claims in connection with the Potential Avoidance Actions, including the right to receive any Proceeds realized or recovered therefrom, (b) that no party has asserted any lien, security interest, contingent interest, equitable interest,

16

participation, setoff, or encumbrance on the same, and (c) the Seller has full right, power, and authority to transfer and assign the Potential Avoidance Actions and Proceeds thereof.

5.4     Bankruptcy.

From the Voluntary Petition Date through the date that this Agreement is executed, Seller has been at all times in its Bankruptcy Case a debtor in possession pursuant to section 1107 of the Bankruptcy Code, and no trustee or examiner has been appointed in the Bankruptcy Case.

5.5     No Other Representations or Warranties; Disclaimers.

(a)     **THE ASSETS ARE BEING SOLD "AS IS," "WHERE IS," AND "WITH ALL FAULTS AS TO ALL MATTERS."**

(b)     NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED IN THIS AGREEMENT, EXCEPT AS AND TO THE EXTENT EXPRESSLY SET FORTH IN THIS AGREEMENT AND IN THE TRANSACTION DOCUMENTS, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, AND DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, STATEMENT OR INFORMATION MADE OR COMMUNICATED (ORALLY OR IN WRITING) TO BUYER (INCLUDING ANY OPINION, INFORMATION, OR ADVICE THAT MAY HAVE BEEN PROVIDED TO BUYER BY ANY AFFILIATE OR REPRESENTATIVE OF SELLER OR BY ANY INVESTMENT BANK OR INVESTMENT BANKING FIRM, ANY PETROLEUM ENGINEER OR ENGINEERING FIRM, SELLER'S COUNSEL, OR ANY OTHER AGENT, CONSULTANT, OR REPRESENTATIVE OF SELLER).

~~(c)     BUYER ACKNOWLEDGES AND AGREES THAT, WITHOUT LIMITATION OF THE OTHER TERMS OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, CLAIMS OR PROCEEDINGS AGAINST SELLER OR TO WHICH SELLER IS OR MAY BECOME A PARTY BEFORE, ON, OR AFTER THE CLOSING MAY HAVE AN EFFECT ON THE CALCULATION OF, AND LIABILITY WITH RESPECT TO, TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF BUYER ARISING UNDER THIS AGREEMENT AFTER THE CLOSING DATE RELATING TO THE ASSETS AND THE ASSUMED LIABILITIES. RESPONSIBILITY UNDER THIS AGREEMENT FOR THE PAYMENT OF ANY DAMAGES, LOSSES OR CLAIMS WITH RESPECT TO ANY OF THE FOREGOING, THE EXCLUDED LIABILITIES AND OTHER LIABILITIES OF SELLER HEREUNDER SHALL NOT INCLUDE, AND BUYER HEREBY EXPRESSLY RELEASES SELLER GROUP, ANY LIABILITY OR RESPONSIBILITY ARISING OUT OF OR RELATING TO ANY EFFECT THAT THE OUTCOME OR SETTLEMENT OF ANY SUCH CLAIMS OR PROCEEDINGS MAY HAVE ON THE CALCULATION OF TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF BUYER ARISING AFTER THE CLOSING DATE. WITHOUT LIMITATION OF SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES OR BUYER'S RIGHTS UNDER OTHER PROVISIONS OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS FOR THE AVOIDANCE OF DOUBT, BUYER ACKNOWLEDGES AND AGREES THAT BUYER CANNOT RELY ON OR FORM ANY CONCLUSIONS FROM SELLER'S METHODOLOGIES FOR (A) THE CALCULATION AND REPORTING OF PRODUCTION AND ROYALTIES ATTRIBUTABLE TO PRODUCTION PRIOR TO THE CLOSING DATE, OR (B) THE DETERMINATION AND REPORTING OF ANY ASSET TAXES THAT WERE UTILIZED FOR ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING PRIOR TO THE CLOSING DATE FOR PURPOSES OF CALCULATING AND REPORTING ASSET TAXES ATTRIBUTABLE TO ANY TAX PERIOD~~

17

~~(OR PORTION THEREOF) BEGINNING AFTER THE CLOSING DATE, IT BEING UNDERSTOOD THAT BUYER MUST MAKE ITS OWN DETERMINATION AS TO THE PROPER METHODOLOGIES THAT CAN OR SHOULD BE USED FOR ANY SUCH LATER TAX RETURN.¶~~

(c)      ~~(d)~~Seller does not make any representation or warranty to Buyer as to transferability or assignability of operatorship of the Assets or the ability of Buyer or any other Person to be designated or qualified as the operator of the Assets.

~~(e)      Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Assets (including Buyer's own estimate and appraisal of the extent and value of Seller's Hydrocarbon reserves attributable to the Assets, and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Assets. Buyer acknowledges that in entering into this Agreement, it has relied only on the aforementioned investigation and the express representations and warranties of Seller contained in this Agreement and the Transaction Documents. Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Proceeding of any kind against Seller or its Affiliates, alleging facts contrary to the foregoing acknowledgment and affirmation.¶~~

(d)      ~~(f)~~SELLER ~~AND BUYER~~ AGREE**S** THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS <u>ARTICLE 5</u> AND THE REST OF THIS AGREEMENT ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LEGAL REQUIREMENTS.

## ARTICLE 6

## <u>REPRESENTATIONS AND WARRANTIES OF BUYER</u>

Buyer represents and warrants to Seller as follows:

6.1      <u>Organization and Good Standing.</u>

Buyer is a [●]limited liability company, duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2      <u>Authority; Validity; Consents.</u>

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally

18

or general principles of equity. Buyer is not or will not be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.3     No Conflict.

The execution and delivery of this Agreement and the other Transaction Documents and the consummation of the transactions provided for herein and therein will not result in the breach of any of the terms and provisions of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Buyer under (a) any agreement, indenture, or other instrument to which it is bound, (b) the partnership agreement, bylaws or other governing documents of Buyer, as applicable, (c) any Order or (d) any Legal Requirement.

6.4     Availability of Funds.

At Closing, Buyer will have sufficient cash in immediately available funds (without giving effect to any unfunded financing, regardless of whether any such financing is committed) to pay the Purchase Price, the Cure Costs and all costs, fees and expenses to be paid by Buyer that are necessary to consummate the transactions contemplated by this Agreement and the other Transaction Documents, and assume the Assumed Liabilities.

6.5     Litigation.

There are no Proceedings pending or, to the Knowledge of Buyer, threatened, that would affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.6     Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Buyer shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

6.7     Independent Investigation.

Buyer is (or its advisors are) experienced and knowledgeable in the oil and gas business and are aware of the risks of such business. Buyer acknowledges and affirms that it is solely responsible for making its independent investigation, verification, analysis, evaluation and valuation of the Assets and making all such reviews and inspections of the Assets as it deems necessary or appropriate to consummate the transactions contemplated hereby.  Except for the representations and warranties expressly made by Seller in Article 5 of this Agreement, the Assignment or the certificate to be delivered to Buyer pursuant to Section 4.4(c) of this Agreement, Buyer acknowledges that there are no representations or warranties, express or implied, as to the financial condition, Liabilities, operations, business, condition, volume, recoverability, value or prospects of the Assets and that, in making its decision to enter into this Agreement and to consummate the transactions contemplated hereby, Buyer has relied solely upon its own independent investigation, verification, analysis, and evaluation. Buyer understands and acknowledges that neither the

19

United States Securities and Exchange Commission nor any federal, state, or foreign agency has passed upon the Assets or made any finding or determination as to the fairness of an investment in the Assets or the accuracy or adequacy of the disclosures made to Buyer, and, except as set forth in <u>Article 11</u>, Buyer is not entitled to cancel, terminate or revoke this Agreement.

6.8     <u>Bankruptcy.</u>

There are no bankruptcy, reorganization or receivership proceedings pending, being contemplated by or, to Buyer's Knowledge, threatened in writing against Buyer or any Affiliate of Buyer.  Buyer is not (and will not be upon, or by virtue of, the consummation of the transactions contemplated hereby) insolvent.

6.9     Acknowledgement of Disclaimers.¶

(a)     BUYER ACKNOWLEDGES AND AGREES THAT, WITHOUT LIMITATION OF THE OTHER TERMS OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS, CLAIMS OR PROCEEDINGS AGAINST SELLER OR TO WHICH SELLER IS OR MAY BECOME A PARTY BEFORE, ON, OR AFTER THE CLOSING MAY HAVE AN EFFECT ON THE CALCULATION OF, AND LIABILITY WITH RESPECT TO, TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF BUYER ARISING UNDER THIS AGREEMENT AFTER THE CLOSING DATE RELATING TO THE ASSETS AND THE ASSUMED LIABILITIES. RESPONSIBILITY UNDER THIS AGREEMENT FOR THE PAYMENT OF ANY DAMAGES, LOSSES OR CLAIMS WITH RESPECT TO ANY OF THE FOREGOING, THE EXCLUDED LIABILITIES AND OTHER LIABILITIES OF SELLER HEREUNDER SHALL NOT INCLUDE, AND BUYER HEREBY EXPRESSLY RELEASES SELLER GROUP, ANY LIABILITY OR RESPONSIBILITY ARISING OUT OF OR RELATING TO ANY EFFECT THAT THE OUTCOME OR SETTLEMENT OF ANY SUCH CLAIMS OR PROCEEDINGS MAY HAVE ON THE CALCULATION OF TAXES, ROYALTIES, RENTALS, AND OTHER PAYMENT OBLIGATIONS OF BUYER ARISING AFTER THE CLOSING DATE. WITHOUT LIMITATION OF SELLER'S EXPRESS REPRESENTATIONS AND WARRANTIES OR BUYER'S RIGHTS UNDER OTHER PROVISIONS OF THIS AGREEMENT AND THE OTHER TRANSACTION DOCUMENTS FOR THE AVOIDANCE OF DOUBT, BUYER ACKNOWLEDGES AND AGREES THAT BUYER CANNOT RELY ON OR FORM ANY CONCLUSIONS FROM SELLER'S METHODOLOGIES FOR (A) THE CALCULATION AND REPORTING OF PRODUCTION AND ROYALTIES ATTRIBUTABLE TO PRODUCTION PRIOR TO THE CLOSING DATE, OR (B) THE DETERMINATION AND REPORTING OF ANY ASSET TAXES THAT WERE UTILIZED FOR ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING PRIOR TO THE CLOSING DATE FOR PURPOSES OF CALCULATING AND REPORTING ASSET TAXES ATTRIBUTABLE TO ANY TAX PERIOD (OR PORTION THEREOF) BEGINNING AFTER THE CLOSING DATE, IT BEING UNDERSTOOD THAT BUYER MUST MAKE ITS OWN DETERMINATION AS TO THE PROPER METHODOLOGIES THAT CAN OR SHOULD BE USED FOR ANY SUCH LATER TAX RETURN.¶

(b)     Buyer acknowledges and affirms that it has made its own independent investigation, analysis, and evaluation of the transactions contemplated hereby and the Assets, and an independent assessment and appraisal of the environmental risks associated with the acquisition of the Assets. Buyer acknowledges that in entering into this Agreement, it has relied only on the aforementioned investigation and the express representations and warranties of Seller contained in this Agreement and the Transaction Documents. Buyer hereby irrevocably covenants to refrain from, directly or indirectly, asserting any claim, or commencing, instituting, or causing to be commenced, any Proceeding of any kind against Seller or its Affiliates, alleging facts contrary to the foregoing acknowledgment and affirmation. ¶

20

(c)     BUYER AGREES THAT, TO THE EXTENT REQUIRED BY APPLICABLE LAW TO BE EFFECTIVE, THE DISCLAIMERS OF CERTAIN REPRESENTATIONS AND WARRANTIES CONTAINED IN ARTICLE 5 AND THE REST OF THIS AGREEMENT ARE "CONSPICUOUS" DISCLAIMERS FOR THE PURPOSE OF ANY APPLICABLE LEGAL REQUIREMENTS.¶

## ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

7.1     <u>Operations Prior to the Closing Date.</u>

Seller covenants and agrees that, except (w) as expressly contemplated by this Agreement, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld, conditioned or delayed); (y) as otherwise required by Legal Requirements (including as required under the Bankruptcy Code); or (z) as permissible under the Bidding Procedures and the Bidding Procedures Order, after the date of this Agreement and prior to the Closing Date, Seller shall not:

(a)     exercise any election to abandon any Assets; or

(b)     sell, lease, encumber, or otherwise dispose of all or any portion of any Assets.

Notwithstanding the foregoing provisions of this <u>Section 7.1</u>, in the event of an emergency or as ordered by the Bankruptcy Court, Seller may take such action as reasonably necessary and shall notify Buyer of such action promptly thereafter. The acts or omissions of third Persons who are not controlled Affiliates of Seller shall not constitute a violation of the provisions of this <u>Section 7.1</u>, nor shall any action required by a vote of working interest owners constitute such a violation so long as the Seller has voted its interests in a manner consistent with the provisions of this <u>Section 7.1</u>.

7.2     <u>Reasonable ~~Best~~Commercial Efforts.</u>

(a)     Each of Seller and Buyer shall use reasonable commercial efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate as soon as practicable, the transactions contemplated by this Agreement, including using reasonable commercial efforts to: (i) cause the conditions precedent set forth in <u>Article 9</u> and <u>Article 10</u> to be satisfied, (ii) obtain, at the earliest practicable date, all necessary Governmental Authorizations and to make all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and to take all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, and (iii) execute or deliver any additional instruments necessary to consummate the transactions contemplated hereby and to carry out the purposes of this Agreement.

(b)     Each of Seller and Buyer (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, neither Party shall participate, or agree to participate in any meeting with any Governmental Authority with respect to any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Party in advance and, to the extent permitted by any such Governmental Authority, gives the other Party the opportunity to attend and participate in such meeting, in each case to the extent

21

practicable. Subject to any restrictions under applicable laws, rules or regulations, each of Buyer and Seller shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it, its Affiliates and its respective Representatives and any Governmental Authority or members of its staff with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to a Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

7.3     Bankruptcy Court Approval.

(a)     Buyer understands that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval, and to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and best offer for the Assets, including giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court.

(b)     If any party other than Buyer or Seller appeals or seeks a stay of the Confirmation Order, Seller shall promptly notify Buyer of such appeal or stay request and shall provide to Buyer promptly a copy of the related notice of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion or application filed in connection with any appeal from either of such orders.

(c)     From and after the date of execution of this Agreement and prior to the Closing or the termination of this Agreement in accordance with Section 11.1, Seller shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Confirmation Order or this Agreement.

7.4     Bankruptcy Filings.

Subject to Section 7.3, Seller shall pursue diligently the entry of the Confirmation Order; *provided that,* and notwithstanding anything herein to the contrary, Seller, in all instances, shall act in accordance with its fiduciary obligations and obligations owed under the Bankruptcy Code. Buyer agrees that it shall promptly take such actions as are reasonably requested by Seller to assist Seller in obtaining entry of the Confirmation Order (after Buyer has had an opportunity to review and comments on the form and substance of the Confirmation Order) and a finding by the Bankruptcy Court that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code.  In the event that the entry of the Confirmation Order is appealed or a stay pending appeal is sought, Seller shall oppose the appeal or the stay pending appeal and seek the dismissal of any appeal (including a petition for certiorari, motion for rehearing, re-argument, reconsideration or revocation).  Notwithstanding the foregoing, any resulting changes to this Agreement or any related document or resulting material changes to the Confirmation Order shall be subject to the approval of Buyer in its reasonable discretion.  Seller shall (i) provide Buyer with drafts of any and all other pleadings and proposed orders to be filed or submitted in connection with this Agreement and the transactions contemplated hereby, and such pleadings and proposed orders shall be in form and substance reasonably acceptable to Buyer and (ii) make reasonable efforts to consult and cooperate with Buyer regarding any discovery taken in connection with seeking entry of the Confirmation Order (including any depositions).

7.5     Bidding Procedures.

Buyer agrees and acknowledges that Seller, including through its Representatives, is and may continue to take such actions as are mandated by the Bidding Procedures and the Bidding Procedures Order, including for the avoidance of doubt, the termination of this Agreement at any time prior to Closing if mandated by such Bidding Procedures or Bidding Procedures Order.

7.6     Back-up Bidder.

If an Auction is conducted and Seller does not choose Buyer as the Successful Bidder, but instead chooses Buyer as the Back-up Bidder, Buyer will be the Back-up Bidder.  If Buyer is chosen as the Back-up Bidder, Buyer will be required to keep its bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as may be amended with Buyer's written consent prior to or at the Auction) open and irrevocable until the closing of the sale of the Assets to the Successful Bidder.  If the Successful Bid with the Successful Bidder is terminated prior to closing, Buyer will be deemed to be the Successful Bidder and will ~~forthwith~~promptly proceed to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be amended with Buyer's written consent prior to or at the Auction).~~]~~

**ARTICLE 8**

**ADDITIONAL AGREEMENTS**

8.1     Taxes.

(a)     Any transfer, documentary, sales, use, stamp, registration and other such Taxes, and all conveyance fees, recording charges and other fees and charges (including any penalties and interest) incurred in connection with the consummation of the transactions contemplated by this Agreement (collectively, the "Transfer Taxes") shall be borne by and paid by Buyer when do. Seller and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Assets from any Transfer Taxes, including under section 1146(a) of the Bankruptcy Code. Buyer will, at its own expense, timely file all necessary Tax Returns and other documentation with respect to all Transfer Taxes, and, if required by applicable law, rule or regulation, the Parties will, and will cause their Affiliates to, join in the execution of any such Tax Returns and other documentation.

(b)     Seller shall retain responsibility for, and shall bear and pay, all ad valorem, property, excise, severance, production or similar Taxes based upon operation or ownership of the Assets or the production of Hydrocarbons or the receipt of proceeds therefrom (but excluding, for the avoidance of doubt, income, franchise and similar Taxes and Transfer Taxes) (collectively, the "Asset Taxes") for (i) any period ending prior to the Effective Time and (ii) the portion of any Straddle Period ending prior to the Effective Time. For purposes of allocation between the Parties of Asset Taxes assessed with respect to the Assets that are payable with respect to any tax periods beginning before and ending after the Effective Time ("Straddle Periods"), the portion of any such Taxes that are attributable to the portion of the Straddle Period that ends prior to the Effective Time shall (A) in the case of such Asset Taxes that are based upon or related to income or receipts or imposed on a transactional basis such as severance or production Taxes, be allocated based on revenues from sales occurring before the Effective Time (which shall be Seller's responsibility) and on or after the Effective Time (which shall be Buyer's responsibility); and (B) in the case of other Asset Taxes, be allocated pro rata per day between the period prior to the Effective Time (which shall be Seller's responsibility) and the period on and after the Effective Time (which shall be Buyer's responsibility). For purposes of clause (A) and (B) of the preceding sentence, any exemption, deduction, credit or other item that is calculated on an annual basis shall be allocated pro rata per day

23

between the period ending prior to the Effective Time and the period beginning on and after the Effective Time. At the Closing, Asset Taxes for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the Asset Tax assessment for such Straddle Period, if available, or if otherwise, based on the Asset Taxes paid during the preceding Tax period. With respect to any not yet delinquent Asset Taxes relating to a Tax year ending after the Closing Date, Buyer assumes responsibility for the payment of all such Asset Taxes to the applicable Governmental Authority. With respect to any Asset Taxes relating to a Straddle Period or pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing.

(c)     Seller or Buyer, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other (the "Paying Party") all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Section 8.1. Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective Liability therefor (together with the supporting calculation of such Taxes and Liability), although failure to do so will not relieve the Reimbursing Party from its Liability hereunder except to the extent the Reimbursing Party is prejudiced thereby. Any amounts which may become payable from Seller to Buyer pursuant to this Section 8.1 shall constitute a super priority administrative expense of Seller under section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in sections 503(b) or 507(b) of the Bankruptcy Code.

(d)     From and after Closing Buyer and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Assets are located; *provided*, *however*, that neither Buyer nor Seller shall be required to disclose the contents of its income Tax Returns to any Person. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(d) shall be borne by the Party requesting it.

8.2     Allocation of Purchase Price.

The Purchase Price shall be allocated among the Assets as set forth in Schedule 8.28.2(a) hereto, and the portion of the Purchase Price allocated to each Asset is referred to herein as the "Allocated Value" of such Asset. Seller and Buyer agree to be bound by the Allocated Values set forth in Schedule 8.28.2(a) and Schedule 8.28.2(b) for purposes of this Agreement. Schedule 8.28.2(b) sets forth the allocation of the Purchase Price and any liabilities assumed by Buyer under this Agreement that are treated as consideration for Tax purposes among the Assets in accordance with section 1060 pf the Code, and the regulations thereunder (the "Tax Allocation"). Seller and Buyer agree that the Tax Allocation shall be prepared in a manner consistent with the Allocated Values, as set forth on Schedule 8.28.2(a). Seller and Buyer each agree to report, and to cause their respective Affiliates to report, the federal, state and local income and other Tax consequences of the transactions contemplated herein, and in particular to report the information required by section 1060(b) of the Code, and to jointly prepare Form 8594 (Asset Acquisition Statement under section 1060 of the Code) as promptly as possible following the Closing Date and in a manner consistent with the Tax Allocation as revised to take into account subsequent adjustments to the Purchase Price, including any adjustments pursuant to the Agreement to determine the Purchase Price, and shall not take any position inconsistent therewith upon examination of any Tax return, in any refund claim, in any

litigation, investigation, or otherwise, unless required to do so by a determination as defined in section 1313(a) of the Code (or corresponding provision of state Tax Law), or with the Party's prior consent.

8.3     Bulk Sales.

Buyer and Seller hereby waive compliance with all "bulk sales," "bulk transfer" and similar Legal Requirements that may otherwise be applicable with respect to the sale and transfer of any or all of the Assets to Buyer.

8.4     ~~Payments Received.~~Reserved.

~~Each of Seller and Buyer agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using their best efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which properly belongs to the other in accordance with the terms of this Agreement and will account to the other for all such receipts.¶~~

8.5     Post-Closing Books and Records and Personnel.

For five years after the Closing Date (or such longer period as may be required by any Governmental Authority or ongoing claim), (a) Buyer shall not dispose of or destroy any of the Records received by Buyer as Assets and (b) Buyer shall allow Seller (including, for clarity, any trust established ~~under a chapter 11 plan of~~ for Seller or any other successors of Seller) and any of its directors, officers, employees, counsel, representatives, accountants and auditors reasonable access during normal business hours, at Seller's (or such Person's) sole expense and upon reasonable advance notice, to all employees and files of Buyer and their respective controlled Affiliates and any Records included in the Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Seller, the functions of any such trusts or successors, or other reasonable business purposes, and Seller (including any such trust or successors) and such directors, officers, employees, counsel, representatives, accountants and auditors shall have the right to make copies of any such files, books, records and other materials. Until the closing of the Bankruptcy Case or the liquidation and winding up of Seller's estates, Seller shall preserve and keep the Records and, at Buyer's sole expense, shall make such Records, records, and Seller's personnel available to Buyer as may be reasonably required by Buyer in connection with, among other things, any insurance claims by, Proceedings, Actions or Tax audits against, or governmental investigations of, Buyer or any of its Affiliates or in order to enable Buyer to comply with its obligations under this Agreement and each other Transaction Document. In the event any Party desires to destroy any such Records during or after the time during which they must be maintained pursuant to this Section 8.5, such Party shall first give 90 days prior written notice to the other Party and any such other Party shall have the right at its option and expense, upon prior written notice given within such 90 day period to the Party desiring to destroy such Records or records, to take possession of the applicable Records within 180 days after the date of such notice, or such shorter period as the liquidation and winding up of Seller's estates shall permit.

8.6     Prosecution of Potential Avoidance Actions.¶

(a)     Within ten Business Days following the Closing, Seller shall, in consultation with Buyer, engage outside counsel to direct and perform the legal work in connection with prosecution of the Potential Avoidance Actions. Seller shall not be permitted to terminate such counsel without Buyer's prior written consent, which consent shall not be unreasonably withheld. Seller's counsel shall promptly commence and diligently prosecute (or continue if already commenced) legal action for the purposes of establishing Clear Title to the Third Party Claimed Interests. Payment of all fees and expenses incurred by Seller (or any liquidation trust as its successor in interest) in connection with the prosecution of the Potential

Avoidance Actions, including all filing fees and fees for services rendered by all counsel and advisors (but excluding any settlement costs owed to any Third Party Claimed Interest), shall be recoverable by Seller from the Avoidance Litigation Account. ¶

(b)     Seller's counsel shall not have the right to settle any action or dispute with a Third Party Claimed Interest without the prior written approval (including email approval) of Buyer, which such approval shall not to be unreasonably withheld. Any amount paid over or agreed to be paid to a Third Party Claimed Interest in connection with such settlement shall be recoverable by Seller (or any liquidation trust as its successor in interest) from the Third Party Claimed Interest Escrow Account, and an amount equal to any remaining portion of the Cleared Interest Value shall be recoverable by Seller (or any liquidation trust as its successor in interest) from the Third Party Claimed Interest Escrow Account pursuant to Section 3.3(b). The Parties agree that if a settlement with respect to a Third Party Claimed Interest results in Clear Title with respect to only a portion of the Third Party Claimed Interest, (i) both (A) the settlement amount owed to the Third Party Claimant and (B) the applicable portion of the Cleared Interest Value owed to Seller (or any liquidation trust as its successor in interest) for the portion of the Cleared Interest transferred to Buyer shall be recoverable from the Third Party Claimed Interest Escrow Account, and (ii) the remainder of the Claimed Interest Value shall remain in the Third Party Claimed Interest Escrow Account and will be available to fund other fees and expenses incurred in connection with the prosecution of the Potential Avoidance Action. ¶

(c)     All amounts remaining in either the Avoidance Litigation Account or the Third Party Claimed Interest Escrow Account following the resolution of all Potential Avoidance Actions shall belong to Seller (or any liquidation trust as its successor in interest).¶

(d)     If Seller's counsel reasonably determines that any Third Party Claimed Interest will not be capable of becoming a Cleared Interest, the Claimed Interest Value associated with such Third Party Claimed Interest shall be paid to Buyer from the Third Party Claimed Interest Escrow Account within ten Business Days of Seller counsel's determination, and such Third Party Claimed Interest shall be retained by Seller (or any liquidation trust as its successor in interest) as an Excluded Asset.¶

(e)     If a liquidation trust is established and approved by the Bankruptcy Court as a successor in interest to Seller during Seller's prosecution of the Potential Avoidance Actions, Seller and Buyer agree to negotiate in good faith the terms of the liquidation trust agreement and any other documents related thereto such that the terms of those documents reflect the same terms as agreed to by the Parties in this Section 8.6.¶

8.7     No Recourse to Buyer's Debt Financing Sources.¶

(a)     Subject to the rights of the parties to any commitment letter evidencing the Buyer's financing incurred or intended to be incurred by Buyer in regards to financing, in whole or in part, the Deposit, the balance of the Purchase Price at Closing, and the other transactions contemplated by this Agreement (collectively, the "***Buyer's Financing***"), under the terms thereof, none of the parties hereto, or any of their respective Affiliates, shall have any rights or claims against any persons, including any investors, lenders or arrangers, that have committed to provide the Buyer's Financing (such persons collectively, the "***Buyer's Financing Sources***") in connection with the terms of this Agreement or the Buyer's Financing, whether at law or equity, in contract, in tort or otherwise.¶

(b)     Notwithstanding anything in this Agreement to the contrary, each of the parties hereto agrees (i) that it will not bring, support or permit any claim, action, proceeding or counterclaim involving any Buyer's Financing Sources arising out of, or relating to this Agreement, the transactions contemplated hereby, the Buyer's Financing or the performance of services thereunder or related thereto, against such Buyer's Financing Sources in any forum other than any federal court of the United States

26

sitting in Houston, Texas and any appellate court thereof or, if that court does not have subject matter jurisdiction, in any state court located in Houston, Texas; (ii) that service of process, summons, notice or document by registered mail addressed to them at their respective addresses will be effective service of process against them for any such legal proceeding brought in any such court; (iii) to hereby waive, to the fullest extent permitted by law, any objection which any of them may now or hereafter have to the laying of venue of, and the defense of an inconvenient forum to the maintenance of, any such legal proceeding in any such court; and (iv) that any such legal proceeding will be governed and construed in accordance with the laws of the State of Texas. The provisions of this Section 8.7 shall be enforceable by any Buyer's Financing Sources, their Affiliates and their respective successors and assigns.¶

EACH PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING AGAINST ANY BUYER'S FINANCING SOURCES DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY) AND FOR ANY COUNTERCLAIM THEREIN.¶

**ARTICLE 9**

**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE**

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

9.1     <u>Accuracy of Representations.</u>

The representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties shall be true and correct in all material respects on and as of such earlier date), except whether the failure to be true and correct could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. If Buyer determines that there has been a breach or inaccuracy of any of Seller's representations and warranties, it shall provide Seller with notice of such breach or inaccuracy as promptly as reasonably practicable so that Seller may attempt to cure such breach or inaccuracy on or before the Closing Date.

9.2     <u>Seller's Performance.</u>

The covenants and agreements that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been duly performed and complied with in all material respects, including those set forth in <u>Section 7.1</u>.

9.3     <u>No Order.</u>

No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.

9.4     Seller's Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.4 shall have been so delivered or Seller shall be ready, willing and able to make such deliveries (or cause such deliveries to be made).

9.5     Confirmation Order.

The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be in full force and effect and shall not be subject to a stay pending appeal.  The Confirmation Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising liens, claims, and encumbrance (other than Assumed Liabilities) of, against or created by Seller or its bankruptcy estate, shall be fully released from and with respect to the Assets, which shall be transferred to Buyer free and clear of all such liens, claims, and encumbrance (other than Assumed Liabilities).

9.6     Consummation of Purchase of Stipulated Oil and Gas Interests.¶

Contemporaneously with the acquisition of the Assets, Buyer shall have consummated the purchase of the Stipulated Oil and Gas Interests pursuant to the Asset Purchase Agreement (Lot 1).¶

**ARTICLE 10**

**CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLER TO CLOSE**

Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

10.1    Accuracy of Representations.

The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects on and as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case, such representations and warranties shall be true and correct in all material respects on and as of such earlier date), except whether the failure to be true and correct could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

10.2    Confirmation Order in Effect.

The Bankruptcy Court shall have entered the Confirmation Order and the Confirmation Order shall be in full force and effect and shall not be subject to a stay pending appeal.

10.3    Buyer's Performance.

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects.

10.4    No Order.

28

No Governmental Authority shall have enacted, issued, promulgated or entered any Order which is in effect and which has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or could cause any of such transactions to be rescinded following the Closing.

10.5    Buyer's Deliveries.

Each of the deliveries required to be made to Seller pursuant to Section 4.3 shall have been so delivered or Buyer shall be ready, willing and able to make such deliveries (or cause such deliveries to be made).

**ARTICLE 11**

**TERMINATION**

11.1    Termination Events.

Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)    by either Seller or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order prohibiting the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of Seller or Buyer or either of their Affiliates;

(ii)    by mutual written consent of Seller and Buyer;

(iii)    if the Bankruptcy Court enters an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, the Bankruptcy Case; or

(iv)    if the Seller exercises its rights under Section IV(D)(xiii) of the Bidding Procedures to pursue an Alternative Transaction because such action is deemed necessary by the Seller to discharge properly its fiduciary duties or to otherwise comply with the governing law.

(b)    by Buyer:

(i)    in the event of any breach by Seller of any of Seller's agreements, covenants, representations or warranties contained herein and such breach (A) would result in the failure of a condition set forth in Section 9.1 or Section 9.2 to be satisfied, and (B) has not been cured by Seller within 15 Business Days after Buyer has given written notice thereof to Seller (which notice shall specify the nature of such breach and be given as promptly as practicable); *provided*, *however*, that Buyer shall not be permitted to terminate this Agreement pursuant to this Section 11.1(b) (i) if Buyer is in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or similar expressions);

(ii)    if Seller enters into and consummates an Alternative Transaction;

(iii)    if the Closing shall not have occurred by the Outside Date, or such later date as agreed to in writing by Seller and Buyer; *provided*, *however*, that Buyer shall not be permitted to

29

terminate this Agreement pursuant to this Section 11.1(b)(iii) if Buyer is in breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or similar expressions); *provided*, *further*, that in the event Buyer is determined to be the Back-Up Bidder with respect to the Assets, Buyer shall have no right to terminate this Agreement until the earlier of: (x) the closing of the Successful Bid with the Successful Bidder; or (y) if the Successful Bid with the Successful Bidder is terminated prior to closing and Buyer is then deemed to be the Successful Bidder, the Alternative Outside Date.

(c)        by Seller:

(i)        upon any breach by Buyer of any of Buyer's agreements, covenants, representations or warranties contained herein and such breach (A) would result in the failure of a condition set forth in Section 10.1 or, Section 10.3 or Section 10.5 to be satisfied (including, without limitation, if Buyer is unable to deliver the Cash Consideration to Seller in accordance with Section 4.3(a) because of Buyer's failure to obtain Buyer's Financing); and (B) has not been cured within 15 Business Days after the giving of written notice thereof by Seller to Buyer (which notice shall specify the nature of such breach and be given as promptly as practicable); *provided*, *however*, that Seller shall not be permitted to terminate this Agreement pursuant to this Section 11.1(c)(i) if Seller is in breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions);

(ii)        if Seller enters into and consummates an Alternative Transaction; and

(iii)        if the Closing shall not have occurred by the Outside Date, or such later date as agreed to in writing by Seller and Buyer; *provided*, *however*, that Seller shall not be permitted to terminate this Agreement pursuant to this Section 11.1(c)(iii) if Seller is itself in material breach of any of its representations, warranties, covenants or agreements contained herein (or in breach at all with respect to those representations, warranties, covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions).

11.2    Effect of Termination.¶

Subject to Section 3.2, in the event of termination of this Agreement by Buyer or Seller pursuant to this Article 11, this Agreement shall become null and void and have no effect, and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party (other than as expressly provided herein); *provided*, that the provisions of Sections 13.8 (Expenses), and 13.10 (Governing Law, Consent to Jurisdiction and Venue; Jury Trial Waiver), and 13.16 (Injunctive Relief), and this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 11 shall expressly survive the termination of this Agreement).

11.3    Mutual Acknowledgment of Agreements.

Each Party acknowledges that the agreements contained in this Article 11 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement.

## ARTICLE 12

## SURVIVAL AND LIMITATIONS

12.1     <u>Non-Survival of Seller's Representations and Warranties; Survival of Other Provisions</u>.

(a)     All (i) representations and warranties of Seller set forth in this Agreement and the other Transaction Documents shall terminate and expire at Closing (except as expressly set forth in this <u>Section 12.1</u>); (ii) the covenants, obligations and agreements of Seller set forth in this Agreement and the other Transaction Documents which are expressly stated to be performed on or prior to Closing shall terminate and expire at Closing; and (iii) the covenants, obligations and agreements of Seller set forth in this Agreement and the other Transaction Documents to be performed after Closing shall survive the Closing and terminate and expire the date such covenant, obligation and/or agreement is fully performed; provided, however, that Seller shall not be deemed to be in breach of any covenant, obligation and/or agreement unless Seller fails to cure such breach within 60 days of Purchaser's written notification to Seller of such breach.

(b)     The representations, warranties, obligations and covenants of Buyer set forth in this Agreement and the other Transaction Documents, including the covenants and obligations set forth in <u>Section 2.3</u>, shall survive the Closing indefinitely. Subject to <u>Article 11</u> and <u>Section 13.10</u>, the liability of Buyer under this Agreement shall be without limit.

12.2     <u>Buyer's Exclusive Remedy and Certain Limitations</u>.

(a)     If this Agreement is terminated pursuant to <u>Article 11</u> for any reason, notwithstanding anything to the contrary contained in this Agreement, Buyer's sole and exclusive remedy against Seller with respect to (i) the negotiation, performance and consummation of, or the failure to consummate, the transactions contemplated hereunder, (ii) any breach of the representations, warranties, covenants and agreements of Seller contained herein, (iii) the affirmations of such representations, warranties, covenants and agreements contained in this Agreement or any other Transaction Document delivered hereunder by or on behalf of Seller, and/or (iv) the breach or failure of Seller to perform any warranties, covenants or agreements of Seller required to be performed hereunder and under any Transaction Document, shall be limited to the return of the Deposit, if returnable to Buyer pursuant to <u>Section 3.2(c)</u>.

(b)     From and after the Closing, notwithstanding anything to the contrary contained in this Agreement, Buyer shall have no remedy against Seller, and Buyer shall be deemed to have waived, released, remised and forever discharged Seller from any and all Damages, suits, legal or administrative proceedings, claims, demands, losses, costs, obligations, liabilities, interest, charges or causes of action whatsoever, in law or in equity, known or unknown, which Buyer might now or subsequently may have, based on, relating to or arising out of (i) all avoidance, fraudulent transfer, preference or similar claims, causes of action, rights or proceedings, including all claims under Chapter 5 of the Bankruptcy Code, the Uniform Fraudulent Transfer Act, and the Uniform Fraudulent Conveyance Act enacted by any state, or any other similar state or Federal law, (ii) the negotiation, performance and consummation of this Agreement or the other Transaction Documents or the transactions contemplated hereunder or thereunder, (iii) any breach of the representations, warranties, covenants and agreements of Seller contained in this Agreement or the other Transaction Documents, (iv) the affirmations of such representations, warranties, covenants and agreements contained in this Agreement or any other Transaction Document delivered hereunder by or on behalf of Seller, (v) the breach or failure of Seller to perform any warranties, covenants or agreements of Seller required to be performed hereunder and under any Transaction Document and/or (vi) Seller's ownership, use or operation of the Assets, or the condition, quality, status or nature of the

31

Assets, **INCLUDING RIGHTS TO CONTRIBUTION UNDER CERCLA OR ANY OTHER ENVIRONMENTAL LAW, BREACHES OF STATUTORY AND IMPLIED WARRANTIES, NUISANCE OR OTHER TORT ACTIONS, RIGHTS TO PUNITIVE DAMAGES, COMMON LAW RIGHTS OF CONTRIBUTION, ANY RIGHTS UNDER INSURANCE POLICIES ISSUED OR UNDERWRITTEN BY SELLER, EVEN IF CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE (WHETHER SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE, OR CONCURRENT), STRICT LIABILITY OR OTHER LEGAL FAULT OF ANY RELEASED PERSON, INVITEES OR THIRD PARTIES, BUT, IN ALL CASES, EXCLUDING ANY ACTUAL FRAUD CLAIMS THAT BUYER MAY HAVE.**

      12.3    <u>Express Negligence/Conspicuous Manner.</u>

      **WITH RESPECT TO THIS AGREEMENT, ALL PARTIES AGREE THAT THE PROVISIONS SET OUT IN THIS <u>ARTICLE 12</u> AND ELSEWHERE IN THIS AGREEMENT COMPLY WITH THE REQUIREMENT, KNOWN AS THE EXPRESS NEGLIGENCE RULE, TO EXPRESSLY STATE IN A CONSPICUOUS MANNER TO AFFORD FAIR AND ADEQUATE NOTICE THAT THIS AGREEMENT HAS PROVISIONS REQUIRING BUYER TO BE RESPONSIBLE FOR THE NEGLIGENCE (WHETHER, SOLE, JOINT, ACTIVE, PASSIVE, COMPARATIVE OR CONCURRENT), STRICT LIABILITY, OR OTHER FAULT OF SELLER. BUYER REPRESENTS TO SELLER (A) THAT BUYER HAS CONSULTED AN ATTORNEY CONCERNING THIS AGREEMENT OR, IF IT HAS NOT CONSULTED AN ATTORNEY, THAT BUYER WAS PROVIDED THE OPPORTUNITY AND HAD THE ABILITY TO SO CONSULT, BUT MADE AN INFORMED DECISION NOT TO DO SO AND (B) THAT BUYER FULLY UNDERSTANDS ITS OBLIGATIONS UNDER THIS AGREEMENT.**

**ARTICLE 13**

**<u>GENERAL PROVISIONS</u>**

      13.1    <u>Confidentiality.</u>

      The Parties agree that the confidentiality agreement entered into by them and their Affiliates, dated [●] (the "<u>Confidentiality Agreement</u>"), shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; *provided*, *however*, that (a) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto shall not constitute a breach of such Confidentiality Agreement, and (b) disclosures permitted under this Agreement shall not constitute a breach of such Confidentiality Agreement.

      13.2    <u>Public Announcements.</u>

      Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Seller or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange or with respect to disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto, Buyer and Seller shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

      13.3    <u>Notices.</u>

32

All notices (including any notice of termination pursuant to <u>Section 11.1</u> of this Agreement), consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by email (with read receipt requested, with the receiving Party being obligated to respond affirmatively to any read receipt requests delivered by the other Party), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested) or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses and representatives (if applicable) set forth below (or to such other addresses and representatives as a Party may designate by notice to the other Parties):

(i)      If to Seller, then to:

        Barrow Shaver Resources Company LLC
        Attn:  James Katchadurian
        977 Pruitt Place
        Tyler, TX 75703
        Email:  james.katchadurian@cr3partners.com

with a copy (which shall not constitute notice) to:

        Jones Walker LLP
        201 St. Charles Avenue, Suite 5100
        New Orleans, LA 70170
        Attn: Curtis R. Hearn, Meredith Maxwell
        E-mail: chearn@joneswalker.com;
                mmaxwell@joneswalker.com
        Phone: 504-582-8000

        -and-

        Jones Walker LLP
        811 Main Street, Suite 2900
        Houston, TX 77002
        Attn: Joseph E. Bain, Sean T. Wilson
        E-mail: jbain@joneswalker.com;
                swilson@joneswalker.com
        Phone: 713-437-1800

(ii)      If to Buyer:

        [●]TEXOIL INVESTMENTS, LLC
        ~~Attn: [●]~~_____
        ~~Email: [●]~~_____¶
        Attn: _____¶
        Email: _____

with a copy (which shall not constitute notice) to:

        [●]Jones, Allen & Fuquay, LLP
        ~~Attn: [●]~~7557 Rambler Road, Suite 500

33

Email: [●]Dallas, Texas 75231¶
Attn: Laura Worsham¶
Email: lworsham@jonesallen.com

13.4    Waiver, Waiver of Damages.

Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege shall preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege. To the maximum extent permitted by applicable law, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand. NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, NO PARTY SHALL BE LIABLE TO THE OTHER FOR SPECIAL, INDIRECT, EXEMPLARY OR PUNITIVE DAMAGES ARISING OUT OF, ASSOCIATED WITH, OR RELATING TO THIS AGREEMENT (INCLUDING LOSS OF PROFIT OR BUSINESS INTERRUPTIONS, HOWEVER SAME MAY BE CAUSED) AND THE PARTIES HEREBY WAIVE ALL CLAIMS FOR ANY SUCH DAMAGES.

13.5    Entire Agreement; Amendment.

This Agreement (including the Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer and Seller with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer and Seller with respect to their subject matter. This Agreement may not be amended except by a written agreement executed by all of the Parties.

13.6    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); *provided*, *however*, that Buyer shall be permitted, upon prior notice to Seller prior to the Closing Date, to assign all or part of its rights and/or obligations hereunder to one or more of its Affiliates, and each such assignee shall be deemed to be a Buyer for all purposes under the Transaction Documents to the extent of the rights and obligations so assigned to such assignee. No assignment of any obligations hereunder shall relieve the Parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to the Seller or Buyer shall also apply to any such assignee unless the context otherwise requires.

13.7    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

13.8    Expenses.

Whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby; *provided*, *however*, that, subject to <u>Section 8.1(a)</u>, Transfer Taxes shall be borne by Buyer.

13.9     <u>Time of Essence.</u>

Time shall be of the essence with respect to all time periods and notice periods set forth in this Agreement.

13.10     <u>Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.</u>

(a)     SUBJECT TO SECTION 8.7, EXCEPT TO THE EXTENT THE MANDATORY PROVISIONS OF THE BANKRUPTCY CODE APPLY, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS APPLICABLE TO CONTRACTS MADE AND TO BE PERFORMED ENTIRELY IN SUCH STATE WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OR CHOICE OF LAWS OR ANY OTHER LAW THAT WOULD MAKE THE LAWS OF ANY OTHER JURISDICTION OTHER THAN THE STATE OF TEXAS APPLICABLE HERETO.

(b)     Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; *provided*, *however*, that, if the Bankruptcy Case is closed, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a Texas federal court sitting in Houston, Texas, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with <u>Section 13.3</u>) or any other manner permitted by Legal Requirement.

(c)     EACH PARTY HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LEGAL REQUIREMENTS, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER TRANSACTION DOCUMENTS OR ANY OTHER AGREEMENT CONTEMPLATED HERETO AND THERETO OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

13.11     <u>Counterparts.</u>

This Agreement and any amendment hereto may be executed in one or more counterparts and by different Parties in separate counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same agreement. Delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by facsimile or other electronic means (including portable document format sent via email) shall be as effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

13.12   Parties in Interest; No Third Party Beneficiaries.

This Agreement shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement is for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind; provided notwithstanding anything in this Agreement to the contrary, the parties expressly confirm their agreement that any liquidation trust established and approved by the Bankruptcy Court as a successor in interest to Seller shall be an express intended third-party beneficiary of this Agreement. Any such liquidation trust shall be entitled to reply upon, shall be an express intended third-party beneficiary of, and shall be entitled to enforce the provisions of, this Agreement as if such liquidation trustee were an original party hereto. The Parties further agree that Seller shall be entitled to assign to any such liquidation trust without any Buyer's consent any right or claim that Seller may have pursuant to or arising under this Agreement.

13.13   Non-Recourse.

Any claim or cause of action based upon, arising out of, or related to this Agreement or any agreement, document or instrument contemplated hereby may only be brought against the Parties hereto, and then only with respect to the specific obligations set forth herein or therein.  Other than the Parties hereto, no other party shall have any liability or obligation for any of the representations, warranties, covenants, agreements, obligations or Liabilities of any party under this Agreement, the other Transaction Documents, or any other agreement contemplated hereto and thereto or of or for any Proceeding based on, in respect of, or by reason of, the transactions contemplated hereby or thereby (including the breach, termination or failure to consummate such transactions), in each case whether based on contract, tort, fraud, strict liability, other Legal Requirements or otherwise and whether by piercing the corporate veil, by a claim by or on behalf of a Party hereto or another Person or otherwise.

13.14   Disclosure Schedules; Materiality.

The inclusion of any matter in any Disclosure Schedule shall be deemed to be an inclusion in all other Disclosure Schedules to the extent that such disclosure is sufficient to identify the matter to which such disclosure is responsive and reasonably apparent on its face, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement. The disclosure of any particular fact or item in any Disclosure Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

13.15   WAIVER OF TEXAS DECEPTIVE TRADE PRACTICES – CONSUMER
          PROTECTION ACT.

BUYER EXPRESSLY ACKNOWLEDGES AND RECOGNIZES THAT THE PRICE FOR WHICH SELLER HAS AGREED TO SELL THE ASSETS AND PERFORM ITS OBLIGATIONS UNDER THE TERMS OF THIS AGREEMENT HAS BEEN PREDICATED UPON THE INAPPLICABILITY OF THE TEXAS DECEPTIVE TRADE PRACTICES - CONSUMER

PROTECTION ACT, TEX. BUS. & COM. CODE § 17.41 *ET SEQ.* (THE "<u>DTPA</u>"), OR ANY SIMILAR STATUTE, AND THE WAIVER OF THE DTPA, AND ANY SIMILAR STATUTE, BY BUYER, SET FORTH IN THIS <u>SECTION 13.15</u>. BUYER'S RIGHTS AND REMEDIES WITH RESPECT TO THIS TRANSACTION AND WITH RESPECT TO ALL ACTS OR PRACTICES OF SELLER, PAST, PRESENT, OR FUTURE, IN CONNECTION WITH THIS TRANSACTION SHALL BE GOVERNED BY LEGAL PRINCIPLES OTHER THAN THE DTPA, OR ANY SIMILAR STATUTE OF ANY JURISDICTION THAT MAY BE APPLICABLE TO THE TRANSACTIONS CONTEMPLATED HEREBY. BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES THE APPLICABILITY OF THE DTPA, OR ANY SIMILAR STATUTE, TO THIS TRANSACTION AND ANY AND ALL RIGHTS, DUTIES, OR REMEDIES THAT MIGHT BE IMPOSED BY THE DTPA, OR ANY SIMILAR STATUTE.

13.16    <u>Injunctive Relief.</u>

(b)    (a)Except as provided in <u>Section 3.2(d̶e)</u>, the Buyer agrees that Seller would be subject to irreparable damage in the event that Buyer fails or refuses to close the transactions contemplated by this Agreement after (i) the conditions to Buyer's obligations to close set forth in Article 9 had been satisfied, and (ii) Seller has delivered, or demonstrated that it was prepared to deliver, all of the deliveries required by Section 4.4 of this Agreement, and that damages at law may be an inadequate remedy for the breach of any of the covenants, promises, and agreements contained in this Agreement or the other Transaction Documents (as applicable), and, accordingly, in such event, the Seller shall be entitled to injunctive relief to enforce specifically the closing of the transactions contemplated by Article IV of this Agreement or the other Transaction Documents (as applicable). The rights set forth in this <u>Section 13.16</u> shall be in addition to any other rights which a Party may have at law or in equity pursuant to this Agreement or the other Transaction Documents (as applicable).

(c)    (b)The Buyer hereby agrees not to raise any objections to the availability to seller of the equitable remedy of specific performance set forth in Section 13.16(a).

(d)    (c)Notwithstanding the foregoing, nothing in this <u>Section 13.16</u> shall prevent Seller from ceasing operations or winding up its affairs following the Closing.

*[Signature page follows.]*

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the day and year first above written.

**SELLER:**

BARROW SHAVER RESOURCES COMPANY, LLC

By: _____

Name: _____

Title: _____

**BUYER:**

[●]TEXOIL INVESTMENTS, LLC

By: _____

Name: _____

Title: _____