United States Bankruptcy Court
Southern District of Texas
**ENTERED**
August 24, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO: 24-33353** |
| **BARROW SHAVER RESOURCES COMPANY, LLC,** | § | |
| | § | |
| | § | |
| **Debtor.** | § | |
| | § | |
| | § | **CHAPTER 11** |

**MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART MIDDLETON OIL COMPANY'S ADMINISTRATIVE EXPENSE APPLICATION (RELATES TO ECF NOS. 1148, 1169, & 1312)**

Before the Court is Middleton Oil Company's (hereinafter "Middleton" or "Middleton Oil") *Application for Allowance and Payment of Administrative Expense Claims* against Barrow Shaver Resources, LLC (hereinafter "the Debtor" or "BSR"). Middleton asserts it is entitled to allowance and payment of certain production revenues, advance payments, and disputed expenses as administrative expenses under 11 U.S.C. § 503(b)(1)(A). For the reasons below, Middleton's application is granted in part and denied in part.

## BACKGROUND

The Debtor is an independent oil and natural gas company focused on exploring, developing, producing, and acquiring crude oil and natural gas from properties.[1] The Debtor acts as lessor and operator for mineral leases in a development known as the Lone Star Prospect in Morris, Cass, Upshur, and Camp Counties, Texas (the "Hidden Rock Field").[2]

[1] ECF No. 63 at 4.
[2] ECF No. 1302-1.

Middleton Oil holds non-operating working interests in the Hidden Rock Field pursuant to an Exploration Agreement, dated August 17, 2021 (the "EA" or "Exploration Agreement").[3] The Exploration Agreement provided that all operations relating to Middleton's working interests were to be conducted pursuant to a joint operating agreement, covering all existing leases in the Hidden Rock Field ("JOA").[4] Since 2021, Middleton has acquired or earned working interests in a number of wells under the EA, JOA, and post-petition third-party transactions.[5]

As a non-operating working interest holder under the EA and JOA, Middleton agreed to pay its proportionate share of costs and expenses for the Debtor's operations on the properties in which it has working interests, and in exchange, the Debtor agreed to distribute Middleton's share of production revenues deriving from those operations.[6] The Debtor billed a joint account for Middleton's share of costs and expenses and issued Middleton monthly settlement statements reflecting any billings and revenues earned for particular wells (the statements later referred to as "JIBs").[7]

Between September 2023 and July 2024, Middleton Oil elected to participate in certain Authority for Expenditures ("AFE") and made payments ("AFE Payments") to the Debtor pursuant to the JOA to finance projects pertaining to the construction and development of the Hidden Rock Pipeline.[8] The JOA provision governing AFE Payments provides:

[3] ECF No. 1302-1.

[4] ECF No. 1302-1 at 5–6.

[5] ECF No. 1148 at 6–7; Campbell Assignment, ECF No. 1301-4; Naymola Assignment, ECF No. 1301-6; Boerhof Assignment, ECF No. 1301-7; and Van Der Jagt Assignment, ECF No. 1301-8.

[6] ECF No. 1301-3; ECF No. 1302-1.

[7] ECF No. 61. "Joint Account" refers to the account established to record the financial transactions related to joint operations under the JOA. The account reflects the charges paid and credits received in conducting joint operations, which the parties share.

[8] ECF No. 1301-3 at 5; Hrg. Trans. (July 15th, 2026), ECF No. 1322 at [23:35]; ECF No. 1148 at 8–10.

> Operator shall hold for the account of the Non-Operators any funds of the Non-Operators advanced or paid to the Operator, either for the conduct of operations hereunder or as a result of the sale of production from the Contract Area, and such funds shall remain the funds of the Non-Operators on whose account they are advanced or paid until used for their intended purpose or otherwise delivered to the Non-Operators or applied toward the payment of debts as provided in Article VII.B. Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose other than to account for Non-Operator funds as herein specifically provided. Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.[9]

On July 23, 2024 (the "Involuntary Petition Date"*)*, certain creditors filed an involuntary petition against the Debtor under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code").[10] On August 19, 2024 (the "Voluntary Petition Date"),[11] the Debtor filed its petition for relief under chapter 11 of the Bankruptcy Code.[12] After the Involuntary Petition Date, the Debtor continued managing and

[9] ECF No. 1301-2 at 5.

[10] ECF No. 1.

[11] ECF No. 46.

[12] On the Voluntary Petition Date, the Debtor also filed its *Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay or Apply Payments Attributable to Mineral Interests in the Ordinary Course and (II) Granting Related Relief*. ECF No. 61. In its Motion, the Debtor sought an Order from the Court authorizing, but not directing, the Debtor to make post-petition payments from production revenues attributable to various mineral interests to avoid being "immediately thrust into litigation on the issues pertaining to the Mineral Interest Title Issue." ECF No. 61 at 15. The Debtor explained, "[i]n the Debtor's business judgment, it is necessary to allow the Debtor to pay certain of the Mineral Interest Holders in accordance with the expectations implicit in the Debtor's prior business practices and to, likewise, authorize the Debtor to offset any unpaid joint interest billings." ECF No. 61 at 15.

operating its business in the ordinary course pursuant to §§ 303(f), 1107, and 1108 of the Bankruptcy Code.[13]

On September 30, 2024, the Court entered the *Final Order (I) Authorizing the Debtor to Pay or Apply Payments Attributable to Mineral Interests in the Ordinary Course and (II) Granting Related Relief* (the "Mineral Interests Order").[14] The Mineral Interests Order provides:

> [T]he Debtor is authorized, but not directed to pay, distribute, or apply against any outstanding JIBs, in the ordinary course of business and in the Debtor's discretion and business judgment, any revenue attributable to a Working Interest whether such amounts accrued before or after the Involuntary Petition Date or during the Gap Period. The Debtor is further authorized, but not directed, to setoff any disbursement pertaining to a Working Interest against joint interest billings pursuant to agreement or applicable law in the ordinary course of business whether such setoff amounts accrued before or after the Involuntary Petition Date or during the Gap Period, and the automatic stay under section 362 of the Bankruptcy Code is modified accordingly. Notwithstanding the foregoing language in this paragraph, nothing in this Final Order authorizes the Debtor to setoff any disbursement in contravention of the applicable operating agreements or applicable law and no rights of third-party Working Interest Holders are waived, modified, or affected by this paragraph.[15]

After the Mineral Interest Order was entered, the Debtor continued operations pursuant to the JOA and EA, billing Middleton's share of operation expenses to the joint account and paying Middleton Oil its proportionate share of production revenues until December 2025.[16] The Debtor had determined that continuing operations in this manner maintained the status quo, that is, avoided litigation over the

[13] ECF No. 61 at 7.
[14] ECF No. 237.
[15] ECF No. 237 ¶ 4.
[16] *See* ECF Nos. 1301-13 to ECF No. 1301-27 (post-petition JIB statements).

ownership of royalty and working interests pertaining to its Hidden Rock operations; and by doing so, ultimately, facilitated a value-maximizing transaction of the estate's assets to TexOil Investments, LLC and its assignee TexOil ET, LLC (collectively, "TexOil").[17] The Court approved the transaction with TexOil in November 2025.[18]

On March 17, 2026, while working to close the transaction with TexOil, the Debtor moved for authorization to reject the JOA and all Exploration Agreements pertaining to its oil and gas leases under § 365(a) of the Bankruptcy Code.[19] And on March 25, 2026, the Court authorized the Debtor's rejection of the JOA and EA pursuant to § 365(g)(1) of the Bankruptcy Code to occur upon the closing of the sale between the Debtor and TexOil.[20] The sale between TexOil and the Debtor closed on May 1, 2026.[21]

On April 8, 2026, Middleton Oil filed the instant *Application for Allowance and Payment of Administrative Expense Claims*.[22] Middleton seeks certain unpaid production revenues, disputed charges, and AFE Payments, as administrative expenses, totaling no less than $1,245,846.23, plus attorneys' fees and costs (the "Administrative Claim").[23] Middleton argues: (i) the Debtor breached the JOA and EA post-petition by failing to pay Middleton production revenues

---

[17] ECF No. 1116 at 14; ECF No. 1169 at 4. In its Rejection Motion, the Debtor argues the Mineral Interest Order makes clear the production payments made to working interest holders, including Middleton Oil, based on the Executory Contracts—JOA and EA—were "made simply for purposes of preserving the status quo" and do not obligate the estate post-petition. ECF No. 1116 at 14.

[18] ECF No. 972.

[19] ECF No. 1116. The Debtor sought rejection because "[t]he Debtor, through its CRO, …ha[d] determined that, in its sound, reasonable business judgment, the Executory Contracts are no longer beneficial to the Debtor's estate." ECF No. 1116 at 3. The Debtor explained rejection was "necessary to finalize the Closing [of the transaction between TexOil and BSR]." ECF No. 1116 at 3.

[20] ECF No. 1136.

[21] ECF No. 1177 at 2.

[22] ECF No. 1148.

[23] ECF No. 1312 at 1; ECF No. 1148. Middleton Oil revised the amount sought in its administrative claim between its initial application and reply to the Debtor's objection.

attributable to its working interests from December 2025 to April 2026; (ii) the Debtor breached the JOA post-petition by improperly using or failing to return certain funds attributable to Middleton's pre-petition AFE payments pursuant to the EA and JOA as of the Petition date; and (iii) the Debtor breached the JOA and EA post-petition by continuously netting duplicate and other improper expenses from production revenues otherwise owed to Middleton Oil.[24] It is Middleton's position that the JOA and EA remained in force post-petition prior to the Debtor's rejection.[25]

On April 29, 2026, the Debtor and the Official Committee of Unsecured Creditors (the "Committee") each filed objections to the Administrative Claim.[26] The Debtor's Objection argues Middleton is not entitled to its Administrative Claim because Middleton fails to establish a post-petition transaction, as the Debtor's rejection of the JOA and EA converts the appropriate remedy for any post-petition breach into an unsecured claim for rejection damages.[27] The Committee's Objection maintains that Middleton Oil should not be able to recover any claimed expenses because Middleton Oil already received revenues during BSR's bankruptcy and allowing the Administrative Claim would occur at the expense of oil field service providers.[28]

## JURISDICTION AND VENUE

28 U.S.C. § 1334 provides the District Courts with jurisdiction over this proceeding. This Court has jurisdiction over this proceeding as it is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). This Court has constitutional authority to enter final orders and judgments. *Stern v. Marshall*, 564 U.S. 462, 486–87 (2011). And venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

[24] ECF No. 1148; ECF No. 1312.
[25] ECF No. 1148; ECF No. 1312.
[26] ECF No. 1169; ECF No. 1172.
[27] ECF No. 1169.
[28] ECF No. 1172.

## LEGAL STANDARD

Middleton Oil's Administrative Claim falls under §§ 503(b)(1)(A) and 507(a) of the Bankruptcy Code. Section 503(b)(1)(A) provides "there shall be allowed, administrative expenses . . . including—(1)(A) the actual, necessary costs and expenses of preserving the estate." 11 U.S.C. § 503(b)(1)(A). "[A]dministrative expenses" are granted priority over most unsecured damages claims. *See* 11 U.S.C. § 507(a). Administrative expense "classification is significant because [courts] presume that all 'creditors are equally innocent victims in this bankruptcy.'" *Nabors Offshore Corp. v. Whistler Energy II, L.L.C. (In re Whistler Energy II, L.L.C.)*, 931 F.3d 432, 441 (5th Cir. 2019) (citing *In re Jack/Wade Drilling, Inc.*, 258 F.3d 385, 389 (5th Cir. 2001)). Thus, in evaluating Middleton's Administrative Claim, the Court asks not whether Middleton Oil deserves to get paid, but instead, whether Middleton deserves to get paid at the expense of the Debtor's existing unsecured creditors. *See In re Jack/Wade Drilling Inc.*, 258 F.3d at 389.

In the Fifth Circuit, a claim for "actual and necessary costs" under § 503(b)(1)(A) must "have arisen post-petition and as a result of actions taken by the trustee [or debtor-in-possession] that benefitted the estate." *See, e.g.*, *In re Whistler Energy II, L.L.C.*, 931 F.3d at 441 (quoting *In re Jack/Wade Drilling, Inc.*, 258 F.3d at 387); *In re Transamerican Nat. Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992) (explaining the relevant standard as "[a] prima facie case under § 503(b)(1)(A) may be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function as a going concern."). Moreover, "actual, necessary costs" under § 503(b) may "include costs ordinarily incident to operation of a business, and not be limited to costs without which rehabilitation would be impossible." *Reading Co. v. Brown*, 391 U.S. 471, 483 (1968). "The claimant seeking administrative expenses bears the burden of proof." *In re Whistler Energy II, L.L.C.*, 931 F.3d at 441.

## DISCUSSION

As the Debtor rejected the JOA and EA upon the closing of its sale with TexOil, the question before the Court is whether a pre-rejection but post-petition breach of the JOA and EA by the Debtor allows Middleton to recover certain production revenues, advance payments, and disputed expenses as administrative expenses, rather than general unsecured damages. For the reasons below, the Court concludes that only the production revenues and certain disputed expenses qualify as administrative expenses.

### I. WHETHER EACH OF MIDDLETON'S ADMINISTRATIVE EXPENSE CLAIMS AROSE POST-PETITION.

First, each of Middleton Oil's administrative expense claims must have arisen post-petition. *See In re Whistler Energy II, L.L.C.*, 931 F.3d at 442. The parties agree that the JOA and EA constitute executory contracts, which the Debtor rejected on May 1, 2026.[29] Each of Middleton's administrative expense claims, however, depends on the Debtor's post-petition but pre-rejection breach of the JOA and EA.

Section 365 of the Bankruptcy Code governs a debtor-in-possession's rejection of executory contracts.[30] A rejection of an executory contract constitutes a breach of that contract occurring "immediately before the date of the filing of the petition." *See* 11 U.S.C. § 365(g)(1); *In re Talen Energy Supply, LLC*, No. 22-90054, 2023 WL 2816683, at *4 (Bankr. S.D. Tex. Apr. 6, 2023) (quoting *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 374 (2019)). A party aggrieved by a rejected contract may only assert a general unsecured

---

[29] *See* ECF No. 1177 at 2.

[30] Agreements conveying real property interests cannot be rejected by the Debtor. *See In re Chesapeake Energy Corp.*, 622 B.R. 274, 281–82 (Bankr. S.D. Tex. 2020); *In re Topco, Inc.*, 894 F.2d 727, 740 n.14 (5th Cir. 1990). However, for purposes of this proceeding, the Court accepts that the Parties do not dispute that the JOA and EA constitute rejected executory contracts. Any issues pertaining to real property interests will be considered by the Court in *Middleton Oil Co. v. TexOil Investments, LLC*, et al., Adv. No. 26-03146.

claim for damages. *In re Talen Energy Supply, LLC,* 2023 WL 2816683, at *4.

However, "[i]f the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract, may be what is specified in the contract." *See NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 531 (1984) (citation omitted); *see also In re Airlift Int'l, Inc.*, 761 F.2d 1503, 1509 (11th Cir. 1985) (explaining the policy behind allowing claims for post-petition breaches under § 503(b)(1)(A) is because "[t]he debtor-in-possession or trustee by . . . entering into the contract makes a determination that the contract is in the best interest of the estate and its creditors."). Moreover, if "the non-debtor party performs on the executory contract postpetition, it is entitled to a postpetition administrative claim." *In re El Paso Refinery, L.P.*, 220 B.R. 37, 43 (Bankr. W.D. Tex. 1998). Accordingly, the Court will assess each of Middleton's claimed expenses in turn.

### A. Production Revenues

The first issue before the Court concerns whether Middleton's claim for production revenues arose post-petition. According to Middleton, the Debtor paid Middleton production revenues attributable to its interests for sixteen months post-petition before ceasing the payments months before it rejected the JOA and EA.[31] Middleton argues it is entitled to administrative priority for its proportionate share of production revenues from December 2025 to April 2026, which the Debtor withheld in breach of the JOA and EA pre-rejection.[32] In particular, Middleton points to Article III.B of the JOA, which provides, "the parties shall . . . own all production of Oil and Gas from the Contract

[31] ECF No. 1312 at 11, 21.
[32] ECF No. 1148 at 2.

Area subject, however, to the payment of royalties and other burdens on production as described hereafter."[33]

The Debtor argues that its rejection of the JOA and EA allows Middleton to assert only a claim for unsecured rejection damages, not administrative expenses, for the production revenues it failed to pay Middleton post-petition.[34] Because of the particular facts of this case, however, the Court disagrees with the Debtor.

The Debtor's obligation to pay Middleton Oil production revenues arises under the pre-petition JOA and EA, which the Debtor rejected. However, in seeking rejection of the contracts, the Debtor specifically requested that this Court effectuate the JOA and EA's rejection upon the closing of its transaction with TexOil.[35] The Debtor's sale with TexOil closed on May 1, 2026.[36] Prior to the closing of the sale, however, the Debtor continued revenue-generating operations on wells pertaining to Middleton's non-operating working interests for nearly two years post-petition, issuing Middleton revenues in the ordinary course pursuant to the JOA, EA, and Mineral Interest Order until December 2025.[37]

The unpaid revenues Middleton claims clearly arose post-petition but pre-rejection. Given the facts presented, the Court is reluctant to allow the Debtor's rejection of the JOA and EA to convert Middleton's claim for unpaid production revenues into an unsecured damages claim. If the Debtor had rejected the JOA and EA on day one of the bankruptcy, then Middleton Oil would clearly be entitled only to unsecured rejection damages. *See In re Talen Energy Supply, LLC*, 2023 WL 2816683, at *4 (explaining that although the debtor continued performing under the rejected contracts post-petition, the debtor's rejection constituted a pre-

---

[33] ECF No. 1301-2 at 2.

[34] ECF No. 1169 at 12–16, 20 ("Any purported claim Middleton Oil holds against the Debtor is an unsecured claim for damages . . . .").

[35] *See* ECF No. 1116; ECF No. 1136 at 2; ECF No. 1302, Ex. 1 (EA); ECF No. 1301, Ex. 2 (JOA).

[36] ECF No. 1177 at 2.

[37] *See* ECF Nos. 1301-13 to ECF No. 1301-27 (post-petition JIB statements).

petition breach giving rise to unsecured damages because the debtor-in-possession gave notice of rejection on the first day of bankruptcy and ceasing its performance under the rejected contracts after providing notice would violate state laws). However, this Court has not been presented with a day-one rejection; rather, it is presented with a breach occurring before the contracts were rejected after the Debtor performed for nearly two years post-petition pursuant to the rejected contracts. *See Bildisco & Bildisco*, 465 U.S. at 531 ("If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract, may be what is specified in the contract.") (citation omitted).

Middleton Oil cites the Eighth Circuit case *Robert M. Hallmark & Assocs. v. Athens/Alpha Gas Corp. (In re Athens/Alpha Gas Corp.)* as an analogous circumstance.[38] 332 B.R. 578, 580–81 (B.A.P. 8th Cir. 2005). In *In re Athens/Alpha Gas Corp.*, non-operating working interest holders sought post-petition production revenues generated from the debtor's post-petition production and sale of oil and gas from wells attributable to their working interests. *Id.* In assessing whether the working interest holders' claim arose post-petition, the Eighth Circuit observed:

> The parties' agreement regarding revenue distribution was indeed a pre-petition agreement. However, the appellants' right to a share of the revenue at issue here arose when the profits became available and should have been distributed; in other words, their claim is against post-petition assets which were derived from the post-petition production and sale of oil and gas. The bankruptcy court misapplied the law to the facts in ruling otherwise.

*Id.* at 580.

[38] ECF No. 1312 at 9.

Here, the Eighth Circuit's observations in *In re Athens/Alpha Gas Corp.* demonstrate similar circumstances as to what occurred prior to the Debtor's rejection of the JOA and EA. Although the JOA and EA constitute pre-petition agreements, the Debtor voluntarily continued its revenue-generating operations post-petition on properties attributable to Middleton's working interests. The Debtor continued these operations pre-rejection, including the production and sale of oil and gas, during the months in which the Debtor did not pay revenues to Middleton. Because the Debtor had not yet rejected the agreements, Middleton's "right to a share of the revenue at issue here arose when the profits became available and should have been distributed." *See id.* Moreover, the Court views Middleton's share of production revenues as expenses "ordinarily incident to operation of [the Debtor's] business" with respect to those properties associated with Middleton's working interests, as payments attributable to the working operations were a core part of the Debtor's business. *See Reading Co.*, 391 U.S. at 483 (explaining administrative expenses may include "'actual and necessary costs' . . . ordinarily incident to operation of a business"). Therefore, the Court concludes Middleton's claim for unpaid production revenues arose post-petition for purposes of § 503(b), regardless of the Debtor's later rejection.

### B. AFE Payments

The next issue before the Court is whether Middleton's claim for AFE Payments arose post-petition. According to Middleton Oil, the relevant post-petition transaction for its AFE-related expenses claim is the Debtor's post-petition retention and unauthorized use of Middleton's funds, not the initial transfer of the funds.[39] Middleton argues all funds relating to its AFE Payments constitute Middleton's property under the JOA, and remain misapplied, unused, and held by the Debtor post-petition in breach of the JOA and EA.[40]

[39] ECF No. 1312 at 18.
[40] ECF No. 1312 at 15.

The Debtor argues all AFE payments advanced by Middleton Oil constitute pre-petition transactions, disqualifying the payments from receiving administrative expense treatment.[41] As with production revenues, the Debtor maintains its rejection of the JOA and EA allows Middleton to assert only a claim for unsecured rejection damages arising from any post-petition breach related to the AFE Payments.[42]

Here, given the facts presented, the Court agrees with the Debtor that the AFE payments did not arise post-petition. Middleton advanced all AFE-related payments pursuant to the JOA, Exploration Agreement, and a series of AFEs and cash calls issued between September 2023 and July 2024, pre-petition. Not only were all payments transferred to the Debtor pre-petition, but the Debtor also received them pre-petition. "[I]t is not enough that payment [or return of funds] becomes due after the petition date if the transaction was entered into with the debtor prepetition," for a transaction to be considered post-petition, as Middleton attempted to argue. *In re Talen Energy Supply, LLC*, 2023 WL 2816683, at *4 (quoting *In re Northstar Offshore Grp.*, *LLC*, 628 B.R. 286, 299 (Bankr. S.D. Tex. 2020)). Thus, Middleton's AFE Payments do not satisfy the post-petition requirement of § 503(b).

### C. Disputed Duplicate Expenses

Before determining whether certain disputed expenses arose post-petition, the Court first illustrates how expenses were billed to Middleton Oil. Pursuant to the JOA—pre- and post-petition—the Debtor billed Middleton its proportionate share of costs and expenses pertaining to revenue-generating operations in wells in which Middleton has working interests.[43] In monthly JIB statements, the Debtor would

[41] ECF No. 1169 at 11–12, 13.

[42] ECF No. 1169 at 20 ("Any purported claim Middleton Oil holds against the Debtor is an unsecured claim for damages . . . .").

[43] *See*, *e.g.*, ECF No. 1301-15 (December 2023 JIB Statement).

net Middleton's share of costs and expenses against its share of revenues earned from that well.[44]

According to Middleton Oil, the Debtor breached the JOA post-petition by improperly netting certain expenses against Middleton's post-petition production revenues.[45] Middleton Oil contends the Debtor improperly netted three types of expenses post-petition in breach of the JOA: duplicative expenses relating to the Kerr, LSHZ9 Wilmeth-Wren, Templeton, and Paige wells, which had already been billed to Middleton pre-petition; unauthorized rig mobilization charges; and *ad valorem* tax preparation service costs.[46]

According to the Debtor, the disputed expenses reflect legitimate charges, as revealed by an internal review of the Debtor's books and records, and are permissible billings under the JOA.[47] The Debtor points to Exhibit C, Section 4 of the JOA, which authorizes the Debtor, as operator, to make billing adjustments for expenditures until the end of a "twenty-four (24) month period following the end of the calendar year" in which the original charge appeared or should have appeared in the joint account or JIB.[48]

To the extent that expenses were improperly netted out of Middleton's production revenues in breach of the JOA, Middleton is entitled to recover those expenses. Improperly netted expenses may qualify as administrative expenses regardless of the Debtor's rejection because, as with the production revenues, the disputed expenses

[44] *See*, *e.g.*, ECF No. 1301-15 at 7. The following example demonstrates the process and information in a typical JIB statement: first, a particular well generated $34,628.89 in total gross oil sales for the month; thus, without expenses, Middleton Oil is entitled to $5,075.95 of that total sum because of its working interests. However, the operations to produce the oil may have incurred $825.08 in expenses, making Middleton's proportionate share of expenses $131.72. The Debtor would then net the $131.72 from the $5,075.95, and Middleton would receive $4,944.23 from that well.

[45] ECF No. 1148 at 21; *see* ECF Nos. 1301-11; ECF No. 1301-12.

[46] ECF No. 1301-11 at 2.

[47] *See* ECF No. 1302-1 at 5–6; ECF No. 1301-3 at 3.

[48] *See* ECF No. 1301-3 at 3; ECF No. 1169 at 11–12.

accrued post-petition and pre-rejection.[49] Moreover, Middleton performed its obligations under the JOA by paying its proportionate share of costs and expenses of the Debtor's post-petition, pre-rejection operations conducted on wells in which it has working interests. When "the non-debtor party performs on the executory contract postpetition, it is entitled to a postpetition administrative claim . . . ." *In re El Paso Refinery, L.P.*, 220 B.R. at 43. However, the Court has insufficient information to rule on whether most disputed expenses qualify as administrative expenses.

As explained above for production revenues, the Court is reluctant to grant Middleton unsecured rejection damages for the Debtor's post-petition but pre-rejection breaches of the JOA committed in the ordinary course. For any disputed expenses, therefore, Middleton bears the burden of demonstrating such breach exists to satisfy the post-petition requirement for § 503(b). *See In re Transamerican Nat. Gas Corp.*, 978 F.2d at 1416 (claimant bears the burden).

Middleton meets its burden with respect to the *ad valorem* tax preparation service costs. The tax-preparation costs clearly violate the JOA, were billed post-petition but pre-rejection, were corroborated by JIB statements, and were netted from production revenues otherwise owed to Middleton Oil.[50] Although the Debtor contends Middleton failed to provide it money post-petition, Middleton provided those funds from its production revenues otherwise earned from its working interests.[51] Middleton's JIB statement for January 2025 indicates the tax-preparation costs were billed from production revenues relating to 29 wells, totaling $3,191.99.[52] And Middleton's JIB for September 2025 indicates the tax-preparation costs were billed from production revenues

[49] *See* ECF No. 1301-11.

[50] *See* ECF No. 1301-3 at 8 ("Costs of tax consultants or advisors . . . in matters regarding ad valorem or other tax matters, are not permitted as direct charges unless approved by the Parties pursuant to Section I.6.A (General Matters)."); ECF No. 1301-22 (January 2025 JIB Statement); ECF No. 1301-26 (September 2025 JIB Statement).

[51] *See* ECF No. 1324-1 at 22.

[52] *See* ECF No. 1301-22; ECF No. 1301-11.

relating to 38 wells, totaling $4,147.70.[53] Because the Debtor breached the JOA and EA pre-rejection, and Middleton performed pursuant to the JOA, the tax-preparation services may qualify as post-petition administrative costs under § 503(b), subject to whether they benefited the estate and its creditors. *See In re El Paso Refinery, L.P.*, 220 B.R. at 45.

However, for the other disputed charges alleged, Middleton fails to explain that the Debtor's expense deductions occurred in breach of the JOA. To establish improper duplicative costs were netted against production revenues otherwise owed to Middleton post-petition, Middleton compares refunded and non-refunded duplicate charges. For instance, Middleton points to a $1,571.17 charge relating to the LSHZ10 well, which the Debtor billed to Middleton twice in its September 2024 JIB statement, but the duplication was later credited to Middleton in its November 2024 JIB statement.[54] Middleton contrasts this refunded duplicate charge for the LSHZ10 well with a non-refunded duplicate charge of $2,894.97 for the LSHZ9 well to establish a post-petition breach.[55] Middleton argues an original charge of $17,880.75 ($2,711.91 Middleton Share) for the LSHZ9 well appeared in its September 2023 JIB statement pre-petition; the charge was improperly duplicated post-petition on its October 2024 JIB statement; and subsequently, the Debtor did not refund nor credit the improper duplicate charge to Middleton.[56] Likewise, Middleton Oil points to a duplicate charge of $7,367.47 for rods for pumping units for the Kerr 1H well, which appeared on its November and December 2023 JIB statements, was later credited back in its January 2024 statement, and billed again in

[53] *See* ECF No. 1301-26; ECF No. 1301-11.

[54] ECF No. 1301-12 at 6; ECF No. 1301-18 at 27 (September 2024 JIB Statement); ECF No. 1301-20 at 32 (November 2024 JIB Statement).

[55] ECF No. 1301-12 at 8.

[56] ECF No. 1301-13 at 70–71 (September 2023 JIB Statement); ECF No. 1301-19 at 57 (October 2024 JIB Statement).

its July and August 2024 JIB for the Kerr 1H well.[57] However, a duplicate charge need not be improper when considering the Debtor's business practice of later crediting funds back. The Court has reached a similar conclusion on Middleton's claim for the rig mobilization charge. Thus, the Court lacks sufficient information to rule whether the remaining disputed expenses arose post-petition in breach of the JOA for §503(b) purposes.

### II. WHETHER MIDDLETON'S POST-PETITION EXPENSES BENEFITED THE ESTATE AS A RESULT OF THE DEBTOR-IN-POSSESSION'S ACTIONS.

In addition to arising post-petition, the production revenues and *ad valorem* tax costs must have resulted from actions taken by the debtor-in-possession that benefited the estate to qualify as administrative expenses.[58] *See In re Jack/Wade Drilling, Inc.*, 258 F.3d at 387.

Middleton argues the estate and its creditors benefited because the Debtor continued operating on wells in which Middleton Oil holds non-operating working interests, controlled all post-production revenues deriving from its operations, including Middleton's proportionate share, and reaped a windfall in netting the improper tax-preparation expenses.[59] According to Middleton, the Debtor would not

---

[57] ECF No. 1301-12 at 4; ECF No. 1301-14 at 19 (November 2023 JIB Statement); ECF No. 1301-15 at 20 (December 2023 JIB Statement); ECF No. 1301-17 at 79 (July and August 2024 JIB Statement).

[58] The Court focuses only on the benefit conferred on the estate because both remaining expenses clearly resulted from the debtor-in-possession's actions—knowing deduction of expenses from revenues earned and acceptance of revenues attributable to Middleton's working interests. "[A] creditor can establish that its expenses are attributable to the actions of the bankruptcy estate through evidence of either a direct request from the debtor-in-possession or other inducement via the knowing and voluntary post-petition acceptance of desired goods or services." *See In re Whistler Energy II, L.L.C.*, 931 F.3d at 442 (citing *In re Mammoth Mart, Inc.*, 536 F.2d 950, 955 (1st Cir. 1976)) (explaining that "[w]hen the debtor-in-possession . . . accepts services from a third party without paying for them, the debtor-in-possession itself caused legally cognizable injury, and the resulting claims for compensation are entitled to first priority.").

[59] *See* ECF No. 1312 at 9.

have sought either the Mineral Interest Order or rejection of the JOA and EA as late as it did if the estate had not benefited.[60]

Without addressing whether Middleton's claimed revenues and expenses conferred a benefit on the estate, the Debtor argues Middleton Oil, not the estate, benefited pre- and post-petition because Middleton collected $3,569,373.40 in production revenues pursuant to the Mineral Interest Order.[61] According to the Debtor, Middleton Oil failed to seek the relief allowed under § 365(d)(2), which demonstrates Middleton's fear of losing the beneficial revenue stream.[62] The Court disagrees.

"While the amount to be allowed as an administrative expense must be measured in dollars and cents, (thus satisfying § 503(b)(1)'s requirement that the costs or expenses be 'actual'), the question [of] whether the estate has been benefited cannot be so narrowly confined." *In re Whistler Energy II, L.L.C.*, 931 F.3d at 443 (citing *In re Transamerican Nat. Gas Corp.*, 978 F.2d at 1420) (citation modified). An estate may "receive[] other less readily calculable benefits, such as the ability to continue to conduct business as usual [post-petition]." *Id*. Thus, expenses "ordinarily incident to the operation of a business" may benefit the estate. *See Reading Co.,* 391 U.S. at 483.

Here, both Middleton's claims for production revenues and the improper tax-preparation expenses arose from the Debtor's continued operations in the ordinary course pursuant to the JOA and EA post-petition but pre-rejection. Continuing to operate pursuant to the JOA and EA benefited the estate and its creditors because it preserved the status quo, allowed the Debtor to continue operating in its ordinary manner, avoided immediate litigation over ownership of its oil and gas

---

[60] ECF No. 1312 at 10. Middleton specifically cites the Debtor's Motion seeking approval of the Mineral Interest Order at ECF No. 61, ¶ 42: "In the Debtor's business judgment, it is necessary to allow the Debtor to pay certain of the Mineral Interest Holders in accordance with the expectations implicit in the Debtor's prior business practices and to, likewise, authorize the Debtor to offset any unpaid joint interest billings."

[61] ECF No. 1169 at 21; ECF No. 1324 at 14.

[62] ECF No. 1324 at 15.

leases, and facilitated a value-maximizing sale with TexOil.[63] The Debtor itself argued that these were benefits to the estate as part of its pursuit of the Mineral Interest Order and as a key part of securing the value-maximizing transaction with TexOil.[64]

Moreover, the Court finds the Debtor's arguments irrelevant for purposes of determining whether Middleton's claims are administrative expenses. The $3,569,373.40 earned by Middleton during the bankruptcy reflects properly earned income pursuant to the pre-petition operative contracts, which, for purposes of this administrative expense proceeding, remained in force post-petition before the Debtor's rejection. The Debtor only rejected the JOA and EA once they no longer proved beneficial.[65] The Debtor cannot receive benefits from operating pursuant to the JOA and EA post-petition, reject the contracts once they were no longer beneficial to the estate, and then preclude Middleton from claiming any administrative expenses incurred as a result of the Debtor's pre-rejection, post-petition adherence to the JOA and EA. Therefore, the Court concludes Middleton's unpaid production revenues and disputed tax-preparation costs qualify as administrative expenses.

### III. WHETHER THEORIES OTHER THAN § 503(B) ALLOW MIDDLETON OIL TO CLAIM THE AFE PAYMENTS AS ADMINISTRATIVE EXPENSES.

Middleton asserts two alternative theories that its AFE Payments should be accorded administrative priority: first, Middleton relies on conversion and the *Reading* exception; and second, Middleton asserts the funds are held in trust. The Court will address each in turn.

---

[63] *See* ECF No. 237. The Mineral Interest Order maintained the status quo and payments were made to avoid being "immediately thrust into litigation" and to obtain a breathing spell to maximize estate value. *See* ECF No. 61 at 15.

[64] ECF No. 1169 at 4 (stating "the Debtor successfully leveraged the relief granted in the Mineral Interest Order to foster competitive tension that led to a successful auction of . . . the Debtor's assets to TexOil . . . .").

[65] *See* ECF No. 1116-2.

### A. Conversion and *Reading* Exception

Middleton's first alternative theory to § 503(b) maintains the Debtor committed post-petition conversion by withholding and improperly using its funds relating to its AFE Payments, and that those funds should be accorded administrative priority because a post-petition tort was committed during ordinary business.[66] According to Middleton Oil, conversion occurred when the Debtor "retain[ed], commingle[d], and use[d] Middleton Oil's funds," post-petition in breach of the JOA.[67] Middleton maintains the Debtor's post-petition conversion of its AFE-related funds falls within the scope of the *Reading* exception, which provides that damages resulting from post-petition torts committed in the course of operating the debtor's estate may qualify as actual and necessary costs imbued with priority status. *See, e.g.*, *Reading Co.*, 391 U.S. at 485.

By contrast, the Debtor argues *Reading* should not apply because the extreme unfairness and potential for injustice present in *Reading* are inapplicable.[68] Moreover, according to the Debtor, even if conversion was available to Middleton under *Reading,* Middleton's tort claim is barred by the economic loss rule.[69]

Here, the Court agrees that the economic loss rule bars Middleton's conversion theory. Under Texas law, the economic loss rule precludes recovery in tort for economic losses based on the breach of a contractual duty, when the harms "consist only of the economic loss of a contractual expectancy." *See, e.g.*, *Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, 445 S.W.3d 716, 718 (Tex. 2014); *LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 241 (Tex. 2014) ("[C]ourts generally do not recognize tort liability for economic losses caused by the breach of a contract between the parties . . . ."). However, a party may still recover in tort if the "duty allegedly breached is independent of the

---

[66] ECF No. 1148 at 19–20; ECF No. 1312 at 18-20.
[67] ECF No. 1312 at 18–19.
[68] ECF No. 1169 at 21–23.
[69] ECF No. 1169 at 21–23.

contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit." *See, e.g.*, *Chapman Custom Homes*, 445 S.W.3d at 718*; D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998).

Here, Middleton correctly notes an independent duty exists to not exercise dominion and control over the property of another.[70] *See, e.g.*, *Mansflied Heliflight, Inc. v. Bell/Agusta Aerospace Co.*, 507 F. Supp. 2d 638, 649 (N.D. Tex. 2007) (listing the elements of conversion); *Exxon Mobil Corp. v. Kinder Morgan Operating L.P.*, 192 S.W.3d 120, 128 (Tex. App.—Houston [14th Dist.] 2006, no pet.). However, Middleton attempts to establish this independent duty by citing the JOA's express language. Middleton asserts that "[t]he Debtor cannot retain funds that are, by clear and unambiguous language of the JOA, the property of Middleton Oil."[71] Middleton additionally bases the Debtor's conversion of the funds on the permitted usage under the JOA's terms.[72] In Texas, contract, not tort, law governs suits in which parties rely on contractual provisions to demonstrate injury. *See, e.g.*, *Exxon Mobil Corp.*, 192 S.W.3d at 127 ("[W]hen the contract spells out the parties' respective rights about a subject matter, the contract—not common law tort theories—governs any dispute about the subject matter."); *Castle Tex. Prod. Ltd. P'ship v. Long Trs.*, 134 S.W.3d 267, 277 (Tex. App.—Tyler 2003, pet. denied) ("Because they had to rely on proof of the contractual provisions and could show no injury independent of contract damages, we have held their suit was for breach of contract, not conversion."); *Reed v. CareCentric Nat'l, LLC (In re Soporex, Inc.)*, 446 B.R. 750, 786–87 (Bankr. N.D. Tex. 2011) ("[T]he Court's research has revealed several cases where Texas courts have applied the economic loss rule, which has also been referred to by Texas courts as the 'independent injury' doctrine, to a conversion claim. In each, the court held that the claim was barred."). Because Middleton's conversion claim arises from the JOA itself rather than an independent duty, the economic loss rule

[70] ECF No. 1312 at 18–19.
[71] ECF No. 1312 at 20.
[72] ECF No. 1312 at 18.

precludes recovery of Middleton's AFE Payments as administrative expenses through conversion.

### B. Constructive Trust

The next theory advanced by Middleton Oil contends the AFE funds are held in constructive trust by the Debtor. According to Middleton Oil, Section V.D.4 of the JOA establishes that the AFE Payments constitute Middleton Oil's property, and thus, the funds remain held in trust by the Debtor until used for their intended purpose or returned to Middleton Oil.[73] Middleton argues the Debtor has intermingled AFE Advances and that the means of determining which funds are attributable to the AFE Advances is the lowest intermediate balance test.[74]

In response, the Debtor argues that neither the JOA nor other applicable law provides that the AFE Advances were to be held in trust for Middleton's benefit, and that Middleton Oil misapplies the lowest intermediate balance rule.[75] According to the Debtor, Middleton fails to establish an actual or constructive trust under Texas law.[76] The Court agrees.

"An express trust comes into existence only by the execution of an intention to create it." *Rosenberg v. Collins,* 624 F.2d 659, 663 (5th Cir. 1980). When "[a]n express trust was not created by the pertinent documents, and an express trust is not provided in the governing regulation[,]… a trust will arise, if at all, through a court-imposed constructive trust." *In re Behring Int'l, Inc.*, 61 B.R. 896, 900 (Bankr. N.D. Tex. 1986). Texas law requires the claimant to demonstrate three elements to establish a constructive trust: (i) "[b]reach of a long-standing fiduciary duty or actual fraud," (ii) "[u]njust enrichment of the wrongdoer," and (iii) "[t]racing to an identifiable *res*." *Id.* at 907 (citing *Meadows v. Bierschwale*, 516 S.W.2d 125, 128 (Tex. 1974); *Hudspeth v.*

[73] ECF No. 1148 at 20.
[74] ECF No. 1148 at 17.
[75] ECF No. 1169 at 9.
[76] ECF No. 1169 at 9.

*Stoker*, 644 S.W.2d 92, 94 (Tex. Civ. App.—San Antonio 1982, writ ref'd); *Peirce v. Sheldon Petrol. Co.*, 589 S.W.2d 849, 853 (Tex. Civ. App.—Amarillo 1979, no writ)). Bankruptcy courts are reluctant "to impose constructive trusts without a substantial reason to do so." *Haber Oil, Co. v. Swinehart* (*In re Haber Oil Co.),* 12 F.3d 426, 436 (5th Cir. 1994) (citing *In re Behring Int'l, Inc.*, 61 B.R. at 902). This is because "[i]mposition of a constructive trust clearly thwarts the policy of ratable distribution and should not be impressed cavalierly." *In re Behring Int'l, Inc.*, 61 B.R. at 902.

Here, no trust was imposed by the JOA nor applicable law, and Middleton has not established the elements required for constructive trust, specifically actual fraud or a breach of long-standing fiduciary duty. *See id.*, 61 B.R. at 907 (describing element one); *In re Haber Oil Co.,* 12 F.3d at 436 (the burden of proof rests on the proponent of the constructive trust). The relevant JOA provision provides:

> Nothing in this paragraph shall be construed to establish a fiduciary relationship between Operator and Non-Operators for any purpose *other than to account for Non-Operator funds as herein specifically provided.* Nothing in this paragraph shall require the maintenance by Operator of separate accounts for the funds of Non-Operators unless the parties otherwise specifically agree.[77]

Even if Middleton could establish a breach by the Debtor in its failure to account for Middleton's payments based on the JOA's plain language, under Texas law, a joint operating agreement does not of itself support a finding of a broader fiduciary relationship, such as a partnership or a joint venture. *See Norman v. Apache Corp.*, 19 F.3d 1017, 1024–1025 (5th Cir. 1994) (citing *Rankin v. Naftalis*, 557 S.W.2d 940, 946 (Tex.1977)); *Hamilton v. Tex. Oil & Gas*, 648 S.W.2d 316, 321 (Tex. App.—El Paso 1982, writ ref'd n.r.e.). The elements of a joint venture are (i) mutual right of control, (ii) community of interest, (iii) the sharing of profits as principals, and (iv) the sharing of losses, costs,

[77] ECF No. 1301-2 at 5 (emphasis added).

or expenses. *See Ayco Dev. Corp. v. G.E.T. Serv. Co.*, 616 S.W.2d 184, 186 (Tex. 1981). Middleton Oil has made no mention of whether it is a joint venturer with the Debtor, nor does the JOA indicate the parties have a mutual right to control the AFE funds once transferred.

Therefore, Middleton Oil's constructive trust theory fails on account of its failure to establish a breach of fiduciary duty. As no trust has been established, the lowest intermediate balance test is unnecessary. *See United States v. McConnell*, 258 B.R. 869, 874 (N.D. Tex. 2001) (noting the "lowest intermediate balance test as the correct method for tracing" *trust funds* held by debtor). Because both alternative theories fail, Middleton cannot claim its AFE Payments as administrative expenses and may only assert a claim for damages resulting from the Debtor's breach.

## IV. VALUING MIDDLETON'S ADMINISTRATIVE EXPENSE CLAIMS

Middleton Oil is entitled to receive immediate payment for administrative expenses for production revenues and *ad valorem* tax preparation service costs.

"If the debtor-in-possession elects to continue to receive benefits from the other party to an executory contract pending a decision to reject or assume the contract, the debtor-in-possession is obligated to pay for the reasonable value of those services, which, depending on the circumstances of a particular contract, may be what is specified in the contract." *See Bildisco & Bildisco*, 465 U.S. at 531 (citation omitted). "Even if the contract is rejected, [a] contract party is entitled to payment for postpetition value received by a debtor." *In re MCS/Tex. Direct, Inc.*, No. 02-40229, 2004 Bankr. LEXIS 379, *11–12 (Bankr. N.D. Tex. Mar. 30, 2004) (citing *In re Whitcomb & Keller Mortg. Co.*, 715 F.2d 375, 379 n.5 (7th Cir. 1983)) (noting that when a debtor continued to receive benefits from a contract party during the administration of the estate without paying for those benefits, the indebtedness to the contract party would be entitled to priority status); *In re Waste Sys. Int'l*, Inc., 280 B.R.

824, 826 (Bankr. D. Del. 2002) ("[A] non-debtor party to an executory contract is entitled to an administrative expense claim equal to the value of any post-petition [sic] benefit conferred on the estate prior to . . . rejection . . . .").

Because the Debtor continued receiving benefits from its voluntary pre-rejection, post-petition operations on wells, Middleton is entitled to administrative expense claims for the reasonable value of its unpaid production revenues plus any *ad valorem* tax preparation service costs which were improperly netted from its earned revenues pre-rejection. It is irrelevant that Middleton already earned significant income pursuant to its working interests during BSR's bankruptcy. The Debtor's estate claim against Middleton Oil, avoidance of Middleton's working interests, and recoupment under § 549 are similarly irrelevant to whether Middleton is entitled to immediate payment for these claims.

Accordingly, the Court grants Middleton Oil an administrative expense claim totaling $555,784.75 for its unpaid production revenues from December 2025 to March 2026.[78] The Court, however, has insufficient information to determine how much revenue Middleton is entitled to for April. Although Middleton has advanced its calculations for the unpaid revenue it is owed for April 2026, its calculation of $420,500.01 does not account for expenses incident to the Debtor's operations, which the JOA and EA consider.[79] Each Party should submit to the Court a declaration indicating the appropriate calculation of revenues less taxes and expenses. As for the tax-preparation service costs, the Court grants Middleton Oil an administrative expense claim,

[78] *See* ECF No. 1313 at 6; ECF No. 1301-31; ECF No. 1301-32 (production revenues net expenses). Debtor contends a plethora of issues remain unresolved regarding Middleton's working interests; those issues are not currently before the Court. Based on the record presented, the Debtor benefited from Middleton's working interests prior to its rejection of the JOA and EA, and thus, should compensate Middleton. Further, the working interests conveyed to Middleton post-petition by third parties are included in the Court's calculation of production revenues owed to Middleton Oil because no issues pertaining to the automatic stay exist.

[79] *See* ECF No. 1313 at 6–7; ECF No. 1311-3 (April 2026 Production Revenue).

totaling $7,339.69.[80] This sum adequately reflects the amounts billed in breach of the JOA post-petition and thus the "postpetition value received by a debtor." *In re MCS/Tex. Direct, Inc.*, 2004 Bankr. LEXIS 379, at *11–12. Any remaining claims relating to the duplicate expenses will need to be further developed. All the other claims should be resolved and administered through the bankruptcy claims process.

## CONCLUSION

For the reasons described above, this Court GRANTS IN PART AND DENIES IN PART Middleton Oil's *Application for Allowance and Payment of Administrative Expense Claims* (ECF No. 1148). The parties are to confer and settle an order consistent with this opinion.

SIGNED 08/24/2026

Alfredo R Pérez
United States Bankruptcy Judge

[80] *See* ECF No. 1301-11.